**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:21-cv-1901-DDD-MEH</u>

AFTER II MOVIE, LLC,
BADHOUSE STUDIOS, LLC,
BODYGUARD PRODUCTIONS, INC.,
DALLAS BUYERS CLUB, LLC,
HANNIBAL CLASSICS INC.,
I AM WRATH PRODUCTION, INC.,
JUSTICE EVERYWHERE PRODUCTIONS LLC,
KILLING LINK DISTRIBUTION, LLC,
LF2 PRODUCTIONS, INC.,
LHF PRODUCTIONS, INC.,
MILLENNIUM FUNDING, INC.,
MILLENNIUM IP, INC.,
MILLENNIUM MEDIA, INC.,
MON, LLC,
NIKOLA PRODUCTIONS, INC.,
OUTPOST PRODUCTIONS, INC.,
PARADOX STUDIOS, LLC,
RAMBO V PRODUCTIONS, INC.,
SCREEN MEDIA VENTURES, LLC
VENICE PI, LLC,
VOLTAGE HOLDINGS, LLC,
WONDER ONE, LLC,
HITMAN TWO PRODUCTIONS, INC.,
GLACIER FILMS 1, LLC, and
CINELOU FILMS, LLC,

      Plaintiffs,

v.

WIDEOPENWEST FINANCE, LLC,

      Defendant.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

20-023W

Plaintiffs AFTER MOVIE II, LLC, BADHOUSE STUDIOS, LLC, BODYGUARD PRODUCTIONS, INC., DALLAS BUYERS CLUB, LLC, HANNIBAL CLASSICS INC., I AM WRATH PRODUCTION, INC., JUSTICE EVERYWHERE PRODUCTIONS LLC, KILLING LINK DISTRIBUTION, LLC, LF2 PRODUCTIONS, INC., LHF PRODUCTIONS, INC., MILLENNIUM FUNDING, INC., MILLENNIUM IP, INC., MILLENNIUM MEDIA, INC., MON, LLC, NIKOLA PRODUCTIONS, INC., OUTPOST PRODUCTIONS, INC., PARADOX STUDIOS, LLC, RAMBO V PRODUCTIONS, INC., SCREEN MEDIA VENTURES, LLC, VENICE PI, LLC, VOLTAGE HOLDINGS, LLC, WONDER ONE, LLC, HITMAN TWO PRODUCTIONS, INC., GLACIER FILMS 1, LLC and CINELOU FILMS, LLC ("Plaintiffs") file this First Amended Complaint against Defendant WIDEOPENWEST FINANCE, LLC ("Defendant") and allege as follows:

## I.     NATURE OF THE ACTION

1.     This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act").

2.     The Plaintiffs allege that Defendant is liable for injunctive relief pursuant to 17 U.S.C. § 512(j) and secondarily liable (under material contribution and vicarious infringement) for direct copyright infringements in violation of 17 U.S.C. §§ 106 and 501 and violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.

## II.    JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition).

20-0231A

4.      Defendant solicits, transacts, and/or does business within this jurisdiction, and has committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that its acts would cause injury in this jurisdiction.  As such, Defendant has sufficient contacts with this judicial district to permit the Court's exercise of personal jurisdiction over it.

5.      Upon information and belief, Defendant WIDEOPENWEST FINANCE, LLC ("WOW") is a limited liability company organized under the laws of Delaware and has its principal office at Englewood, Colorado.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendant can or could be found, in this District; and/or (c) Defendant is subject to the court's personal jurisdiction with respect to the present action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendant or Defendant's agents reside and can be found in this District.

### III.      PARTIES

### A.   The Plaintiffs

7.      The Plaintiffs are owners of the copyrights for the motion pictures ("Works"), respectively, as shown in Exhibit "1".

8.      Plaintiffs are producers of popular motion pictures currently available for sale online and in brick and mortar retail stores. Many of these critically acclaimed motion pictures were released in theaters throughout the world and feature A-list actors such as

3

20-0231A

Matthew McConaughey, Samuel Jackson, Ryan Reynolds, Sylvester Stallone, Nicholas Cage, Angela Basset, Gerard Butler, Gary Oldman, Common, Linda Cardellini, Milla Jovovich, Pierce Brosnan, Dylan McDermott, Woody Harrelson, James Marsden and Rob Reiner, among others.

9.    Plaintiffs invested significant financial resources, time and effort in making and marketing these motion pictures based upon the expectation that they would have an opportunity to get a return on their investment from rentals and sales. Massive piracy of these motion pictures on the Internet via peer-to-peer networks by subscribers of Internet Service Providers ("ISPs") such as WOW and the willful failure of the ISPs to deal with this issue despite clear notice of it have hindered this opportunity.

10.   AFTER II MOVIE, LLC is a Nevada limited liability company with its principal place of business at Las Vegas, NV.

11.   BADHOUSE STUDIOS, LLC is a Wyoming limited liability company with its principal place of business at West Hollywood, CA.

12.   BODYGUARD PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media

13.   DALLAS BUYERS CLUB, LLC is a Texas limited liability company with its principal place of business at The Woodlands, TX.

14.   HANNIBAL CLASSICS INC. is a California corporation with its principal place of business at West Hollywood, CA.

15.   I AM WRATH PRODUCTION, INC. is a California corporation with its

20-0231A

principal place of business at Los Angeles, CA.

16.    JUSTICE EVERYWHERE PRODUCTIONS LLC is a Georgia limited liability company with its principal place of business at Los Angeles, CA, 90067.

17.    KILLING LINK DISTRIBUTION, LLC is a California limited liability company with its principal place of business at Beverly Hills, CA.

