1

```
1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
2
   Case No. 21-cv-1901-DDD-MEH
3  _____

4  AFTER II MOVIE, LLC, et al.,

5       Plaintiff,

6  vs.

7  WIDEOPEN WEST FINANCE, LLC.

8       Defendant.
   _____
9

10          Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for

12  the District of Colorado, commencing at 10:17 a.m., December

13  1, 2021, in the United States Courthouse, Denver, Colorado.

14  _____

15          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                      APPEARANCES

19          JOSHUA LEE and KERRY CULPEPPER, Attorneys at Law,

20  appearing for the Plaintiff.

21          RICHARD BROPHY, Attorneys at Law, appearing for

22  the Defendant.

23  _____

24                 SCHEDULING CONFERENCE

25
```

```
 1                P R O C E E D I N G S

 2            (Whereupon, the within electronically recorded

 3   proceedings are herein transcribed, pursuant to order of

 4   counsel.)

 5

 6            THE COURT:  All right.  We're having problem with

 7   appearances.  We're going to go ahead, because it's time.

 8            21-cv-01901, After II Movie, LLC., vs. WideOpen

 9   West Finance, LLC.  Who's on the phone for the plaintiff,

10   please.

11            MR. LEE:  This is Joshua Lee for plaintiffs.

12            THE COURT:  Okay.  Well, you're flying solo today,

13   Mr. Lee.  And in the courtroom, please.

14            MR. BROPHY:  Good morning, Your Honor.  Richard

15   Brophy on behalf of the defendant, WideOpen West.

16            THE COURT:  Thank you.  Tell me about your case,

17   Mr. Lee.

18            MR. LEE:  Yes, Your Honor.  So this is a copyright

19   infringement case, a secondary liability on internet service

20   provider WideOpen West.

21            THE COURT:  Okay.  How many violations are you

22   alleging?

23            MR. CULPEPPER:  Hello?

24            THE COURT:  Yes.

25            MR. CULPEPPER:  Yes, this is Kerry Culpepper.
```

1            THE COURT:  Good morning.  Go ahead and make your

2    appearance, Mr. Culpepper.

3            MR. CULPEPPER:  Kerry Culpepper, appearing for

4    plaintiffs.

5            THE COURT:  Thank you.  Okay.

6            So either of you:  How many works are alleged?

7            MR. CULPEPPER:  How many works alleged?  Hold on.

8            THE COURT:  Hello?

9            MR. CULPEPPER:  Yeah, I'm here.  Hold on.  You

10   said how many works are alleged?

11           THE COURT:  How many works are alleged to have

12   been infringed, yes.

13           MR. CULPEPPER:  Yeah.  I'm pulling up the exhibit.

14   One moment.

15           THE COURT:  Okay.

16           MR. CULPEPPER:  There's 56 -- 56 works that are

17   infringed.

18           THE COURT:  56 works?  Okay.  Oh, okay.  Well, how

19   -- okay.

20           In your computation of damages, you list 93

21   copyrights and 350 DMCA violations.  So what's the

22   discrepancy here?

23           MR. CULPEPPER:  The discrepancy is some of the

24   works have a copyright on the screen play and on the motion

25   picture.  For example, you know, Work Number 52 -- if you go

4

1    to Exhibit 1, which is Document 25-1 --

2            THE COURT:  Okay.

3            MR. CULPEPPER:  -- here we have the certificate

4    number of each movie.  So, for example, Number 52, The

5    Hitman's Wife's Bodyguard, I have the copyright for the

6    screenplay and for the motion picture.  And our position is

7    the screenplay infringed also when the work is strained --

8            THE COURT:  Okay.

9            MR. CULPEPPER:  -- for example --

10           THE COURT:  So tell me what I -- WideOpen West

11   was --

12           MR. CULPEPPER:  -- and the total number of

13   copyrights.

14           THE COURT:  I understand.

15           MR. CULPEPPER:  The --

16           THE COURT:  That's fine.  You have 56 separate

17   works, but there are multiple violations for some of the

18   works, I assume; right?  That's what you're talking about?

19           MR. CULPEPPER:  The -- no.  I multiplied by the

20   number of copyrights and the DMCA violations are shown in

21   your Document Number 25-7.

22           THE COURT:  Okay.  So what is the defendant?  Is

23   that an ISP?

24           MR. BROPHY:  Yes, Your Honor.  We're an internet

25   service provider here in town.

