**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:21-cv-1901-DDD-MEH</u>

AFTER II MOVIE, LLC, et al.,

      Plaintiffs,

v.

WIDEOPENWEST FINANCE, LLC,

      Defendant.

---

**PLAINTIFFS' MOTION TO COMPEL DEFENDANT TO PROVIDE DOCUMENTS AND
INFORMATION, RESPONSE TO INTERROGATORIES AND TO ANSWER
DEPOSITION TOPICS**

---

      Plaintiffs move pursuant to Fed. R. Civ. P. 37(a) for an Order compelling Defendant to provide documents and information, to fully respond to interrogatories and to answer certain deposition topics.

**<u>INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES</u>**

**I.     Introduction**

      1.     Attached **Exhibit "A"** shows how each of the below main disputes summarized below relates to outstanding discovery.

      2.     <u>No timely production of documents</u>.  Can Defendant completely fail to timely produce documents in response to discovery?

      3.     <u>The pre-2018 evidence.</u>  Is evidence of Defendant's policies, practices, and procedures for its purported DMCA safe harbor policy from 1/1/2014-7/13/2018 relevant in view of the evidence Plaintiffs presented to Defendant of piracy of their Works beginning in early 2015?

4.      <u>Defendant's disparate enforcement practices between other policies and its DMCA policy.</u>   During the same period of its purported DMCA policy, are Defendant's policies, practices, and procedures for selectively taking measures for piracy of content of studios with which it had a profitable relationship relevant?

5.      <u>Defendant's discussions of other ISP copyright lawsuits.</u>   Are Defendant's communications concerning other ISP copyright lawsuits relevant evidence for proving Defendant's safe harbor policy is a sham that has not been reasonably implemented, particularly when Defendant has adopted some of the same practices Courts have deemed dubious in other ISP copyright lawsuits?

6.      <u>Defendant's network monitoring practices</u>. Are Defendant's policies, practices, and procedures for monitoring its network relevant to rebut its denials in the Amended Answer [Doc. #140] of allegations 147 and 174 that it monitors its subscribers' access, bandwidth, usage, transmissions and content, Defendant's contention that it had no way to verify allegations in Notices and proving that it does not qualify for any of the safe harbors in 17 U.S.C. §512(a)-(d)?

7.      <u>Defendant's failure to preserve electronic data</u>. Are Defendant's policies, practices, and procedures for retaining IP address customer assignments relevant to prove that it interferes with copyright owners' ability to send notices to service providers for where it has evidence of ongoing infringement and that it violated Fed. R. Civ. P. 37(e)?

## II.      Legal Standard

8.      Fed. R. Civ. P. 26(b)(1) provides that the scope of discovery includes "any nonprivileged matter that is relevant to the party's claim or defense and proportional to

the needs of the case," and that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." *In re Office of the Utah AG*, 56 F.4th 1254, 1261 n.4 (10th Cir. 2022).

9.     Defendant "bears the burden of raising entitlement to the safe harbor and of demonstrating that it has…taken the steps necessary for eligibility." *Capitol Records, LLC v. Vimeo*, LLC, 826 F.3d 78, 94 (2d Cir. 2016); *see also Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F3d 1045, 1052 (9th Cir. 2017) ("Because the safe harbor is an affirmative defense, [a defendant] must establish 'beyond controversy every essential element,' and failure to do so will render ineligible for the safe harbor's protection.").

## III.     Argument

### A. Defendant completely fails to timely produce documents in response to discovery.

10.     On Nov. 23, 2021 (over 20 months ago), the Parties agreed to a first staged discovery limited to Defendant's DMCA safe harbor defense.  Discovery opened in April. Yet Defendant still has not produced basic information such as its DMCA database that should have been ready long ago. An example of Defendant's feet dragging is its response to Plaintiffs' Second Request for Production of Documents that is replete with boilerplate objections and the vague statement "WOW will produce" without any definite timeframe.  *See* Ex. "I". Plaintiffs have received *zero* documents in response to request numbers 3-6, 8-26, 28, 31-32, 37, 40, 51, 52, 57-59, 63, 71, 72, 76, 82, and 84-89. Regarding request numbers 90-94, Defendant has only turned over documents that show statuses for customers by customer ID without any means to tie the customer ID to the IP address.  Plaintiffs should not be prejudiced by a document dump eve of the discovery

cut-off. Another example is Defendant's answer to interrogatory #4.  *See* Ex. "G".  Rather than simply answering with the limits, restrictions, and quotas of Defendant's purported DMCA policy, Defendant directs Plaintiff to 100 documents, three of which are vast spreadsheet sets with unintelligible codes[1]. This is not the sufficient detail required by Rule 33(d)(1).