18.    LF2 PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

19.    LHF PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

20.    MILLENNIUM FUNDING, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

21.    MILLENNIUM IP, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media

22.    MILLENNIUM MEDIA, INC. is a corporation organized under the laws of the State of Nevada and has a principal office in Nevada.

23.    MON, LLC is a California limited liability company with its principal place of business at Beverly Hills, CA.

24.    NIKOLA PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

5

20-0231A

25.     OUTPOST PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

26.     PARADOX STUDIOS, LLC is a Delaware limited liability company with its principal place of business at Wilmington, DE.

27.     RAMBO V PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

28.     SCREEN MEDIA VENTURES, LLC is a Delaware limited liability company with its principal place of business New York, NY.

29.     VENICE PI, LLC is a California limited liability company with its principal place of business at Los Angeles, CA.

30.     VOLTAGE HOLDINGS, LLC is a limited liability company registered under the laws of the State of Nevada, has principal offices in Los Angeles, California and is an affiliate of Voltage Pictures.

31.     WONDER ONE, LLC is a Wyoming limited liability company with its principal place of business at Sherman Oaks, CA.

32.     HITMAN TWO PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

33.     GLACIER FILMS 1, LLC is a Louisiana limited liability company with its principal place of business in California.

20-0231A

34.     CINELOU FILMS, LLC is a California limited liability company with its principal place of business in California.

### B.   The Defendant

35.     Defendant WIDEOPENWEST FINANCE, LLC, upon information and belief, operates collectively with WIDEOPENWEST NETWORKS, INC. and WIDEOPENWEST INC. as a single operating unit, WOW, under the direction and control of parent company WIDEOPENWEST INC.

36.     Upon information and belief, WIDEOPENWEST NETWORKS, INC. is a corporation organized under the laws of Delaware with its principal office at Englewood, Colorado.

37.     Upon information and belief, WIDEOPENWEST, INC. is a corporation organized under the laws of Delaware with its principal office at Englewood, Colorado.

38.     Defendant is an Internet Service Provider that provides transmitting, routing, or connection for material through a system or network controlled or operated by or for Defendant.

39.     Defendant advertises itself "As one of the biggest broadband providers in the country..."  About wow!, https://www.wowway.com/ [last accessed on May 27, 2021].

40.     Many of Defendant's subscribers are motivated to subscribe to Defendant's service because it allows them to download movies and other copyrighted content—including unauthorized content—as efficiently as possible.

41.     Accordingly, Defendant promotes its service as enabling subscribers "intensively downloading or uploading content" and "who wants it all" to download and

7

upload large amounts of content at "our fastest speed."

42.     In exchange for this service, Defendant has charged its subscribers monthly fees ranging in price based on the speed of service.

43.     At all relevant times, Defendant knew that its subscribers routinely used its networks for illegally downloading and uploading copyrighted works, particularly Plaintiffs' Works. As described below, Plaintiffs' agent sent tens of thousands of notices to Defendant informing Defendant that many of its subscribers were actively utilizing its service to infringe their Works. Those notices gave Defendant the specific identities of its infringing subscribers, referred to by their Internet Protocol ("IP") addresses, port numbers and time of infringement (to the ms) and included the file title of the infringing copy being pirated. Nonetheless, Defendant persistently turned a blind eye to the massive infringement of Plaintiffs' Works occurring over its network. Defendant allowed the illegal activity because it was popular with subscribers and acted as a draw to attract and retain new and existing subscribers. Defendant's subscribers, in turn, purchased more bandwidth and continued using Defendant's services to infringe Plaintiffs' copyrights.

44.     Defendant knew that if it terminated or otherwise prevented repeat infringer subscribers from using its service to infringe, or made it less attractive for such use, Defendant would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue. For those account holders and subscribers who wanted to download files illegally at faster speeds, Defendant obliged them in exchange for higher rates. In other words, the greater the bandwidth its subscribers required for pirating content, the more money Defendant made.

20-0231A

45.     Defendant is a member of The American Registry of Internet Numbers ("ARIN"), which is a nonprofit, member-based organization that manages and distributes Internet number resources such as IP addresses and Autonomous System Numbers.

## IV.     JOINDER

46.     Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely (i) the use of Defendant's services by its subscribers for infringing the copyrights in Plaintiffs' Works, (ii) the contribution to said copyright infringements by Defendant, (iii); and (b) that there are common questions of law and fact.

## V.     FACTUAL BACKGROUND

### A.  The Plaintiffs Own the Copyrights to the Works

47.     The Plaintiffs are the owner of the copyrights in the motion pictures ("Works") as shown in Exhibit "1" either through work for hire agreement, assignments and/or mergers.  The Works are the subjects of copyright registrations, and this action is brought pursuant to 17 U.S.C. § 411.

48.     The Works are motion pictures currently offered for sale in commerce.

49.     Defendant had notice of Plaintiffs' rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

50.     Defendant also had notice of Plaintiffs' rights through general publication and advertising associated with the motion pictures, and packaging and copies, each of

which bore a proper copyright notice.

51.     Defendant also had notice of Plaintiffs' rights through notices that were sent to Defendant's abuse contact.

52.     Defendant also had notice of Plaintiffs rights through a letter from Plaintiffs' counsel.  *See* Exhibit "4".

**B. Defendant's subscribers Infringe Plaintiffs' Copyrights.**

53.     Defendant's subscribers use software such as BitTorrent to infringe Plaintiffs' exclusive rights of reproduction and distribution.

54.     BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

55.     The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

56.     In a report from January 2011, a survey conducted by the firm Envisional estimated that 11.4 percent of all Internet traffic involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent.