1            THE COURT:  WideOpen West Finance, LLC?

2            MR. BROPHY:  And that's something we addressed in

3    some of our papers, Your Honor.  There are a number of

4    different entities which, by their combined efforts, provide

5    internet service.  And the parties have agreed that we're

6    not going to take any issue with the specific named party,

7    because it -- I think it would be an unnecessarily

8    burdensome and wasteful exercise for everyone.

9            THE COURT:  Okay.  So what are the trade names for

10   the ISP?

11           MR. BROPHY:  WOW or WideOpen West.

12           THE COURT:  Oh, WOW.

13           MR. BROPHY:  Yeah.

14           THE COURT:  Okay.

15           MR. BROPHY:  Sometimes WOW! with an exclamation

16   point at the end.

17           THE COURT:  All right, and where do they operate?

18   You don't have to keep standing.

19           MR. BROPHY:  They operate in Denver.  And -- I --

20   it's difficult to answer that question.  They just got rid

21   of some of their geographic regions, but they're not just in

22   the Colorado area.  They're also throughout the Midwest.

23           THE COURT:  Okay.  All right.

24           Well, let me ask you a few questions, I guess, and

25   you don't need to keep standing.

6

1          So have both of you litigated this type of case

2     before?

3          MR. BROPHY:  Your Honor, I'm involved currently

4     with four or five other cases of this kind.

5          THE COURT:  Okay.

6          MR. BROPHY:  So the answer is yes.

7          THE COURT:  Do you expect a lot of discovery

8     fights?

9          MR. BROPHY:  I know that Your Honor is involved in

10    a Charter case --

11         THE COURT:  Yes.

12         MR. BROPHY:  -- which involves a lot of discovery

13    fights.  I don't expect that we are going to follow that

14    path.

15         THE COURT:  Okay.

16         MR. BROPHY:  There is one significant dispute that

17    we've raised in our papers regarding production of

18    subscriber personal identifying information.

19         THE COURT:  Sure.

20         MR. BROPHY:  But short of that, my program is to

21    be as streamlined as possible with handling discovery.

22    So --

23         THE COURT:  Okay.  And there's no spoliation

24    issues we have to worry about in this case?

25         MR. BROPHY:  None that I'm aware of, Your Honor.

1          THE COURT:  All right.  All right, thank you.

2          Because that's -- yeah, that's 11,000 works just

3  in one of the cases.  On the second case, I'm not sure how

4  many works are at issue.

5          MR. BROPHY:  Right.  This case has far fewer than

6  most --

7          THE COURT:  Right.

8          MR. BROPHY:  -- fortunately.  But maybe one thing

9  I could flag for Your Honor.

10         THE COURT:  Go ahead.

11         MR. BROPHY:  There are 30,000 notices and 14,000

12  different IP addresses.  So --

13         THE COURT:  Okay.

14         MR. BROPHY:  -- to the extent discovery could

15  balloon, it would balloon because of the production of that

16  -- of those subscriber information and disputes that arise

17  out of those --

18         THE COURT:  Okay.

19         MR. BROPHY:  -- individual subscriber issues.

20         THE COURT:  So there was a -- I can't remember

21  what it was called, but there was an organization that was

22  formed by the ISP -- by some ISPs and they agreed to follow

23  certain protocols.  I can't -- do you remember -- what was

24  that organization?

25         MR. BROPHY:  There was the -- yes, Your Honor.

8

1    The Copyright Alert System.

2        THE COURT:  Copyright Alert System, right.

3        MR. BROPHY:  Yes.

4        THE COURT:  CAS?

5        MR. BROPHY:  CAS, and we're not a party to that.

6        THE COURT:  All right.

7        MR. BROPHY:  That's since dissolved, but we were

8    not a party to that.

9        THE COURT:  Yeah, I thought it was dissolved.

10   Okay.  CAS.  And would you expect that discovery would take

11   longer than the average case or not?

12       MR. BROPHY:  It's -- I'm pausing to answer,

13   because the discovery we've dealt with has mostly been

14   during COVID and so things have been stilted.  I believe

15   there are some complications in this case.

16       In these cases, as you may already be aware,

17   there's typically a third party who is retained --

18       THE COURT:  Correct.

19       MR. BROPHY:  -- to monitor the internet.

20       THE COURT:  Like MarkMonitor was --

21       MR. BROPHY:  MarkMonitor is one --

22       THE COURT:  Okay.

23       MR. BROPHY:  -- Rights Corp. is another.

24       THE COURT:  Yes.

25       MR. BROPHY:  There's a third here, Maverickeye,

9

1  and --

2           THE COURT:  How do you spell that?

3           MR. BROPHY:  Maverick --

4           THE COURT:  Okay.

5           MR. BROPHY:  M-A-V-E-R-I-C-K-E-Y-E.  My

6  understanding, limited as it may be, is that that's a German

7  entity.