**B.  Evidence concerning Defendant's policies and practices 1/1/2014-7/13/2018 is relevant**.

　　　*i.  Plaintiffs discovered Defendant's liability in 2020.*

11.     Plaintiffs have turned over evidence of piracy of their Works and DMCA violations going back to 2015.  *See* AFTERII1-AFTERII77.  The discovery rule allows Plaintiffs to seek damages going back to 2015 because they did not discover Defendant's liability until 2020.   Accordingly, Plaintiffs seek discovery from Defendant starting from Jan. 1, 2014, the year prior. The relevant point in time is when Plaintiffs learned of "[Defendant's] policy of refusal to take action in the face of such infringement by its customers, which is central to Plaintiffs' contributory liability theory against..."   *UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, 384 F. Supp. 3d 743, 769 (W.D. Tex. 2019) ("*Grande*").  Further, as noted by the Court in the hearing of June 28, 2023, Plaintiffs need only make "a nonfrivolous argument" in support of the discovery rule. Ex. "B" at p. 6.  Plaintiffs have presented a nonfrivolous argument establishing discovery supported by public records.  On April 4, 2019, some of the Plaintiffs filed lawsuits against the operator of the piracy website YTS, among other defendants, in the District of Hawaii (Case  Nos.  1:19-cv-00169-LEK-KJM,  1:19-cv-389-ACK-KJM  and  1:19-cv-1:19-cv-

---

[1] For example, WOW99 has over 150000 rows.

00413-SOM-KJM).  Between December 27, 2019 and April 14, 2020, the Hawaii District Court entered stipulated judgments against the YTS website operator to resolve the lawsuits. *See* Ex. "C".  In 2020 the YTS website operator provided account information on its registered users included the email address used to register for an account with the YTS website, the torrent files the registered users downloaded, and the IP addresses from where they downloaded the torrent files. *See* First Amended Complaint ("FAC") [Doc. #25] at ¶¶ 96-98, Ex. "2" [Doc. #25-2] to FAC.  Next, Plaintiffs' counsel obtained data from PML concerning notices sent to Defendant and from MEU concerning capture records of infringement of their Works to confirm the data provided by the YTS website operator.  *See* FAC at ¶¶122-139.  Shortly thereafter, on Mar. 15, 2021, Plaintiffs' counsel sent a demand letter to Defendant to attempt to resolve the issue amicably.  *See* Ex. "4" to FAC [Doc. #25-4].  Accordingly, it would not have been possible for Plaintiffs to know that Defendant allowed its service to be a hot bed for piracy until they received the information from the YTS website operator, the notice data from PML and the capture data from MEU.

12.    Defendant argues that the knowledge of MEU should be imputed to Plaintiffs because certain entities (PML, CMS and Crowell Law) engaged MEU.  *See* Ex. "B" at p.5.  MEU is <u>not</u> and has never been any of Plaintiffs' agent.  The portion of the First Amended Complaint [Doc. #25] unartfully stating, "The Plaintiffs engaged Maverickeye UG ("MEU")…" does not imply any agency relationship between Plaintiffs and MEU.  Plaintiffs are correcting this confusing language in the proposed Second Amended Complaint [Doc. #149-1] to state "Maverickeye UG ("MEU"), Irdeto, and/or Facterra LLC ("Facterra") were engaged to identify the IP addresses…".  Either does not

change the fact that the notices were sent in names of PML, CMS or Crowel Law – not MEU and that MEU is not Plaintiffs' agent.  *See, e.g.,* Ex. "3" [Doc. #25-3] to the FAC. Nonetheless, despite discovery in this case being limited only to the issue of Defendant's purported safe harbor, Plaintiffs have turned over the applicable contracts to Defendant that show some of the Plaintiffs engaged Crowell Law, CMS or PML to send notices to ISPs.  *See* AFTERII78-AFTERII197.  Crowell Law, CMS or PML in turn engaged MEU to track infringements and generate notices to be sent to the ISPs.