57.     A more recent study by Sandvine determined that file-sharing accounts for 3 percent of global downstream and 22 percent of upstream traffic, with 97% of that traffic

20-0231A

in turn being BitTorrent.   *See* Sandvine, "The Global Internet Phenomena Report", October 2018, https://www.sandvine.com/hubfs/downloads/phenomena/2018-phenomena-report.pdf [last accessed on May 27, 2021].

58.     BitTorrent is overwhelmingly used for piracy.  *See* David Price, "NetNames Piracy Analysis: Sizing the Piracy Universe", September 2013, pg. 18, http://creativefuture.org/wp-content/uploads/2016/01/netnames-sizing_piracy_universe-FULLreport-sept2013.pdf [last accessed on Oct. 1, 2021] ("Of all unique visitors to bittorrent portals in January 2013, it is estimated that 96.28% sought infringing content during the month…")

### 1.  The Initial Seed, Torrent, Hash and Tracker

59.     A BitTorrent user that wants to upload the new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using, for example, the Client he or she installed onto his or her computer.

60.     The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

61.     The initial seeder often modifies the file title of the Work to include a wording such as "FGT", "RARBG" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

62.     The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

11

63.     The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Works, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

64.     When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

65.     Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

66.     The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

67.     The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

68.     Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 2. Torrent Sites

20-0231A

69.     "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol. There are numerous torrent websites including the notorious YTS, The Pirate Bay and RARBG websites.  These websites were noted by the Office of the United States Trade Representative ("USTR") as examples of Notorious Markets defined as an online marketplace reportedly engaged in and facilitating substantial piracy. *See* USTR, 2014 Out-of-Cycle Review of Notorious Markets, Mar. 5, 2015, pg. 17, Available at https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20-%20Published_0.pdf [last accessed on May 7, 2021]; *see also* USTR, 2018 Out-of-Cycle Review of Notorious Markets, April 2019, pgs. 24, 27-28, Available at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [accessed on May 7, 2021].

### *3. Defendant's subscribers access torrent sites from IP addresses provided by Defendant*

70.     Defendant's subscribers accessed torrent sites including the YTS website to upload and download Plaintiffs' copyrighted Work from IP addresses provided by Defendant.

71.     Defendant's subscriber S W-C accessed the torrent website YTS from IP address 50.4.162.153 and downloaded torrent files for the Works *Last Full Measure* and *Outpost*.  *See* Decl. of S W-C at ¶¶2-4, Exhibit "2" at pg. 16.

72.     A subscriber of Defendant accessed the torrent website YTS from IP address 75.118.149.167 and downloaded a torrent file for the Work *I Feel Pretty*.  *See*

13

Exhibit "2" at pg. 2.

73.     A subscriber of Defendant accessed the torrent website YTS from IP address 24.96.106.170 and downloaded a torrent file for the Work *Hellboy*.  *See* Exhibit "2" at pg. 3.

74.     A subscriber of Defendant accessed the torrent website YTS from IP address 69.73.33.142 and downloaded a torrent file for the Work *Angel Has Fallen*.  *See* Exhibit "2" at pg. 5, Decl. of K S at ¶¶3-6.

75.     A subscriber of Defendant accessed the torrent website YTS from IP address 24.42.128.225 and downloaded a torrent file for the Work *2 Guns*.  *See* Exhibit "2" at pg. 7.

76.     A subscriber of Defendant accessed the torrent website YTS from IP address 74.199.2.53 and downloaded a torrent file for the Work *2 Guns*.  *See* Exhibit "2" at pg. 8.

77.     A subscriber of Defendant accessed the torrent website YTS from IP address 75.118.149.167 and downloaded a torrent file for the Work *Lone Survivor*.  *See* Exhibit "2" at pg. 8.

78.     A subscriber of Defendant accessed the torrent website YTS from IP address 74.199.2.53 and downloaded a torrent file for the Work *Lone Survivor*.  *See* Exhibit "2" at pg. 11.

79.     A subscriber of Defendant accessed the torrent website YTS from IP address 50.4.137.110 and downloaded a torrent file for the Work *Lone Survivor*.  *See* Exhibit "2" at pgs. 12-13.

20-0231A

80.     A subscriber of Defendant accessed the torrent website YTS from IP address 69.14.104.20 and downloaded a torrent file for the Work *The Last Full Measure*. See Exhibit "2" at pg. 15.

### 4. Uploading and Downloading a Work Through a BitTorrent Swarm

81.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

82.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.  Defendant transmits the pieces to the peers.

83.     Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.  Defendant transmits the pieces to the peers.

84.     In this way, all of the peers and seeders are working together in what is called a "swarm."

85.     Here, the Defendant's subscribers participated in a swarm and directly interacted and communicated with other members of the swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions, Plaintiffs' Works.

86.     Defendant distributed the subscribers' transmissions to other members of the swarm.

20-0231A

87.     In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

88.     Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

***5. The Plaintiffs' Computer Investigator Identified Defendant's IP Addresses as Participants in Swarms That Were Distributing Plaintiffs' Copyrighted Works.***

89.     The Plaintiffs engaged Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiff's copyrighted Work.

90.     MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

91.     MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

20-0231A

92.     MEU logged information including the IP addresses, Unique Hash Numbers, and hit dates that show that Defendant's subscribers distributed copies of the Plaintiffs' copyrighted Works identified by the Unique Hash Number.

93.     Defendant's subscribers' computers used the identified IP addresses to connect to the investigative server in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

94.     MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works.

95.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

***C. The Operator of the YTS website confirmed that Defendant's subscribers downloaded torrent files for copying copyright protected Works from the YTS website.***

96.     The YTS website operator maintained records of activity of registered user accounts. *See* Exhibit "2" at pg. 18 (Certificate of Authenticity).