8           THE COURT:  I think they all are.

9           MR. BROPHY:  I know that Rights Corp isn't.

10           THE COURT:  I think MarkMonitor is.

11           MR. BROPHY:  Is that right?

12           THE COURT:  Yeah.

13           MR. BROPHY:  In any event, I don't know.  There

14  may be complications as a result of the foreign discovery

15  there.

16           THE COURT:  There hasn't been that for the other

17  cases.

18           MR. BROPHY:  Okay.

19           THE COURT:  So --

20           MR. CULPEPPER:  Your Honor?

21           THE COURT:  Yes.

22           MR. CULPEPPER:  This is Kerry Culpepper for the

23  plaintiffs.

24           The -- I don't foresee issues with Maverickeye.

25  We are going to work to cooperate to have them promptly

10

1    reply to requests -- for example, for the source code,

2    that's provided for in the proposed protective order.

3            THE COURT:  Okay.

4            MR. CULPEPPER:  I've been involved in about a half

5    dozen of these ISP lawsuits.  And my experience has been

6    that the ISPs resist disclosure.

7            So I'm not going to -- I don't -- I hope it

8    doesn't happen -- like, Charter, I hope we don't have a big

9    blowup with that.  I would expect that the ISP will fight

10   request for information and documents.  And I get that

11   impression, because the ISP has indicated that they're not

12   going to disclose -- they're going to oppose disclosure of

13   the subscriber identities.

14           THE COURT:  Well, we'll have to see.  I

15   understand.  We'll cross that bridge when we get there.

16           So -- yeah.  So what we do in our District is we

17   do a presumptive 45 days -- by the way, I'm at Case Plan

18   Schedule, paragraph 9.  We do a presumptive 45 days, but at

19   any time you can amend your complaint, add parties simply by

20   showing of good cause.  It's not a high standard.

21           So 45 days would take us to approximately January

22   15th.  Discovery cutoff, you left blank.  Dispositive

23   motion, you left blank, I guess.  So --

24           MR. BROPHY:  If I may, Your Honor?

25           THE COURT:  Go ahead.

11

1              MR. BROPHY:  I'm sorry to interrupt.

2              If you look further down, there's a Table.  We've

3      put deadlines -- we tried to create a single Table that had

4      the deadlines in linear order.  I hope that doesn't

5      frustrate the process, rather than helping it.  We've

6      addressed some of those deadlines down below.  And that

7      begins on Page 8.

8              THE COURT:  Yeah.  So I mean, we -- I don't like

9      contingent dates.  I like hard dates.  So let's try and do

10     some hard dates here.

11             MR. BROPHY:  Understood.

12             THE COURT:  All right.  Who has the motion to

13     dismiss?

14             MR. CULPEPPER:  Sorry.  You said who filed the

15     motion to dismiss, or who has it?

16             THE COURT:  Yeah, who has it is what I'm asking.

17     Which judge?  Me or Dominico?

18             MR. CULPEPPER:  It --

19             THE COURT:  Okay.

20             MR. CULPEPPER:  -- hasn't been referred to you

21     yet, and the defendant's reply brief hasn't been filed yet.

22     So I suppose after a reply brief is filed, that will

23     probably --

24             THE COURT:  Well, they -- most judges do it right

25     away.  Judge Dominico sometimes waits, but I suspect --

12

1   well, I expected he will keep it.  So at least that's the

2   status quo.

3           Does it resolve -- would the granting of the

4   motion resolve all the claims?

5           MR. BROPHY:  It would from our perspective, Your

6   Honor.

7           THE COURT:  And what's the pleading defect?

8           MR. BROPHY:  We take issue with both the vicarious

9   and contributory claims that they have alleged on multiple

10  grounds, including lack of knowledge, lack of direct

11  evidence of infringement, no direct -- and I know you've

12  addressed some of these issues before in previous --

13          THE COURT:  Right.

14          MR. BROPHY:  -- orders.

15          THE COURT:  Well, see, I think I've seen courts be

16  -- dismissing the vicarious liability on a regular basis.  I

17  think the judge down in Florida did that in the Bright House

18  case.