13.     Most importantly, Plaintiff Screen Media Ventures ("SMV") never engaged Crowell Law, CMS, PML or MEU.  Rather, Foresight Unlimited, a predecessor in interest to SMV, entered into an agreement with a *different* entity (Intellip LLC) in 2014.  *See* AFTERII181.  Accordingly, any knowledge of Crowell Law, CMS, PML or MEU cannot be imputed to SMV.  This fact should resolve this entire issue at this stage because infringement captures for the SMV Work *2 Guns* begin in June 1, 2015. *See* AFTERII1-AFTERII77.

14.     Defendant has no evidence that MEU was/is the agent of Crowell Law, CMS, PML rather than an independent contractor[2].  In *BWP Media USA, Inc. v. Clarity Dig. Grp.*, LLC, the Tenth Circuit rejected an argument that an independent contractor's action and knowledge of uploading infringing content could be imputed to the service provider.  *See BWP Media USA, Inc. v. Clarity Dig. Grp.*, LLC, 820 F.3d 1175, 1180 (10th Cir. 2016).  Defendant has not presented any evidence that the scope of any relevant agency agreement included informing Plaintiffs of potential liability of ISPs.  This Court has stated that Defendant has the burden of proof for disproving Plaintiffs' position that

---

[2] The agreement between Crowell Law and MEU explicitly states, "Nothing in this agreement shall make either party an agent of the other party." AFTERII139-AFTERII145.

the discovery rule is applicable.  *See Beidleman v. Random House, Inc.*, 621 F. Supp. 2d 1130, 1132 (D. Colo. 2008) ("Defendant had the burden of proof on the issue of when a reasonably prudent person would have discovered the alleged infringement").  Moreover, this Court has repeatedly stated that resolving the factual issues of whether the discovery rule is applicable is not appropriate even for summary judgment.  *See id.* ("That was a fact-intensive inquiry that could not be decided on summary judgment."); *Home Design Servs. v. B&B Custom Homes, LLC*, 509 F. Supp. 2d 968, 973 (D. Col. 2017) ("…whether or not Plaintiff knew or should have known of the alleged infringement…remains a disputed issue of material fact");  *U2logic, Inc. v. Am. Auto Shield, LLC*, Civil Action No. 13-cv-00419-PAB-CBS, 2014 U.S. Dist. LEXIS 138396, at *14-16 (D. Colo. Sep. 30, 2014) (citing *Home Design Servs.* and arriving at similar conclusion).  Because resolution of the facts behind the discovery rule is not even appropriate for *summary judgment*, Plaintiffs should certainly be able to propound discovery for pre-2018 infringements based upon the discovery rule.

15.    Assuming *arguendo* an agency relationship between PML/CMS/Crowell Law (the "Agent") and MEU, the Court should reject any argument that knowledge that Agent had from MEU is imputed to Plaintiffs.  Firstly, Defendant has not provided any evidence that the Agent acquired all the capture data from MEU.  Indeed, Plaintiffs have presented as an exhibit to the FAC evidence from the YTS website operator.  Secondly, it would be manifestly unjust to impute to Agent and thus Plaintiffs the capture data MEU has acquired *all over the world* to Plaintiffs.  Providing extensive data from MEU's worldwide capture data or even capture data pertaining to just Defendant was not consistent with the contractual duties of the Agent.  Thirdly, Defendant has provided no

evidence that the contracts imputed a duty on the Agent or MEU to provide Plaintiffs with the information concerning ISP liability.  Because the contracts call for California law, California's rule limiting imputed notice to the scope of the agency relationship is applicable. *See Primm v. Joyce*, 87 Cal. App. 2d 288, 291-92, 196 P.2d 829 (Cal. App. 1949) ("[T]he law is well settled that notice to an agent is notice to the principal only as to those things within the scope of the agency."), s*ee also* Restatement (Second) of Agency §272 ("[T]he liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information.")  Defendant has not and cannot make any argument that the Agent had a legal duty to disclose to Plaintiffs information of Defendant's liability or that such was within the scope of its duties.