97.     As shown in Exhibit "2", the records including the email address of the registered user account, the torrent files the registered account downloaded, the IP address from where the registered user accessed the YTS website, and the time.

98.     The records show Defendant's subscribers downloaded the torrent file for

17

reproducing the Work, the same file copy MEU's agent verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works, from IP addresses assigned by Defendant to subscribers in some cases.

### D. Defendant's subscribers distributed copies of Plaintiffs' Works.

99.   Defendant's subscribers distributed at least pieces of each of Plaintiffs' Works over network connections provided by Defendant to other peers in the Swarm.

100.   Defendant's subscriber at IP address 75.118.244.40 distributed multiple copies of the Work *Dallas Buyers Club* by the file name Dallas.Buyers.Club.2013.1080p.BluRay.x265-RARBG.

101.   Defendant's subscriber at IP address 75.118.244.40 distributed multiple copies of the Work *London Has Fallen* by the file name London.Has.Fallen.2016.1080p.BluRay.x265-RARBG.

102.   MEU confirmed over 2000 instances of Defendant's subscriber at IP address 75.118.244.40 distributing copies of *London Has Fallen* and *Dallas Buyers Club*.

103.   Defendant's subscriber S W-C distributed copies of the Work *The Last Full Measure* by the file name "The Last Full Measure (2019) [WEBRip] [720p] [YTS.LT]" and the Work *The Outpost* by the file name "The Outpost (2020) [720p] [WEBRip] [YTS.MX]" from IP address 50.4.162.153.

104.   Defendant's subscriber K S distributed copies of the Work *Angel Has Fallen* by the file name "Angel Has Fallen (2019) [BluRay] [720p] [YTS.LT]" from IP address 69.73.33.142.

20-0231A

***E. Defendant's subscribers knew the Copyright Management Information included in the files they distributed to other peers had been removed or altered without the authority of Plaintiffs.***

105.   A legitimate file copy of each of the Works includes copyright management information ("CMI") indicating the title.

106.   The initial seeders of the infringing file copies of Plaintiffs' Works added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

107.   For example, the initial seeder of the infringing file copies of the Works *Dallas Buyers Club* and *London Has Fallen* added the wording "RARBG" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the RARBG website.

108.   The word RARBG is not included in the file title of legitimate copies or streams of the Works.  The initial seeder of the Work altered the title to falsely include the words "RARBG" in the CMI.

109.   The initial seeder of the infringing file copies of the Works *The Last Full Measure*, *The Outpost* and *Angel Has Fallen* added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

110.   The word YTS is not included in the file title of legitimate copies or streams of the Works.  The initial seeder of the Work altered the title to falsely include the words "YTS" in the CMI.

20-0231A

111.    The file copies Defendant's subscribers distributed to other peers in the Swarm included the altered CMI in the file title.

112.    Defendant's subscribers knew that the website or BitTorrent Client from which they obtained their torrent files was distributing illegal copies of the Work.

113.    In many cases, Defendant's subscribers had registered accounts with these piracy websites.

114.    Defendant's subscribers knew that the entity included in the false or altered CMI such as YTS or RARBG was not the author of Plaintiffs' Works.

115.    Defendant's subscribers knew that the entity included in the false or altered CMI such as YTS or RARBG was not a licensed distributor of Plaintiffs' Works.  Indeed, the YTS website includes a warning to this effect.

116.    Defendant's subscribers knew that the false or altered CMI that included words such as YTS and RARBG in the file names was false.

117.    Defendant's subscribers knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Works when they distributed the false CMI, altered CMI or the Work including the false or altered CMI.

118.    Namely, Defendant's subscribers knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

119.    By providing the altered CMI to others, Defendant's subscribers induced, enabled and facilitated further infringements of the Work.

120.    MEU determined that Defendant's subscribers distributed Plaintiffs' Works

20-0231A

with altered CMI as shown, for example, in Exhibit "7".

121.    MEU determined that Defendant's subscribers distributed over 350 different modified CMI with file copies of the Works.

**F.  Defendant had knowledge that its subscribers were infringing Plaintiffs' Works and distributing file copies of the Works with altered CMI but continued to provide service to their subscribers**

122.    Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the DMCA to be sent to service providers of IP addresses where MEU confirmed infringement of copyright protected content.

123.    Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered Copyright Management Information, the IP address and port number at where infringement was confirmed and the time of infringement down to the second.  *See* Exhibit "3" (excerpt below).

Protocol: BITTORRENT
Infringed Work: The Hitmans Bodyguard
Infringing FileName: The Hitman's Bodyguard (2017) [YTS.AG] Infringing FileSize: 904361168 Infringer's IP Address:
75.76.119.141 Infringer's Port: 50214 Initial Infringement Timestamp: 2020-01-04 16:18:26

124.    MEU determines the proper service provider assigned the IP addresses at issue from publicly available information from ARIN.

125.    MEU determines the proper abuse contact email address for Defendant from the DMCA designated directory and Defendant's website.

20-0231A



126.    Plaintiffs' agent sends the Notice to the contact email address of Defendant's designated agent.

127.    Defendant is required to update the WHOIS records for the IP addresses it reassigns or reallocates per its registration agreement with ARIN.

128.    Plaintiffs' agent has sent over 33,750 Notices to Defendant concerning infringements of copyright protected Works including Plaintiffs at IP addresses assigned to Defendant from ARIN.