19          MR. BROPHY:  And also our case in Texas, Your

20  Honor.  The Grande case --

21          THE COURT:  Okay.  And there's a motion for

22  summary judgment pending in the Charter case on that.  And I

23  suspect that's going to be granted.

24          So -- and then I don't imagine Judge Jackson's

25  going to let vicarious liability go in the second Charter

1    case, but this is a different judge, so you never know.  But

2    I'm not inclined -- are you guys proposing to not commence

3    discovery until an order on the motion to dismiss?  Because

4    that's a stay.

5            MR. BROPHY:  That's what is currently proposed.

6            THE COURT:  Okay.

7            MR. BROPHY:  Sorry, Mr. Culpepper, to interrupt

8    you.

9            THE COURT:  Well --

10           MR. CULPEPPER:  Yes, Your Honor.  That's the --

11   oh, someone's trying to -- yeah, Your Honor.  That's what's

12   proposed.  We just -- the only thing that I'm asking for is

13   for them to start the disclosure, the process for notifying

14   their subscribers so that assuming that their motion is at

15   least partially denied, we could immediately start in

16   subscriber disclosure, and the first stage of discovery.

17           THE COURT:  Well, why don't we not enter a

18   scheduling order then, and within three business days of

19   Judge Dominico's decision on a motion to dismiss, please

20   submit a scheduling order and inform the Court whether you

21   need to have a conference, or whether it can just be entered

22   on the record.

23           MR. BROPHY:  And we'll be sure to use concrete

24   dates this time.

25           THE COURT:  Yes, I think that would be best.

1    Okay.

2          Does that sound okay with you, Mr. Culpepper?

3          MR. CULPEPPER:  Yeah, that sounds fine.  My --

4    that 45-day date that you mentioned, is that 45 days from

5    when the scheduling order is --

6          THE COURT:  No, that's -- there's no date now.  I

7    mean, we're not -- I'm not going to impose a date at the

8    moment.  All right?

9          So you guys have effectively agreed on a stay.  So

10   I think I'll go ahead and just make it formal and enter a

11   stay of the case, because that's what the parties request.

12   And then within three days of Judge Dominico's decision on

13   the motion to dismiss, you will submit a revised scheduling

14   order with hard dates, and then I'll get that entered.

15         In the meantime --

16         MR. CULPEPPER:  But there was one thing:  We

17   wanted -- I had requested -- plaintiffs have requested that

18   their disclosure -- the only thing that we didn't want not

19   stayed was the disclosure -- starting the disclosure process

20   for stay on the subscribers.

21         THE COURT:  Sure, and that's fine.  I mean, you

22   guys can -- you have the freedom to do that, and I think --

23   and you should, if that's your agreement.  That's what --

24   you should do that, okay?

25         MR. CULPEPPER:  So we don't have the freedom,

1    because we didn't -- the defendant needs a Court Order to

2    even start that process.  So that's why I filed the motion

3    for the Court Order.

4            So basically, I'm willing to stay everything

5    except for that part.  I mean, I explained why that's -- why

6    I want to do that.

7            THE COURT:  Well -- so, okay.  Can I grant 41?  Is

8    there any problem with that, Mr. Brophy?

9            MR. BROPHY:  Your Honor, we do have an issue with

10   that.  We haven't yet filed our response, which is due on

11   12/14.  And you may be aware, in the Charter case, Charter

12   was not required to produce personal information for all of

13   their subscribers, and we don't believe we should be

14   required to do that either.

15           We'd like an opportunity to brief that issue so

16   that the Court can understand the burdens that we would be

17   under and the complications that would present.  And from

18   our perspective, there's also some relevancy questions to be

19   addressed there.

20           So if I may, Your Honor, I'd request that we could

21   submit our briefing on that before you make your decision on

22   that issue.

23           THE COURT:  Okay.  That's fine.

24           MR. CULPEPPER:  Wait.  Your Honor said Document

25   41.  You didn't say Document 39.  Document 41 is the

1    protective order.

2            MR. BROPHY:  Oh.  Thank you for that

3    clarification.  Excuse me.  I have printouts here that don't

4    have the docket numbers on them.

5            THE COURT:  That's okay.  So 41, I can go ahead

6    and grant it.

7            MR. BROPHY:  The entry of the protective order?

8            MR. CULPEPPER:  Well, is 41 -- 41 is contested

9    too.  We had an issue -- three issues we didn't agree with

10   in 41.