16.     Assuming *arguendo* that knowledge from Agent and MEU is imputed to Plaintiffs, this knowledge still would not have provided discovery of Defendant's liability because identifications of customers assigned IP addresses and Defendant's DMCA policy are uniquely in Defendant's possession. Plaintiffs could never have determined with certainty that the same subscribers were responsible for ongoing piracy unabated until they obtained the data from the YTS website operator in 2020. Notably, Defendant refuses to explicitly publish the details of its purported DMCA policy such as how many notices it takes before it finally terminates a subscriber for being a repeat infringer.

*ii. The pre-7/13/2018 policies and practices are relevant even without the discovery rule.*

17.     In *Grande*, the Western District of Texas found information on how Defendant handled DMCA notices *prior* to the applicable three-year period relevant.  *See*

*Grande*, 2018 WL 4627276, 2018 U.S. Dist. LEXIS 164761, at *9 (W.D. Tex. Sep. 26, 2018).  As noted by the Southern District of Fla. in *Disney Enters. v. Hotfile Corp*, because it is questionable whether a party can ever regain the protections of the DMCA, it is necessary to determine the "exact point" when the Defendant implemented a DMCA-compliant policy or stopped being a "hotbed for infringement".  *Disney Enters. v. Hotfile Corp.*, No. 11-20427-CIV-WILLIAMS, 2013 WL 6336286, 2013 U.S. Dist. LEXIS 172339, at *80 (S.D. Fla. Aug. 28, 2013).  The pre-7/13/2018 discovery Plaintiffs seek will provide evidence of the exact point that Defendant implemented a DMCA compliant policy (if it ever did), Defendant's knowledge of its obligations under the statute, circumstantial evidence that it was aware of infringing conduct on its system, and that it had the practical ability to take action but chose to continue being a "hotbed for infringement".

*iii. Defendant waived objections to providing identification and lease logs for pre-7/13/2018 subscribers.*

18.    Defendant waived any objections concerning relevance of the lease logs and identifications for pre-7/13/2018 IP addresses by failing to timely make these objections to the First Request for Production of Documents ("1RPOD") served on it on Jan. 26, 2022.  *See* Ex. "D" at p.2.  Defendant's deadline to respond to 1RPOD was April 5, 2023.  On Oct. 17, 2022, Defendant filed an Objection [Doc. #115] but it did not include any objections to lease logs, providing subscriber information prior to 3 years from case filing date, or information for dismissed titles.  *See* Ex. "E".  Defendant served response on 4/24/2023 including the lease log objection, but that was after the April 5, 2023 deadline.  *See* Ex. "D" at p.3.  Because Defendant failed to timely serve these objections, it should be compelled to fully respond and provide all identification data and lease logs.

**C.   Defendant's disparate practices when enforcing policies to its benefit in comparison to its purported DMCA policy is relevant.**

19.    A central issue in this case is whether Defendant has reasonably *implemented* a DMCA policy for terminating repeat infringers consistent with 17 U.S.C. §512(i)(A).  Defendant asserts that it has been terminating subscribers per a DMCA policy since 2018.   However, documents Defendant has provided in discovery shows that it

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

20.    Evidence of contradictory practices such as Defendant taking more aggressive action when its subscribers infringe Works of film studios or distributors for which Defendant has negotiated specific agreements for its profit is relevant circumstantial evidence showing that its DMCA policy was purposefully implemented as a sham.  *See Sony Music Entm't v. Cox Communs.*, Inc., No. 1:18-cv-950-LO-JFA, 2019 WL 13298945, 2019 U.S. Dist. LEXIS 231858, at *4 (E.D. Va. Nov. 19, 2019) (Finding communications not directed at specific infringement of works are directly relevant circumstantial evidence regarding the ISP's policies).