129.    For example, Plaintiffs' agent sent over 6600 Notices to Defendant concerning infringement of the motion picture *The Hitman's Bodyguard* at IP addresses assigned to Defendant from ARIN.

130.    For example, Plaintiffs' agent sent over 2800 Notices to Defendant concerning infringement of the motion picture *Hellboy* at IP addresses assigned to

20-0231A

Defendant from ARIN.

131.   For example, Plaintiffs' agent sent over 2400 Notices to Defendant concerning infringement of the motion picture *Angel Has Fallen* at IP addresses assigned to Defendant from ARIN.

132.   For example, Plaintiffs' agent sent over 2400 Notices to Defendant concerning infringement of the motion picture *Rambo V: Last Blood* at IP addresses assigned to Defendant from ARIN.

133.   For example, Plaintiffs' agent sent over 2100 Notices to Defendant concerning infringement of the motion picture *I Feel Pretty* at IP addresses assigned to Defendant from ARIN.

134.   For example, Plaintiffs' agent sent over 1700 Notices to Defendant concerning infringement of the motion picture *Hunter Killer* at IP addresses assigned to Defendant from ARIN.

135.   For example, Plaintiffs' agent sent over 1500 Notices to Defendant concerning infringement of the motion picture *Once Upon a Time in Venice* at IP addresses assigned to Defendant from ARIN.

136.   For example, Plaintiffs' agent sent over 1100 Notices to Defendant concerning infringement of the motion picture *Mechanic: Resurrection* at IP addresses assigned to Defendant from ARIN.

137.   For example, Plaintiffs' agent sent over 1500 Notices to Defendant concerning infringement of the motion picture *London Has Fallen* at IP addresses assigned to Defendant from ARIN.

20-0231A

138.    Plaintiffs' agent sent 100 Notices to Defendant concerning observed infringements at each of IP addresses 75.118.244.40 and 75.76.119.141.

139.    Plaintiffs' counsel sent a letter to Defendant on March 15, 2021 including detailed examples of flagrant piracy and DMCA violations of its subscribers.  *See* Exhibit "4".

140.    Upon information and belief, other rightsholders had similar Notices sent to Defendant concerning infringing activity at IP addresses assigned to Defendant from ARIN.

141.    Defendant failed to terminate the subscribers of the accounts associated with these IP addresses or take any meaningful action in response to these Notices.

142.    Defendant often failed to even forward the Notices to its subscribers.

143.    Defendant continued to provide service to the subscribers despite knowledge that its subscribers were using the service to engage and facilitate massive piracy of copyright protected Works including the Copyright Plaintiffs' and DMCA violations.

144.    Defendant's failure to terminate or take any meaningful action against its subscribers resulted in a cascade of piracy of Plaintiffs' Works.  For example, while Defendant was ignoring the Notices sent to it concerning the subscriber of 75.118.244.40, this subscriber was confirmed distributing copies of *London Has Fallen* and *Dallas Buyers Club* for over 2000 instances.

**G. Defendant controls the conduct of its subscribers.**

145.    Defendant can terminate the accounts of its' subscribers at any time.

146.    Upon information and belief, Defendant promptly terminates subscriber accounts when said subscribers fail to pay for the Service.

24

https://www.wowway.com/docs/wow/documents-terms-and-conditions/internet-terms.pdf?sfvrsn=2 [last accessed on May 26, 2021] ("…If you fail to pay the full amount due for any or all of the Service(s) then WOW!, at its sole discretion in accordance with and subject to applicable law, may interrupt, suspend or disconnect any or all the Service(s) you receive….")

147.    Defendant monitors its subscribers' access to its service.   For example, Defendant requires its subscribers to agree to let Defendant "…have the right to monitor the "bandwidth" utilization…"

**H. Defendant does not have a safe harbor from liability.**

148.    As part of the DMCA, Congress created a safe harbor that limits the liability of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

149.    Defendant does not have a policy of terminating repeat infringers.

150.    Plaintiffs' agent has sent over 33,750 Notices to Defendant concerning infringements at IP addresses Defendant publishes as assigned to it.

151.    Defendant failed to terminate the accounts and/or take any meaningful actions

20-0231A

against its subscribers in response to the Notices consistent with a reasonably implemented policy for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

152.   Below are examples of Defendant's failure to reasonably implement the requisite Policy.

153.   Defendant failed to terminate the account and/or take any meaningful action against its subscriber at IP address 75.118.244.40 even after Plaintiffs' agent sent 110 Notices.  Defendant did not terminate this subscriber until March 2021 in response to a letter from Plaintiffs' counsel.  *See* Exhibit "5".

154.   Defendant failed to terminate the account and/or take any meaningful action against its subscriber at IP address 67.149.226.7 even after Plaintiffs' agent sent over 96 Notices.

155.   Defendant failed to terminate the account and/or take any meaningful action against its subscriber at IP address 64.53.213.160 even after Plaintiffs' agent sent over 94 Notices.

156.   Defendant failed to terminate the account and/or take any meaningful action against its subscriber at IP address 67.149.217.34 even after Plaintiffs' agent sent over 92 Notices.

157.   Defendant failed to terminate the account and/or take any meaningful action against its subscriber at IP address 69.47.6.9 even after Plaintiffs' agent sent over 92 Notices.

158.   Defendant failed to terminate the account and/or take any meaningful action

20-0231A

against its subscriber at IP address (S.W-C) 50.4.162.153 even after Plaintiffs' agent sent multiple Notices.

159.   Defendant did not contact Plaintiffs' agent to ask for further information to verify or confirm the piracy detailed in the Notices.