11           THE COURT:  Okay.  Well, it's called a --

12           MR. CULPEPPER:  Well, why don't we --

13           THE COURT:  -- joint motion.  I mean --

14           MR. CULPEPPER:  -- we could put 41 off -- if the

15   defendant wants, we can put off resolving 41.  Well, maybe

16   we should go ahead.  I'm sorry, go ahead.

17           THE COURT:  No, I mean it's titled a "Joint

18   Motion."  Whenever we receive something called a "Joint

19   Motion," we assume that it is and we enter it -- I enter it,

20   but --

21           MR. CULPEPPER:  Those three issues are disputed.

22   My -- I mean, one of them ties into this disclosure of

23   subscriber information.  And another one is a specific

24   clause we added -- and Document 41, to cover the joint

25   motion, there's -- the three disputed issues are laid out,

1    and each side's position.

2              THE COURT:  All right.  So you want to have both

3    39 and 41 briefed; is that what you want to do?

4              MR. BROPHY:  Your Honor --

5              MR. CULPEPPER:  Well, 41 is -- 41, I don't think

6    we need further briefing.  39, yeah, the defendant wants

7    further briefings and that's -- seems -- I think 41, we can

8    discuss today.  I'll wait for defendant and hear his

9    response.

10             THE COURT:  Okay.  Well, let's do it and get it

11   out of the way so that I don't have to have my law clerks

12   draft something up.

13             All right.  Use of Protected Information is

14   disputed issue number one.  Plaintiffs proposed a paragraph

15   for addition, except for a -- as provided in the separate

16   order by a (indiscernible - voice drops) using subscriber

17   information to pursue legal -- or legal relief against

18   subscribers.

19             So do you want to be able to pursue individual

20   subscribers, then, in a case-by-case basis, I guess?

21             MR. CULPEPPER:  Yes, Your Honor.

22             THE COURT:  So, I mean, there are -- you know, I

23   was the person who did all of the BitTorrent cases, and so

24   if they have an IP that they can tie to a violation, they

25   simply get that person's information.  They're going to get

18

1    it one way or the other.

2           I mean, they can get it -- well, we -- I regularly

3    authorized subpoenas against the ISP to provide the

4    subscriber's information and I felt that was

5    well-established law.  So they get that stuff, probably, one

6    way or the other.

7           MR. BROPHY:  And, Your Honor, I understand that.

8           For example, in the Charter case, there was a

9    limited production of subscriber information, 100

10   subscribers -- residential subscribers --

11          THE COURT:  Right, but they had no intent to

12   pursue them whatsoever.  I mean, they were not going to file

13   lawsuits against them.  And so it wasn't add -- there wasn't

14   the same need for that information.

15          But if he's representing to me in good faith that

16   they would -- intend to pursue individual lawsuits, which

17   they're entitled to do -- in fact, you know, probably the

18   ISPs would prefer they do it that way than sue the ISP.

19          But anyway -- so if they're going to do that, are

20   they just -- they're legally entitled to the subscribers'

21   identifying information, right?

22          MR. BROPHY:  Your Honor, I guess the way that I

23   would respond to that is to say that I think we're dealing

24   with two different issues here.

25          THE COURT:  Okay.

19

1          MR. BROPHY:  With respect to WideOpen West, number

2    one, we're talking about a customer list, and that's

3    confidential information that we should typically be

4    entitled to protect.

5          Number two --

6          THE COURT:  Well, but I mean in most cases, that's

7    protected because the lawsuit is between two competitors --

8          MR. BROPHY:  Right.

9          THE COURT:  -- and, of course, you don't want a

10   competitor to have your customer list, because it shows not

11   just people they can reach out to, but the whole way you do

12   business.  That's why we protect it there.

13         What's the -- how's the -- there the same interest

14   in this situation?

15         MR. BROPHY:  What, essentially, the plaintiffs are

16   asking for, as I understand it, is to have our customer list

17   not be protected under the protective order, be fileable

18   publicly.

19         THE COURT:  Yeah, and -- well, I disagree with

20   that, of course.

21         MR. BROPHY:  Okay.  Yeah --

22         THE COURT:  Yeah, I -- no.  I mean, I don't know

23   why you would want to file it publicly.  If you can file it

24   and restrict it to the parties and the Court -- why are you

25   seeking to be able to file a customer list publicly?

20

1           MR. CULPEPPER:  I didn't ask that we be able to

2    file a customer list publicly.  These protective orders,

3    what would usually happen is they would disclose the

4    customer names, and we could only limit them for this -- we

5    could only use them for this case.