**D.  Defendant's internal discussions of IP copyright lawsuits are relevant.**

21.    Defendant's internal communications about other ISP copyright lawsuits is relevant for rebutting Defendant's safe harbor defense.  In other ISP lawsuits, Courts have viewed internal emails as circumstantial evidence that an ISP has failed to reasonably

implement a DMCA safe harbor policy.  *See UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, 384 F. Supp. 3d 743, 755 (W.D. Tex. 2019) ("*UMG*") (citing internal email discussing how the ISP was not similar to other ISPs).  For example, Defendant's internal communications about *BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, 881 F.3d 293, 301 (4th Cir. 2018) will show that Defendant knew that Courts repeatedly rejected its arguments that notices needed to include verifiably information before an ISP was required to act.  *See* Mot. to Dismiss [Doc. #35] at p. 3 (arguing notices must be verified), p. 15 (arguing no "…no evidence or information that would enable WOW to verify…"). Particularly, the Western District of Texas rejected this argument while noting that it was also rejected in *BMG*.  *See UMG*, 384 F. Supp. 3d at 757 ("…Grande's argument that the… notices failed to demonstrate appropriate circumstances justifying termination is similarly unpersuasive. This argument was also made by the defendant in *BMG*.")   And the District Court in *BMG v. Cox* noted that "Cox publicly purported to comply with its policy, while privately disparaging and intentionally circumventing the DMCA's requirements" and "The emails in the record strip Cox of any innocence. They make clear that it was Cox's policy to intentionally circumvent the DMCA" in rejecting the safe harbor defense. *BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, 149 F. Supp. 3d 634, 655 (E.D. Va. 2015).  Defendant's communications will be particularly relevant in view of the fact that ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████ – the same type of behavior the Fourth Circuit criticized in *Cox*. Defendant should not be permitted to argue that these were just innocent mistakes or

oversights when it was aware that the same type of behavior made Cox lose its safe harbor.

22.     Evidence shows that Defendant summarily ignored ███████████████ ████████████████████████████████████████████████ Plaintiffs dispute that §512(i) requires notifications meet these types of requirements. Nonetheless, assuming *arguendo*, the noncompliant notices at least provided Defendant with red flag knowledge that its subscribers were pirating copyright protected content. Other ISP cases such as *BMG* and *UMG* in which the ISP chose to ignore the notices because they included settlement demands show that an ISP cannot ignore notices for arbitrary reasons.  Defendant's internal communications of *BMG* and *UMG* will show that Defendant has failed to reasonably implement a DMCA safe harbor policy and that its hyper technical reasons for deeming notices "noncompliant" was part of a sham.

23.     Defendant has not made clear on which of the §512 safe harbors it is relying.  *See* Answer [Doc. #145] at ¶5 ("17 U.S.C. § 512, including but not limited to § 512(a), bars Plaintiffs' claims against Defendant.").  Nonetheless, Courts have concluded that failure to terminate subscribers in the face of "red flag" knowledge negates the safe harbor.  *See Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020, 1043 (9th Cir. 2013) ("Fung had "red flag" knowledge of a broad range of infringing activity for reasons independent of any notifications from Columbia, and therefore is ineligible for the § 512(c) safe harbor.).  Defendant's internal communications of *BMG* and *UMG* will show that Defendant has red flag knowledge.

**E.  *Defendant's profits from pirating customers.***

24.     Plaintiffs requested information on the total number of accounts Defendant has terminated per month for failure to pay.  *See* Ex. "J" (interrogatory #7). Defendant did not object based upon burden but based upon relevance.  Nor could it as Defendant discloses in its publicly SEC filed statements detailed financial provisions for delinquent customers. *See* Ex. "L".  However, in other cases such as *Cox*, the Court has evaluated the reasonableness of the policy by comparing terminations for DMCA violations to terminations for non-payment.  *See Cox*, 149 F. Supp. 3d at 659 (E.D. Va. 2015) ("Cox also admits that of the 22 terminated accounts, 17 of those had also either failed to pay their bills…"). Defendant's profit and revenue from pirating customers is relevant to establish its motive for failing to terminate repeat infringers and rebut Defendant's bogus First Amendment argument.  Defendant did not terminate certain customers for which Plaintiff's sent dozens of notices (in some cases over a 100 notices) of ongoing infringement.  Defendant's gross revenue and profits from these pirating subscribers are important for showing Defendant's motive for failing to terminate these customers.  This is particularly the case here because Defendant appears ready to argue that the notices were "non-compliant" based upon hyper technical reasons.