160.   Defendant's conduct renders it ineligible for safe harbor immunity from copyright liability under the DMCA.

### *I. The copyright infringements arise from Defendant's advertisements.*

161.   Defendant states, "We provide high-speed data…to a service area that includes approximately 3.2 million homes and businesses. Our services are delivered across 19 markets via our advanced … cable network." https://ir.wowway.com/investor-relations/overview/default.aspx [last accessed on May 27, 2021].

162.   At all relevant times, Defendant's subscribers have paid substantial subscription fees for access to Defendant's high-speed Internet network.

163.   Defendant offers a tiered pricing structure so its subscribers can have even higher downloading and uploading speed for a higher monthly fee. *See*, e.g., https://www.wowway.com/internet/indiana/evansville [last accessed on May 27, 2021].

20-0231A



164.    Defendant advertises a second highest price tier for $44.99 with "download speeds up to 500 Mbps…A great choice for anyone intensively downloading or uploading content."



165.    Defendant advertises a highest price tier for $64.99 with "download speeds up to 1000 Mbps…Our fastest speed for the consumer who wants it all."



166.   Defendant's subscribers are motivated to become subscribers from Defendant's advertisements.

167.   Defendant's subscribers are motivated to become subscribers from the knowledge of Defendant's practice of ignoring notices of infringements or failing to take any meaningful action.

168.   The ability of subscribers "who want it all" to use Defendant's high speed service to "intensively upload and download" Plaintiffs' Works without having their services terminated despite multiple notices being sent to Defendant acts as a powerful draw for subscribers of Defendant's service. *See* Decl. of Culpepper at ¶¶3-4 (screenshots below).



Servalpur · 7y

While I second everyone else in saying get a VPN (seriously, it's like $7/month, or even under $35/year if you buy it it yearly). I use mine 24/7, and I honestly don't even notice it. I can even game on it without issues.

Anyway, I know from personal experience that if you're in the midwest, Wide Open West Cable & Internet are *amazing* on torrents. I've used them for the past 5+ years now, and have downloaded truly an outrageous amount of data (without a vpn before) and never gotten a letter or notice. They have no data limits (or at least I've never found out about them), I've downloaded 2+ TB in a single month without a word from them.

They're a small regional ISP that has to compete with Comcast, so they're very costumer friendly.

⬆ 2 ⬇   Share   Report   Save

---

⬆
0
⬇    r/Piracy · Posted by u/rickselest 3 years ago 🟧

Am with WOW internet now and have had zero issues with private torrent site, looking to switch to Spectrum. Do they monitor the ip address for torrents

Question

Not sure if it is because of private torrenting buy wondering is spectrum is stricter than WOW

💬 10 Comments    ↗ Share    🔖 Save    👁 Hide    🏳 Report                    25% Upvoted

---

### *J. Defendant could take simple measures to stop further piracy of Plaintiffs' Works but refuses.*

169.    Defendant has knowledge that its subscribers are using its service to access notorious piracy websites of foreign origin such as YTS and RARBG from at least the Notices but refuses to block or even limit access to these websites.  Upon information and belief, Defendant refuses to block or limit its subscribers from accessing notorious piracy websites out of fear of losing subscriber revenue.

170.    Defendant can easily confirm its subscribers' infringements by comparing

20-0231A

the IP address in the notice to data from sources such as Trackers and Distributed Hash Table's indicating the IP addresses broadcasting availability to distribute Plaintiffs' Works.

171.   Defendant never contacted Plaintiffs' agent to ask for further information to investigate the incidents of piracy set forth in the Notices of infringement.

172.   Defendant has knowledge that its subscribers are using its service for piracy but refuses to even forward Notice of infringements from rights holders to its subscribers.  Upon information and belief, Defendant's subscribers would have ceased their piracy activities if Defendant had taken the simple measure of forwarding the Notices of infringements to its subscribers.

173.   Defendant has knowledge that its subscribers are using its service for piracy but refuses to suspend subscribers' accounts.  Upon information and belief, Defendant's subscribers would have ceased their piracy activities if Defendant had taken the simple measure of suspending the subscribers' accounts.

174.   Defendant has the ability to and actively does monitor its subscribers' Internet traffic and limits subscriber's Internet access in certain cases.

175.   For example, pursuant to Defendant's network management practices, Defendant uses "…tools and practices to reduce the negative effects of spam, viruses or other harmful code or content, security attacks, network congestion (including utilizing Subscriber Traffic Management (STM) technology to prioritize traffic during times of peak congestion and limiting speeds during periods of extended congestion), and other risks and degradations of the Service."   WOW! NETWORK MANAGEMENT PRACTICES,

31

April 27, 2021, https://www.wowway.com/sites/default/files/2021-05/network-management-practices.pdf [last accessed on Sept. 20, 2021] (printed as Exhibit "6")

176.   Defendant states it will throttle a subscribers' Internet speed if Defendant determines that said subscriber is using Internet service for non-preferred traffic such as P2P traffic.

**I. OVERVIEW**
The purpose of this document is to disclose information regarding WOW!'s network management practices, performance, and commercial terms of its broadband Internet access service (the "Service") sufficient for consumers to make informed choices regarding use of such Service and for content, application, service, and device providers to develop, market, and maintain Internet offerings, consistent with Commission regulations. High-speed bandwidth and network resources are limited and managing the network is essential to promote the use and enjoyment of the Internet by all of our customers. WOW! is committed to providing the best online experience possible for all of its customers and uses reasonable network management practices to ensure that the WOW! Service is used in ways that are consistent with the specifications of a shared network, and the standards of our local municipalities and the Internet community. WOW! also aims to ensure that the Internet access resources we provide are used in a manner that benefits everyone. The network management practices used by WOW! are consistent with industry standards.  For example, we use tools and practices to reduce the negative effects of spam, viruses or other harmful code or content, security attacks, network congestion (including utilizing Subscriber Traffic Management (STM) technology to prioritize traffic during times of peak congestion and limiting speeds during periods of extended congestion), and other risks and degradations of the Service. In some instances, the techniques that we use may affect the throughput rate at which customers may send and receive data, non-customers' ability to establish session connections within the network (such as peer-to-peer sessions), or result in the delay of certain traffic during times of peak congestion. However, by engaging in reasonable and responsible network management, WOW! can deliver the best possible broadband Internet experience to all of its customers.