6           My problem is:  WideOpen West's past customers are

7    the footprint in states like Alabama.  If -- we couldn't

8    join the subscriber in Alabama to this lawsuit, I don't

9    believe.  So if we wanted to seek legal relief to, say, stop

10   a customer who's continuing to pirate works, we would have

11   to file a separate lawsuit in Alabama.  And we -- I don't

12   see the point of having to start over again and file a

13   request for early discovery in a different district when we

14   have the names.  And if those -- if that person refuses to

15   stop pirating the movies, we shouldn't be prevented from

16   seeking legal relief against that person.

17          MR. BROPHY:  If I may?

18          THE COURT:  What does this have to do with --

19          MR. CULPEPPER:  I'm not going to file the whole

20   entire list as a -- I'm not going to file the entire list as

21   a public document.

22          THE COURT:  Well, I mean, you shouldn't reveal

23   anybody's name, unless there's a good reason.  Most people

24   who sign up for an ISP don't expect their name and address,

25   and any other identifying information to be filed in a

21

1    Federal Court in a public manner.  I mean, there's not --

2    there's some privacy interest here.

3            So what are -- is there a real dispute here,

4    though?

5            MR. BROPHY:  If I may, Your Honor?

6            THE COURT:  Go ahead.

7            MR. BROPHY:  I think the real issue is there's a

8    separate mechanism that the plaintiff can use, the one you

9    just described, where you file a John Doe lawsuit with IP

10    addresses and get discovery.

11            THE COURT:  Correct.

12            MR. BROPHY:  This is a case against WideOpen West,

13    and the discovery in this case should be focused on this

14    case.  If they have an interest in asserting a claim against

15    someone in Alabama --

16            THE COURT:  I agree.

17            MR. BROPHY:  -- they should go over there and do

18    so.

19            THE COURT:  I agree.  Yeah, and so I just -- I'm

20    not the kind of judge that's going to make it easy for you

21    to sue people who aren't involved in this case by suing the

22    ISP here, getting names and addresses of people in other

23    states, and now you can go sue them.  We're not doing that.

24            So anyway, I guess I reject that provision and

25    accept the defendant's position.  Okay?

22

1          MR. BROPHY:  Thank you, Your Honor.

2          THE COURT:  The next one is --

3          MR. BROPHY:  If I may introduce it, Your Honor.

4          There's an issue regarding -- would have been

5    characterized as trade secrets.  And plaintiff has an

6    interest in creating a new category, a higher protected

7    class of material for trade secrets --

8          THE COURT:  Okay.

9          MR. BROPHY:  -- that the plaintiffs would be able

10   to designate -- we would be able to designate, too; we just

11   don't want the provision -- and they'd only be -- those

12   materials would only be reviewable in a clean room,

13   essentially.  Couldn't be used as evidence in the case

14   unless we moved the Court to downgrade them.  And from our

15   perspective, this provision isn't necessary.

16         We already have a provision for a Highly

17   Confidential Attorneys' Eyes Only material and source code

18   material.  If there's something that's trade secret, that's

19   what the protective order is for.  You just designate it,

20   and we protect it.

21         We don't believe this additional provision is

22   necessary, and it's going to be unduly burdensome, in our

23   view.

24         THE COURT:  What's an example of the type of

25   information that you believe they want protected by this

1    type of provision?

2              MR. BROPHY:  My colleague was told something over

3    the phone, but I understand that counsel for the other side

4    doesn't want that in a public record.  So --

5              THE COURT:  Okay.

6              MR. BROPHY:  -- I don't feel like I'm in a

7    position to say that.

8              THE COURT:  Okay.  So why don't I do that -- I'll

9    deal with that on a situation-by-situation basis.  If

10   there's a piece of information, Mr. Culpepper, that needs

11   higher protection, then I'll definitely consider that,

12   because I do value that ability to protect people's trade

13   information.

14             So if you wouldn't mind just -- we have a very

15   streamlined process in our District for resolving disputes

16   informally.  For example, in the -- I'll do this for you

17   guys too, if you want:

18             In the Charter case, if I receive an e-mail copied

19   to all sides at 1:05 p.m., we're on a Zoom call at 1:30, 25

20   minutes later resolving the issue.

21             So I'd be happy to do that for you, okay?

22             MR. CULPEPPER:  I don't understand.  What will

23   happen with this protective order at this --

24             THE COURT:  Well, we're not going to have the

25   Highly Confidential Trade Secret in it for the moment, but I

24

1    would consider such a protection on a issue-by-issue basis;

2    okay?