**F.  Defendant's network monitoring policies and procedures are highly relevant.**

25.     Each of the §512(a)-(d) safe harbors has specific technical requirements. For example, the §512(a)(1)-(5) safe harbor requires the service provider to satisfy five technical requirements pertaining to how material is transmitted through the system to recipient.    Further,  §512(i)(B)  includes  a  requirement  that  the  service  provider accommodate and not interfere with standard technical measures used by copyright owners to protect copyrighted works.  Evidence of Defendant's network monitoring is

relevant to proving that it does not satisfy the technical requirements of §512(a)(1)-(5) or the other §512(a)-(d) safe harbors.  And this is not speculation.  Public records show that Defendant has taken advantage of deep packet inspection techniques that on its face fail to satisfy at least §512(a)(4).  *See* Jacqui Cheng, Nov. 11, 2018, "NebuAd, ISPs sued over DPI snooping, ad-targeting program", https://arstechnica.com/tech-policy/2008/11/nebuad-isps-sued-over-dpi-snooping-ad-targeting-program/ [last accessed on July 4, 2023].  Further Defendant's own publications show that Defendant is closely monitoring its network usage.  *See* Ex. "K".  In other ISP lawsuits, Courts have found Defendant's network monitoring techniques to be relevant.  *See Sony Music Entm't v. Cox Communs.*, Inc., No. 1:18-cv-950-LO-JFA, 2019 WL 13298945, 2019 U.S. Dist. LEXIS 231858, at *8 (E.D. Va. Nov. 19, 2019) (finding that P2P traffic is relevant to the ISP's business mode, finance incentives and knowledge of potentially infringing activity).

### G.  Defendant's data preservation records are relevant.

26.     This Court already ordered the Parties "to work out a process for Plaintiffs to receive information supporting Defendant's explanations for the unavailability of subscriber information." Order [Doc. #126] of Dec. 15, 2022.  In the Order the Court noted, "…I am inclined to agree with Plaintiffs that discovery is appropriate concerning the factual basis for Defendant's inability to provide subscriber information."  To this end, in interrogatory 12, Plaintiffs asked Defendant to "describe all efforts WOW made to preserve identification data for subscribers assigned IP addresses…".  Exhibit "G". Rather than describing what efforts it made, Defendant focused on what it did not do.  But Defendant does not describe the day in month in 2021 that it terminated its relationship

with the third party or when it requested the subscriber information.  Id.  This information is relevant to determining whether Defendant complied with Rule 37(e).

27.    §512(i)(B) includes a requirement that the service provider accommodate and not interfere with standard technical measures used by copyright owners to protect copyrighted works.  █████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████  Plaintiffs need Defendant's records to determine when ██████████████████████████████.

## IV.  Conclusion

28.    For the foregoing, Plaintiffs pray that Court issue an order compelling Defendant to fully respond to the outstanding discovery without objections in 5 days, to answer the deposition topics and grant them such other and further relief to which they may be justly entitled to receive.

DATED: Kailua-Kona, Hawaii, July 11, 2023

*/s/ Kerry S. Culpepper*
Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone: (808) 464-4047
Facsimile: (202) 204-5181
E-Mail: kculpepper@culpepperip.com
Attorney for Plaintiffs


I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

**D.C.COLO.LCivR 7.1(a) Certificate of Good Faith Conference**

The undersigned met and conferred with counsel for Defendant on May 23 and 26, 2023 concerning Defendant's objections to the discovery but were unable to resolve all of their disputes.   On June 28, 2023, after discovery conference, Judge Hegarty granted Plaintiffs leave to file a motion to compel.  *See* Order [Doc. #154].

By: /s/ Kerry S. Culpepper

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2023, I caused a copy of the foregoing to be served upon all counsel of record via ECF notification.

By: /s/ Kerry S. Culpepper