177.   Defendant has the ability to take the simple measure of limiting the BitTorrent traffic of its subscribers for which it has notice of ongoing piracy but purposely chooses not to.

178.   Defendant has the ability to take the simple measure of asking the subscriber to take actions in response to a Notice of Infringement or submit a counternotification denying infringement but purposely chooses not to.

### VI. FIRST CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon material contribution)

179.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

180.   Through its activities, Defendant knowingly and intentionally took steps that

20-0231A

are substantially certain to result in direct infringement of Copyright Plaintiffs' Copyrighted Works, and that have resulted in such direct infringements in violation of Plaintiffs' copyrights.

181.    Despite Defendant's knowledge that its subscribers were using its service to engage in widescale copyright infringements, Defendant has failed to take reasonable steps to minimize the infringing capabilities of its service.

182.    Despite Defendant's knowledge that its subscribers were using its service to engage in widescale copyright infringements via the BitTorrent protocol, which is used overwhelmingly for piracy, Defendant has failed to take reasonable steps to minimize the infringing capabilities of its service.

183.    Defendant is liable as a contributory copyright infringer for the infringing acts of its subscribers.   Defendant has actual and constructive knowledge of the infringing activity of its subscribers.   Defendant knowingly caused and otherwise materially contributed to these unauthorized distributions of Plaintiffs' Works.

184.    Defendant's contributory infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

185.    By engaging in the contributory infringement alleged in this Complaint, Defendant deprived not only the producers of the Works from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.   Defendant's misconduct therefore offends public policy.

20-0231A

## VII. SECOND CLAIM FOR RELIEF
### (Vicarious Infringement)

186.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

187.   Defendant is vicariously liable for the infringing acts of its subscribers' infringements including but not limited to its subscribers' direct infringements of Plaintiffs' exclusive right to reproduce and distribute copies of their Works.

188.   Defendant has the right and ability to supervise and control the infringing activities that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

189.   Defendant could take multiple simple measures to stop further piracy of Plaintiffs' Works by its subscribers but refuses to do so.

190.   Defendant has refused to take any meaningful action to prevent the widespread infringement by its subscribers.  Indeed, the ability of subscribers to use Defendant's service to engage in widespread piracy of copyright protected content including Plaintiffs' Works without having their services terminated despite multiple notices being sent to Defendant acts as a powerful draw for subscribers of Defendant's service.

191.   The ability of subscribers "who want it all" to use Defendant's high speed service to "intensively upload and download" Plaintiffs' Works without having their services terminated despite multiple notices being sent to Defendant acts as a powerful draw for subscribers of Defendant's service.

192.   Defendant is therefore vicariously liable for the unauthorized reproduction

34

20-0231A

and distribution of Plaintiffs' Works.

## XIII.  THIRD CLAIM FOR RELIEF
### (Application for Injunctive Relief)

193.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

194.    Defendant has actual knowledge of its subscribers' infringements of Plaintiffs' exclusive rights under the Copyright Act by its subscribers' use of notorious piracy websites that are of foreign origin to pirate Plaintiffs' Works.

195.    Despite having said actual knowledge, Defendant continues to provide services to the subscribers.

196.    Defendant's actions of providing transmission, routing, or connections for said copies of the Works to its subscribers is a direct and proximate cause of the infringements of Plaintiffs' Works.

197.    Defendant had actual or constructive knowledge of infringement of Plaintiffs' exclusive rights under the Copyright Act by its subscribers. Defendant knowingly and materially contributed to such infringing activity.

198.    Plaintiffs suffer irreparable harm from Defendant's failure to take even simple actions to stop further piracy of their Works by Defendant's subscribers.

199.    Defendant's subscribers are depriving Plaintiffs of their exclusive rights to control how, when, and to whom they will disseminate their Copyrighted Works.

200.    Defendant's subscribers' distribution of freely available infringing copies of the Works inevitably and irreparably undermines the legitimate market in which consumers can purchase access to the same works

20-0231A

201.    Defendant's subscribers' distribution of freely available infringing copies of the Works threaten harm to Plaintiffs' relationships and goodwill with authorized licensees.

202.    The hardship Plaintiffs will face without the injunction prayed for outweighs any harm to the Defendant's interests in profiting from allowing its subscribers to use its service to pirate Plaintiffs' Works.

203.    The public has a compelling interest in protecting copyright owners' marketable rights to their works, particularly from foreign websites that profit from widespread piracy of US copyright protected Works.

204.    As a direct and proximate result of the infringement to which Defendant knowingly and materially contribute and contributed, Plaintiffs are entitled to injunctive or other equitable relief as provided by, for example, 17 U.S.C. §§ 512(j)(1)(A) and (B) including but not limited to an order restraining the Defendant from providing access to infringing material or activity residing at movie piracy websites including but not limited to: (a) YTS; (b) Piratebay; (c) Rarbg; and (d) 1337x; and/or taking reasonable steps to block access to said movie piracy websites.