3              MR. CULPEPPER:  But -- so if we send -- if we

4    don't have this provision, and we send them the redacted

5    document, not the unredacted document --

6              THE COURT:  Right.

7              MR. CULPEPPER:  -- that's when this -- we would

8    have this -- we would come to you and you would ask us,

9    What's the trade secret?  I guess we would have an in-camera

10   discussion about it?

11             THE COURT:  Correct.  And what you would -- what

12   you could do is e-mail it to me so I'm looking at it without

13   the other side looking at it, and then we'll just talk about

14   it.

15             MR. CULPEPPER:  Can we -- is it possible that we

16   can make this be closed for a few minutes and I can explain

17   to you what exactly the part that we consider a trade

18   secret?  Because I'm very confident that it's not relevant

19   to defendant's defense.

20             THE COURT:  Right.  Well, we have seven other

21   people in the courtroom who aren't associated with the case.

22   I don't want to have to clear the courtroom.

23             MR. CULPEPPER:  Oh.

24             THE COURT:  So anyway, yeah, but what's wrong with

25   my solution, that I would give you that ability to have a

1    higher level of protection in -- as-needed basis?

2            MR. CULPEPPER:  Well, we can go that route, but

3    I'm just -- if we have this, I would send them -- I would

4    give them the unredacted documents, but they would just come

5    to the clean room.  We're already going to have a clean room

6    set up for the source code for Maverickeye.

7            So we're going to be using the clean room.  I'm

8    just so confident that if I explain to you what this is

9    about, you would agree that yeah, that's not relevant and we

10   could include this provision.  And I'm willing to specify in

11   restricted protective order, what exactly it is we want to

12   protect.

13           THE COURT:  Okay.

14           MR. CULPEPPER:  So --

15           THE COURT:  Well, I take it a clean room is

16   something --

17           MR. CULPEPPER:  -- I'm happy telephoning

18   counsel --

19           THE COURT:  A clean room is something --

20           MR. CULPEPPER:  -- Your Honor --

21           THE COURT:  -- you can only have access to?  I

22   mean, who has access to a clean room?

23           MR. BROPHY:  We could create one, Your Honor.  The

24   real --

25           THE COURT:  Tell me what it is.

26

1          MR. BROPHY:  Oh --

2          THE COURT:  I can understand the concept, but --

3          MR. BROPHY:  Oh --

4          THE COURT:  -- who has access to it?

5          MR. BROPHY:  It would be a room at a law firm

6    where there are no plugs, or wires connected to anything.

7    There's a computer sitting on a desk --

8          THE COURT:  A physical room?

9          MR. BROPHY:  Physical room with a computer on a

10   desk, not connected to anything --

11         THE COURT:  Yeah.

12         MR. BROPHY:  -- where we would go in and look at

13   things, but we couldn't make copies, we couldn't take notes,

14   we couldn't use it as evidence.

15         THE COURT:  Oh.

16         MR. BROPHY:  And for the record, I'm fine -- we

17   are fine with the proposal that you have.  If this is truly

18   a one-or-two-off issue, we can take them up and resolve

19   them --

20         THE COURT:  Well, how is a clean room different

21   than an Attorneys' Eye Only, other than the attorney

22   actually has the document?

23         MR. BROPHY:  We would need to go, for example, to

24   Mr. Culpepper's offices --

25         THE COURT:  Right.

27

1          MR. BROPHY:  -- physically, sit in front of the

2    computer, and --

3          THE COURT:  Again, why?  Not that you wouldn't

4    want to do that --

5          MR. CULPEPPER:  No, you're not --

6          MR. BROPHY:  I -- maybe I should be championing

7    this, but it just seems like an overly cumbersome approach

8    when we already have a protective order whose intent is to

9    protect materials from public disclosure.  So if there was a

10   trade secret, we will keep it protected.

11         THE COURT:  Yeah, I just can't imagine what kind

12   of information the plaintiff would have -- or the plaintiffs

13   would have that would fall under this, I guess.

14         MR. BROPHY:  And our concern is that --

15         MR. CULPEPPER:  That's why I'd like to explain --

16         MR. BROPHY:  -- we're labeling it "trade secrets,

17   which" is a huge, and kind of unbounded category.

18         THE COURT:  Right.  Yeah, go ahead -- Mr.

19   Culpepper, I -- whatever you say is on the record, so I

20   can't help that.