## XIV.   FOURTH CLAIM FOR RELIEF
### (Secondary Liability for Digital Millennium Copyright Act Violations)

205.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

206.    Defendant's subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the Plaintiffs' copyright protected Works, distributed copyright management information ("CMI") that falsely included wording such as "YTS"

36

and "RARBG" in violation of 17 U.S.C. § 1202(a)(2).

207.    Defendant's subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works distributed CMI that falsely included the wording such as "YTS" and "RARBG" or in violation of 17 U.S.C. § 1202(a)(2).

208.    Defendant's subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works distributed CMI that falsely included the wording such as "YTS" and "RARBG" in violation of 17 U.S.C. § 1202(a)(2).

209.    Defendant's subscribers, without the authority of Plaintiffs or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include wording such as "RARBG" and "YTS" without the authority of the Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs' Copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

210.    Defendant's subscribers, without the authority of Plaintiffs or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed or altered to include wording such as "RARBG" or "YTS", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

211.    Particularly, Defendant's subscribers knew that the CMI in the file names of the pieces of the Work had been altered to include wording such as "RARBG", "YTS"

or "FGT".

212. Particularly, the Defendant's subscribers distributed the file names that included CMI that had been altered to include the wording "YTS" or "RARBG".

213. Defendant's subscribers knew that the wording "YTS" or "FGT" originated from notorious movie piracy website.

214. Defendant's subscribers' acts constitute violations under the Digital Millennium Copyright Act ("DMCA violation"), 17 U.S.C. § 1202.

215. Through their conduct, Defendant knowingly and intentionally induced, enticed, persuaded, and caused its subscribers to constitute DMCA violations.

216. Through its activities, Defendant knowingly and intentionally take or took steps that are substantially certain to result in its subscribers committing DMCA violations, and that have resulted in DMCA violations.

217. Despite Defendant's knowledge that its subscribers use its service to commit DMCA violations, Defendant has failed to take reasonable steps to minimize the capabilities of its service to facilitate DMCA violation.

218. Defendant is secondarily liable for the DMCA violations of its subscribers. Defendant has actual and constructive knowledge of its subscribers' DMCA violations. Defendant knowingly caused and otherwise materially contributed to these DMCA violations.

219. Defendant is vicariously liable for the DMCA violations of its subscribers. Defendant has the right and ability to supervise and control the DMCA violations that occur through the use of its service, and at all relevant times has derived a direct financial

benefit from the DMCA violations complained of herein.  Defendant has refused to take any meaningful action to prevent the widespread DMCA violations by its subscribers. Indeed, the ability of Defendant's subscribers to use Defendant's service to engage in widespread DMCA violations while pirating content without having their services terminated despite multiple notices being sent to Defendant acts as a powerful draw for subscribers of Defendant's service.  Defendant is therefore vicariously liable for the DMCA violations.

220.   Plaintiffs are entitled to an injunction to prevent Defendant from engaging in and/or contributing to further violations of 17 U.S.C. § 1202.

221.   Plaintiffs are entitled to recover from Defendant the actual damages suffered by Plaintiffs and any profits Defendant has obtained as a result of its wrongful acts that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Defendant has realized by its violations of 17 U.S.C. § 1202.

222.   Plaintiffs are entitled to elect to recover from Defendant statutory damages for their violations of 17 U.S.C. § 1202.

223.   Plaintiffs are further entitled to costs and reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Court:

(A) enter permanent injunctions enjoining Defendant from continuing to contribute to its subscribers' infringements of the Plaintiffs' copyrighted Works and DMCA violations;

(B) order Defendant to adopt a policy that provides for the prompt termination of

20-0231A

subscribers for which Defendant receives more than three unique notices of infringements of copyright protected Works within 72 hours without receiving a counter notification from said subscriber;

(C) order Defendant to block subscribers from accessing notorious piracy websites of foreign origin that are listed in the annual trade report of Notorious Foreign Markets published by the United States Government on all networks under its control to prevent further pirating of Plaintiffs' Works via the BitTorrent protocol;

(D) order the Defendant to disclose to Plaintiffs the identifications of the subscribers who used and use Defendant's service to infringe Plaintiffs' Works on an ongoing basis after said subscribers are provided notice as required by 47 U.S.C. § 551;

(E) award the Plaintiffs their actual damages from the copyright infringements and Defendant's profits in such amount as may be found; alternatively, at Plaintiffs' election, for maximum statutory damages of $150,000/copyright for the Works (or a total of at least $13,950,000 for 93 copyrights) pursuant to 17 U.S.C. § 504(a) and (c) against Defendant;

(F) award the Plaintiffs their actual damages from the DMCA violations and Defendant's profits in such amount as may be found; or, in the alternative, at Plaintiff's election, for maximum statutory damages of $25,000 for each DMCA violation pursuant to 17 U.S.C. § 1203(c) for a total of at least $8,750,000 for contributing to the more than 350 violations of and/or vicariously violating 17 U.S.C. § 1202;.

(G) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 and/or 17 U.S.C. § 1203(b)(5); and

(H) grant the Plaintiffs any and all other and further relief that this Court deems just

20-0231A

and proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, October 1, 2021.

/s/ Kerry S. Culpepper
Kerry S. Culpepper
Joshua J. Lee
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:   (808) 464-4047
Facsimile:    (202) 204-5181
E-Mail:          kculpepper@culpepperip.com

F. Christopher Austin
Weide & Miller, Ltd.
10655 Park Run Drive, Suite 100
Las Vegas NV 89144
Telephone:   702.382.4804
Facsimile:    702.382.4805 Fax
E-Mail:          caustin@weidemiller.com
*Attorneys for Plaintiffs*

20-0231A