21         MR. CULPEPPER:  Right.  Well, I just want to

22   reiterate, as I stated in our document, we're willing to say

23   the category in a restricted document what we want to be

24   trade secret.  And I am highly confident that once -- I

25   can't say it now -- you see what we're looking at, that you

1    will agree that what we want to protect has no bearing

2    whatsoever on their defense to our claims --

3            THE COURT:  Well, then why is it relevant at all?

4    Why do we have to worry about documents that are not

5    relevant to any claim or defense in the case?

6            MR. CULPEPPER:  It will be in a document that's

7    relevant, but we want to redact it from that document.  And

8    we're -- our concern is we're -- I'm comfortable with having

9    the unredacted document in the clean room and they can look

10   at it and confirm that, Yeah, this is not -- this isn't

11   relevant.  And if they disagree, they can make their motion.

12           But we are concerned that it's electronic -- once

13   the document is sent -- mailed electronically, there's a

14   risk that they may -- someone may make a mistake and it get

15   out.

16           I'm not saying that I expect them to do it, but if

17   it leaked, it would be devastating to the business of some

18   our clients, and --

19           THE COURT:  Okay.  Well --

20           MR. CULPEPPER:  -- I guess I wish we could --

21           THE COURT:  Well, so you're saying that what you

22   want to protect is not relevant to the case, right?

23           MR. CULPEPPER:  Right, but it's part of a

24   document --

25           THE COURT:  I understand.  It's in a document that

1    otherwise might have relevant material, but that is not

2    relevant, right?

3            MR. CULPEPPER:  Yeah.  The part I want to protect

4    is not relevant to the --

5            THE COURT:  Okay.  Well, then just redact it.  It

6    -- don't treat it as highly confidential or trade secret,

7    just redact it as irrelevant.  And if the defense thinks you

8    over-redacted, they'll let me know.  But you -- I am

9    authorizing you, on the record, to just redact portions of

10   documents for relevance purposes alone, okay?

11           MR. CULPEPPER:  I understand, Your Honor.  Thank

12   you.

13           THE COURT:  All.  Right, and then the last one?

14   Is that it?  Just those two?

15           MR. BROPHY:  I believe those are the two from my

16   perspective, Your Honor.

17           THE COURT:  Okay.  So otherwise, Document 41 is

18   granted.  Are you guys able to then edit a protective order

19   and submit it to us so we can sign it?

20           MR. BROPHY:  Yes, Your Honor.

21           THE COURT:  Okay, and then 39's going to be

22   briefed?

23           MR. BROPHY:  Yes, Your Honor.

24           THE COURT:  Okay.  And then you -- we're going to

25   wait for a decision on a motion to dismiss and then schedule

30

1    out the entire case.

2            Now just fair warning, I would say the typical

3    motion to dismiss is going to be six to eight months out.

4    So that's just a matter of fact --

5            MR. BROPHY:  Understood, Your Honor.

6            THE COURT:  -- and maybe up to a year.

7            MR. BROPHY:  Understood.

8            THE COURT:  All right.  In the meantime, we'll

9    have a decision in Charter, because it's going to trial, I

10    think, in August -- or no, October.

11            So anyway, we'll see what this District does with

12    works.  Whether it --

13            MR. BROPHY:  Very keen to learn.

14            THE COURT:  -- they give 750 bucks, or $150,000

15    per work.  I thought it was $125,000, though, was the max?

16    Is it $150,000?

17            MR. BROPHY:  $150,000.  I'd like it to be zero.

18            THE COURT:  Yeah, I know you would.

19            All right.  Anything else, Mr. Culpepper, today?

20            MR. CULPEPPER:  No, Your Honor.  Thank you very

21    much.

22            THE COURT:  Thank you.  Mr. Brophy?

23            MR. BROPHY:  No, Your Honor.  Thanks for your

24    time.

25            THE COURT:  All right.  Thank you, guys.  Thank

1    you for your appearance today, and we'll hold this one in

2    reserve as far as the scheduling order goes, okay?

3              MR. BROPHY:  Thank you, Your Honor.

4              THE COURT:  All right.  Take care.

5              (Whereupon the within hearing was then in

6    conclusion at 10:48 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  TRANSCRIBER'S CERTIFICATION

 2   I certify that the foregoing is a correct transcript to the

 3   best of my ability to hear and understand the audio

 4   recording and based on the quality of the audio recording

 5   from the above-entitled matter.

 6

 7   /s/ Dyann Labo                    December 16, 2021

 8   Signature of Transcriber              Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```