1

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF COLORADO

3

   AFTER II MOVIE, LLC, ET AL,    .  Case No. 21-cv-01901-DDD-MEH
4                                 .
                                  .
5           Plaintiff,            .
                                  .
6  vs.                           .  Byron Rogers Courthouse
                                  .  1961 Stout Street
7  WIDEOPENWEST FINANCE, LLC,     .  Denver, CO  80294
                                  .
8           Defendant.            .
                                  .  March 19, 2024
9  . . . . . . . . . . . . . . .  .  10:07 a.m.

10      **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
        **MICHAEL E. HEGARTY, UNITED STATES MAGISTRATE JUDGE**
11

12  APPEARANCES:

13
   For the Plaintiff:          Culpepper IP, LLLC
14                             By:  Kerry Culpepper
                               75-170 Hualalai Road
15                             Suite B204
                               Kailua Kona, HI  96740
16                             (808) 464-4047

17                             Weide & Miller, LTD.
                               By:  F. Christopher Austin
18                             10655 Park Run Drive
                               Suite 100
19                             Las Vegas, NV  89144
                               (702) 382-4805
20
   For the Defendant:          Armstrong Teasdale, LLP
21                             By:  Zachary Howenstein
                               By:  Angela Kennedy
22                             7700 Forsythe Boulevard
                               Suite 1800
23                             St. Louis, MO  63105-1807
                               (314) 621-5070
24

25

1  Appearances Continued:

2  Court Recorder:              Clerk's Office
                                U.S. District Court
3                               1961 Stout Street
                                Denver, CO  80294
4

5  Transcription Service:       AB Litigation Services
                                216 16th Street, Suite 600
6                               Denver, CO  80202
                                (303) 296-0017

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

3

```
 1                    (Time Noted:  1:26 p. m.)
 2              THE COURT:  All right.  21-cv-1901, After II
 3   Movie, LLC versus WideOpenWest Finance, LLC.
 4              Make your appearances when you're ready.
 5         (Brief pause)
 6              MR. CULPEPPER:  Your Honor, Kerry Culpepper
 7   appearing on behalf of plaintiffs, along with co-counsel
 8   Chris Austin of the firm Weide & Miller.
 9              THE COURT:  Thank you.
10              MR. CULPEPPER:  Good afternoon, Your Honor.
11              THE COURT:  You, too.
12              MR. HOWENSTINE:  Good afternoon, Your Honor.  Zach
13   Howenstine for the defendant, WideOpenWest.  I will note, I
14   do have a colleague who was planning to dial in, because the
15   Court did provide Zoom conference information.
16              THE COURT:  Oh, so, by video?
17              MR. HOWENSTINE:  I think she's just planning to
18   dial in by phone only.  I don't think she's planning to
19   appear or argue, but she was planning to at least listen in.
20              THE COURT:  That's fine.  I think our phone
21   system's on.
22              THE COURTROOM CLERK:  No, it's not.
23              THE COURT:  Okay.
24              THE COURTROOM CLERK:  Yeah, we can
25   (unintelligible).
```

1              THE COURT:  But it's just phone?

2              THE COURTROOM CLERK:  Yes.  But they are --

3              THE COURT:  They calling in through the video

4    line?

5              THE COURTROOM CLERK:  Yeah.

6              THE COURT:  Okay.

7              AUTOMATED VOICE:  Welcome to a Cisco meeting.  You

8    are entering the meeting now.

9              THE COURT:  All right.  Let's see.  Go ahead, I

10   guess, Mr. Culpepper.

11             MR. CULPEPPER:  Your Honor, would you like for me

12   to address the Court by the --

13             THE COURT:  Whatever you're more comfortable

14   doing.  We're just going to roll up our sleeves and get it

15   done.

16             MR. CULPEPPER:  First off, I believe the first

17   issue for the Court is Defendants -- well, Defendant

18   requested this hearing and Defendant raised the issue of

19   subpoenas that were sent by first class mail.  Would Your

20   Honor like for Plaintiff to address this issue first, or for

21   Defendant?

22             THE COURT:  No, go ahead.  We can have Mr.

23   Howenstine do it.

24             MR. HOWENSTINE:  Thank you, Your Honor.

25             Just a little bit of context.  First, Your Honor

5

1  may recall this is a secondary copyright infringement case

2  and secondary DMCA case against an internet service provider.

3  Earlier in the case Your Honor allowed disclosure of

4  approximately 300-350 subscribers of WideOpenWest internet,

5  I'll use the term WOW for WideOpenWest.

6          THE COURT:  Fine.

7          MR. HOWENSTINE:  So, Plaintiff's Counsel has the

8  identities of those subscribers, and over the last several

9  months they have issued many Rule 45 subpoenas to current and

10 former WOW subscribers.

11         THE COURT:  How many?

12         MR. HOWENSTINE:  Over 150 total, approximately 100

13 in this calendar year.

14         We, Armstrong Teasdale, my firm, represents a

15 minority of the affected subscribers for discovery purposes.

16 So, in response to a recent wave of those subpoenas both

17 WideOpenWest and, we, as counsel, began to get inquiries from

18 customers about these subpoenas that they had received from

19 the Court.

20         THE COURT:  Customer clients, or others?

21         MR. HOWENSTINE:  Both.  Asking about, you know,

22 essentially, what is this, what are these subpoenas, are we

23 obligated to respond to them.  And just from some preliminary

24 fact gathering, it appears that all of these subpoenas were

25 sent by regular U. S. mail to subscribers located around the

1  country.   WOW has subscribers in many different markets, not

2  just in Colorado.   Actually, I don't think any of them are in

3  Colorado at this point.   So, in a lot of different

4  jurisdictions.

5            Based on our review of the case law, service of a

6  subpoena by regular mail is not proper.   And if we fast

7  forward where we're going to find ourselves is with many

8  different disputes in many different courts about the

9  propriety of these subpoenas and whether they were properly

10 served.   And in our view, Your Honor, once plaintiffs

11 obtained this subscriber information they had two choices.

12 They could approach the subscribers informally, ask if they

13 were willing to cooperate, and provide information, or -- and

14 the advantage of that, obviously, is that it's easy, minimal

15 --

16            THE COURT:   Cheap.

17            MR. HOWENSTINE:   Minimal, if any, cost.

18            THE COURT:   Yeah.

19            MR. HOWENSTINE:   The other option is you can

20 properly serve a subpoena, which carries with it the gravitas

21 of the Court, and it costs a little bit more money.   But what

22 the plaintiff's appear to have done is taken a third course.

23            And I don't want to suggest that they've done this

24 with each and every subpoena, because it does appear that at

25 least some Rule 45 subpoenas were personally served, they

1  filed a motion to compel in the Eastern District of Michigan

2  attaching proofs of service, showing in-hand delivery.  But

3  we've asked them for information about, you know, what

4  percentage, which subpoenas were served by which methods, and

5  they've refused to provide that information.

6         THE COURT:  All right.  Stop there.  What's the

7  basis for your refusal to provide that information?

8         MR. CULPEPPER:  Thank you, Your Honor.  Kerry

9  Culpepper, appearing on behalf of plaintiffs.

10         Your Honor, we do not believe we were obligated to

11  report to Defendant's Counsel on how subscribers were served

12  or what means of service were used.

13         THE COURT:  Why?

14         MR. CULPEPPER:  Because it wasn't a discovery

15  request.  Defendant emailed Plaintiff's Counsel suddenly and

16  made the accusation that this service was improper.  That

17  particular week, to be frank, I was very busy preparing for

18  an important deposition of a former WOW officer.

19         Now, I, in preparation for this hearing, we did

20  some rough numbers to see what the numbers were of how these

21  particular subscribers were served, and first, I can say all

22  of the subscribers in Michigan and Ohio were for the most

23  part served by personal service.

24         THE COURT:  Okay.  So those are inconsistent.  All

25  were for the most part.  So it's either for the most part or

 1   it's all.

 2           MR. CULPEPPER:  Well, some subscribers were -- an

 3   attempt was made to serve personally.  Some of the

 4   subscribers' service was unsuccessful, and some of the

 5   subscribers with services unsuccessful, we sent a subpoena by

 6   either certified mail or first class mail.

 7           THE COURT:  Okay.

 8           MR. CULPEPPER:  That's in Michigan and Ohio.

 9           THE COURT:  Okay.

10           MR. CULPEPPER:  And now, the Eleventh Circuit,

11   which I was prepared to argue today this, of course, if a

12   Rule 45 subpoena is served, if it's enforced, the enforcement

13   would take place in the court where its compliance is held,

14   which would be the Eleventh Circuit.  So for those

15   subscribers in Florida, Alabama, and Georgia, which is the

16   Eleventh Circuit, a portion of those were served by mail,

17   first class mail.  Some were served by certified mail.  I

18   believe approximately 20 or 30 were served by certified mail.

19           Another important point is with regard to this

20   last wave of subpoenas sent, we did not get subscriber

21   identities for so many subscribers until this year.

22   Defendant had made an objection to providing those identities

23   because the infringements were pre 2018 infringements.  So

24   the defendant turned over those names this year, and when we

25   received those names, we began sending subpoenas to those

1  subscribers.

2          If Your Honor wishes, I am prepared to discuss

3  the validity of the service by mail and other points to

4  address the defendant's concern.

5          THE COURT:  Well, it would have to be some kind of

6  case law that deviates from the actual rule, because the rule

7  is fairly simple and straightforward and it says serving a

8  copy requires delivery to the named person, plus -- well,

9  that's what it requires.  So, I guess you're saying delivery

10  would include mail, potentially.

11          MR. CULPEPPER:  Yes, Your Honor.  And courts in

12  the Southern District and the Middle District of Florida

13  agreed that service by mail is appropriate.  I cited some of

14  those cases in my email to Your Honor, and in response

15  Defendant has said that those cases only approve service by

16  certified mail.  So, today, I've also included copies of

17  three cases where in the Eleventh Circuit where courts said

18  service by -- of a Rule 45 subpoena by ordinary first class

19  mail is important and the comment is -- I'm sorry, is

20  acceptable.

21          THE COURT:  All right.  Let's explore that.  They

22  say it's acceptable, then is noncompliance with a mailed

23  subpoena a contempt in those courts?

24          MR. CULPEPPER:  In those courts what they look at

25  to see if the recipient actually received the subpoena, yes.

1   If the recipient actually received a copy of the subpoena,

2   then yes, the Court has held the person in contempt.

3            THE COURT:  Okay.

4            MR. CULPEPPER:  One specific example is -- well, I

5   have two examples, but one is, *In Re Brown* in the Northern

6   District of Georgia Bankruptcy Court.  A subpoena was served

7   by first class mail by the United States trustee, and that

8   court held the recipient in contempt, and the court ruled

9   that service by first class mail was appropriate.

10           THE COURT:  Hold on.  Mr. Howenstine, do you agree

11  that various jurisdictions have different interpretations of

12  Rule 45?

13           MR. HOWENSTINE:  I agree that different

14  jurisdictions have different interpretations, yes.

15           THE COURT:  Do you also agree that location of

16  service defines whose law would apply to a non-compliance?

17           MR. HOWENSTINE:  I believe that's correct, Your

18  Honor.

19           THE COURT:  Okay.  So, he's correct then in

20  stating that if the jurisdiction where they were served by

21  mail or certified mail has stated that that's sufficient,

22  then it is sufficient?

23           MR. HOWENSTINE:  It's a hypothetical, Your Honor.

24  But I believe that the caveat here -- and granted, I haven't

25  looked at certain of these cases which were not previously

1   cited.  I haven't seen them before.  But I don't believe that

2   there are cases holding that service by regular mail at the

3   outset, without first an attempt at personal delivery or

4   without leave of court approving some alternative means, is

5   appropriate.

6             THE COURT:  Hold it there.  Do you agree?

7             MR. CULPEPPER:  No, I do not agree, Your Honor.

8   And I'm willing to give the Court a few minutes, and Mr.

9   Howenstine, to look at --

10            THE COURT:  Do you believe that in those

11   jurisdictions you can ab inito send it out by mail without

12   any attempt at personal service or without leave of court?

13            MR. CULPEPPER:  Yes, Your Honor.

14            THE COURT:  Okay.

15            MR. HOWENSTINE:  And without being -- without it

16   being certified mail, just regular mail.

17            MR. CULPEPPER:  Your Honor, in (Unintelligible) v.

18   Anheuser-Busch, which is a Middle District Florida case from

19   1999 --

20            THE COURT:  Did you provide it to me?

21            MR. CULPEPPER:  Yes, Your Honor.  It's a Middle

22   District of Florida case.  And there, the Middle District of

23   Florida rejected an argument that subpoena served by ordinary

24   first class mail is procedurally defective.  There was no

25   prior motion for leave to serve by first class mail.

1          The courts have stated that what's important is

2    whether or not the means used for service ensure -- whether

3    or not the means used ensure that the recipient actually

4    received a copy of the subpoena.  So these courts look to see

5    whether or not the recipient actually received a copy of the

6    subpoena, and opposing counsel stated that these recipients

7    have called his office in a while to discuss subpoenas

8    they've received.  So, it's undisputed that these people have

9    actually received the subpoena.

10          MR. HOWENSTINE:  Your Honor, I would say two

11   things to that.  Number one, this Codrington (phonetic) case

12   that Mr. Culpepper is referring to, that case is over 20

13   years old.  It was a subpoena to a government agency, and the

14   circumstance was where the agency admitted receipt and had

15   already served objections.  Here we have a handful of

16   subscribers who have actually received subpoenas, but we have

17   far more subpoenas than that that are potentially at issue

18   here.

19          THE COURT:  Sure.  So, I don't think we're --

20   we're not saying different things.  It just depends on the

21   circumstance of each attempt of service.  Right?  Whether the

22   service was in a jurisdiction that permits service at the

23   very beginning of a subpoena by U. S. mail, or certified

24   mail, I guess, and whether the person received it.  And if

25   that jurisdiction says that's enough, then that's enough.

1          So, how many jurisdictions are we talking about

2  here?

3          MR. CULPEPPER:  With respect to the subpoenas that

4  are served by mail, for the most part, we're dealing with the

5  Eleventh Circuit.  To be frank, there were, for some

6  individuals in Michigan who we were unsuccessful in serving,

7  we did send subpoenas by mail, I think, to a few, or

8  certified mail.  But one point I want to raise, this issue I

9  respectfully assert is premature because no motions to compel

10  have been brought in those various courts where the

11  subscribers live, or in this court.

12          THE COURT:  Right.

13          MR. CULPEPPER:  To the extent, I'm not sure if

14  opposing counsel is transferring, willing to transfer the

15  dispute on those subpoenas that are -- or those subscribers

16  that are his clients.  I'm prepared to address this issue

17  today, but --

18          THE COURT:  Well, let's start with something I

19  know I have jurisdiction over.  To me, it's just a common

20  courtesy if your opposing counsel calls you and says, listen,

21  I know you've sent out maybe 150 subpoenas, which is not an

22  overwhelming number, and it's something that you could

23  probably reasonably keep track of, would you mind just

24  telling me how you served them, by mail, certified mail, or

25  in person and  -- yeah.  That's what you want, right?

1            MR. HOWENSTINE:  That is one of the things we

2    want, Your Honor.

3            THE COURT:  Okay.  So let's stop there.  It's just

4    a professional courtesy.  Why don't you just do that?

5            MR. CULPEPPER:  First, that wasn't the tone of the

6    email.

7            THE COURT:  Well, I just point out --

8            MR. CULPEPPER:  The email was loaded with

9    accusations about me.

10           THE COURT:  Yeah. And I don't want to -- I hate

11   rehashing old things unless I absolutely have to, but let's

12   talk about going forward.  Is that okay just to provide him

13   with the way you served each subpoena?

14           MR. CULPEPPER:  That's fine.  But his question

15   wasn't that.  His question was, he said every single subpoena

16   was served by first class mail, and that's not appropriate or

17   unlawful.  I replied, that's not correct, and both of those

18   issues were incorrect.

19           THE COURT:  I agree.

20           MR. CULPEPPER:  So, that, he went further with

21   further points.

22           At that point, I knew what Defendant was trying to

23   do.  For some background, respectfully opposing counsel and I

24   are opposing sides on three different lawsuits.  One has been

25   resolved.  So, we have a lot of experience dealing with each

1   other.

2            THE COURT:  Sure.

3            MR. CULPEPPER:  And I knew exactly what

4   Defendant's Counsel was trying to do by asking further

5   questions.

6            THE COURT:  You think he's trying to chill you?

7            MR. CULPEPPER:  He was trying to sniff out what

8   the positions were so he could frame his issue best for his

9   opening motion.  And when he approached me with a position

10  that I knew was wrong by the law and wrong by the facts, and

11  particularly in a week that I was very busy, as he knew,

12  preparing for a deposition of Mr. Valentino (phonetic), a

13  former officer of WOW, I didn't believe I needed to spend my

14  valuable time addressing --

15           THE COURT:  No.  It's just a matter of spending

16  five seconds and saying, you know, I can get to this next

17  week.

18           MR. CULPEPPER:  Well, in the future, I will do

19  that, Your Honor.

20           THE COURT:  Yeah, I will support that 100 percent.

21  What's the issue now?

22           MR. HOWENSTINE:  Well, Your Honor, as far as we're

23  concerned, like I said at the outset, we're just trying to

24  head off having a lot of different subpoena disputes in a lot

25  of places.

1            THE COURT:  Well I agree with the premise of that.

2            MR. HOWENSTINE:  And I think we are still left

3   with a circumstance where some number of subpoenas are being

4   sent out by regular mail in places, in jurisdictions, where

5   that's not authorized.  I guess we'll need to, we'll need to

6   prove that once --

7            THE COURT:  But that's his problem.  That's not my

8   problem.

9            MR. HOWENSTINE:  Well, it may become your problem,

10  Your Honor, once it turns into a motion to compel and they

11  get transferred back to this court, which is why we're

12  bringing it up now.

13           THE COURT:  Sure.

14           MR. HOWENSTINE:  Because we'd like to head that

15  all off, if we can.

16           THE COURT:  I don't know if you can.  I mean,

17  first of all, anything he does has to comply with Rule 11.

18  So, if he's aware that a jurisdiction says certified mail has

19  to be used at least, not regular U. S. mail, and you send it

20  regular U. S. mail, then that's not good faith if he knows

21  that's the contrary to the law.  But if he's proceeding as he

22  understands the law, then we'll just have to deal with

23  whatever the recipient does with that subpoena.

24           I don't want to order him in advance to do

25  anything other than comply with his professional obligations,

 1 │ which we're all under that obligation at all times anyway.

 2 │ So, I don't know what I could craft beyond that.

 3 │          MR. HOWENSTINE:  Well, Your Honor, our position

 4 │ is, based on our understanding of the case law, is that

 5 │ there's no jurisdiction where it would be proper at the

 6 │ outset to serve a subpoena by regular U. S. mail.

 7 │          And perhaps we should brief that up, because that

 8 │ might potentially clarify, okay, in these jurisdictions you

 9 │ can do that.  In these other jurisdictions, you can't do

10 │ that.

11 │          THE COURT:  Well, let's start with the premise --

12 │          MR. HOWENSTINE:  And that would head off some of

13 │ these issues.

14 │          THE COURT:  Are you aware of any persuasive

15 │ district or circuit opinion that authorizes service of a 4045

16 │ subpoena simply by regular U. S. mail?

17 │          MR. CULPEPPER:  Yes, Your Honor.  (Unintelligible)

18 │ v. Anheuser-Busch, one of the cases I gave you, that's a

19 │ Middle District of Florida case.  Also, just focusing on

20 │ first class mail ,we have *In Re. Brown*, which is a bankruptcy

21 │ court in the North District of Georgia where a debtor was

22 │ held in contempt for failing to comply with Rule 45 subpoena

23 │ that was served by first class mail by the U. S. Trustee.

24 │          And I want to reiterate this issue of how a

25 │ subpoena has to be served is in flux in districts throughout

1    the United States.  There's a case in the District of New

2    Jersey that I included, that's New Jersey Building Laborer's

3    Statewide Benefit Funds vs. Torschio Brothers (phonetic).

4    There the subpoena was served by delivery to a household

5    member and followed up by first class mail.  And the court in

6    New Jersey said that you don't have to personally deliver a

7    subpoena to the recipient.  What's important is that you

8    ensure that the recipient actually received the subpoena.

9              So, there are two lines of cases.  Some just --

10             THE COURT:  No, I agree.  I mean, this case,

11   whether it's been superseded or there's other judges

12   disagreeing with judge whoever at the Middle District of

13   Florida, the case clearly says you can just serve by U. S.

14   mail.  So, that's a jurisdiction where that can be done.  At

15   least unless you get a different judge who thinks something

16   different.

17             MR. HOWENSTINE:  Right.

18             THE COURT:  That is only binding in this one case,

19   and you probably haven't had time to look at contrary

20   authority, I suspect.

21             MR. HOWENSTINE:  I'm aware of other cases within

22   district court cases within the Eleventh Circuit saying other

23   things.

24             THE COURT:  But not Middle District of Florida?

25             MR. HOWENSTINE:  Not off the top of my head, Your

1    Honor.

2            THE COURT:  Okay.  So, yeah, it just depends.

3    Obviously, one district judge's, even magistrate judge's

4    decision, is binding only on the parties in that case, not

5    anybody else.  Whether you view it as persuasive or not is in

6    the eye of the beholder.  But I don't think -- I mean, I

7    don't mind talking about generalities over which I have

8    jurisdiction and then would enter orders complying with

9    Federal Rule of Civil Procedure 1, but give me one.

10           MR. HOWENSTINE:  Well, I think just to clarify the

11   issues might help at this point.   If I understand what Mr.

12   Culpepper is saying correctly, the only jurisdiction in which

13   they have served subpoenas by regular mail is within the

14   Eleventh Circuit.  Is that --

15           THE COURT:  Well, I think he said, when you tried

16   these in Michigan, Ohio, and you didn't personally serve,

17   what'd you do then?  Certified mail?

18           MR. CULPEPPER:  It's all -- yeah, certified mail

19   or regular mail.  I don't have the exact numbers with me.

20           THE COURT:  Okay.

21           MR. CULPEPPER:  But I'll tell you the bulk of the

22   subpoenas that were sent by regular mail were sent to

23   individuals in the Eleventh Circuit.

24           THE COURT:  Okay.  So it is possible, it sounds

25   like, that even in Michigan and Ohio, that some were served

1   by U.S. mail after personal service failed.

2           MR. HOWENSTINE:  And Your Honor, just on top of

3   avoiding all of the service disputes that we might have, I

4   just want to note that we have a lot of subpoenas going out

5   to a lot of pro se parties, with the authority of this court,

6   that are seeking a lot of very expansive information from

7   people.

8           THE COURT:  Do you have a subpoena?

9           MR. HOWENSTINE:  I do, Your Honor.  It was in the

10  package of materials we submitted, buy I can --

11          THE COURT:  All right.  What exhibit is it?

12          MR. HOWENSTINE:  It's Exhibit A to Defendant's

13  submission.

14          THE COURT:  So, the subpoena attachment.  Is that

15  what we're talking about?

16          MR. HOWENSTINE:  That's correct.  It's at the very

17  end.

18          THE COURT:  All written communications with

19  WideOpenWest.

20          MR. HOWENSTINE:  Right.  All computing records

21  pertaining to the usage of BitTorrent (phonetic), all social

22  media account usernames, period, for almost the last 10

23  years.  Essentially, and in particular, the social media

24  account usernames request, that's really an interrogatory and

25  in order to respond to these other document requests, really

1  the only thing -- it seems that what they are trying to

2  accomplish is to have people dump all of their personal

3  computing information on the plaintiffs for them to sift

4  through as they want.  And I just think it's important to

5  note at the outset that these are some very intrusive

6  requests being sent to pro se parties with some, at a

7  minimum, substantial questions about the propriety of

8  service.

9        THE COURT:  Yes.  What are you asking, though?

10        MR. HOWENSTINE:  Well, that's a reason why it's

11  important to be careful about this at the outset and make

12  sure that everything is being done correctly, because we are

13  in a situation, given the volume of subpoenas that's going

14  out, where this could spawn a lot of disputes in a lot of

15  different courts, maybe all transferred here maybe not, about

16  these subpoenas.  And this is context for why WOW is bringing

17  this up now.

18        THE COURT:  I understand the issue.  What do you

19  want from me?

20        MR. HOWENSTINE:  Well, I think armed with the

21  information that we have from Plaintiff's Counsel about

22  service and their representation that they're going to tell

23  us how they are serving these going forward, it is, I guess

24  inevitable, that it's going to be incumbent on us to notify

25  subscribers about questions about the propriety of service,

1   even subscribers that WOW doesn't represent, because

2   otherwise pro se parties are going to be receiving subpoenas

3   from this court that are potentially invalid, and they're not

4   going to know any better.

5              THE COURT:  That's always a problem, though.  You

6   inserting yourself into the problem is the issue, and you're

7   welcome to do that, but it's not something you have to do.

8   Right?

9              MR. HOWENSTINE:  I understand, Your Honor.  And I

10  think we've made progress on this issue.  They're going to

11  provide us information about service and then we can attempt

12  to police this going forward.  And I understand that at this

13  point Your Honor maybe can make rulings about what kind of

14  service is appropriate in which jurisdiction.  We're going to

15  have --

16             THE COURT:  Well, it's not ripe.

17             MR. HOWENSTINE:  It's not ripe, but it's going to

18  become ripe.

19             THE COURT:  No, I know.  But I think the platform

20  ought to be the first challenge that occurs somewhere and it

21  is transferred here, and then I will issue orders off of

22  that, because I'll have to, that should govern all of our

23  activity for the rest of the case, because those that end up

24  back in this court will be handled the same.  But if a

25  district or magistrate judge wants to keep the issue

1   somewhere else, they can make the ruling that is consistent

2   with their own jurisdiction.  I think we had a T one up, so

3   let's table that fight for when it's ripe, but you will get

4   an identification of the manner of service of those that have

5   gone out already.  Okay.

6                MR. HOWENSTINE:  Understood.  Thank you, Your

7   Honor.

8                THE COURT:  All right.

9                MR. HOWENSTINE:  I think we can move into the next

10  issue as far as WOW is concerned.

11               MR. CULPEPPER:  Well, I would like to add

12  something about that topic.

13               THE COURT:  Go ahead.

14               MR. CULPEPPER:  And we had a hearing, Your Honor,

15  on January 24th where plaintiffs moved to amend the

16  protective order.  Your Honor denied that motion, but during

17  that hearing Plaintiff showed Your Honor a copy of the

18  subpoena and this attachment A.  We discussed it, and we

19  discussed the relevance of whether or not it was proportional

20  to the needs of the case.  So, this has been an issue that

21  has been -- it was the Defendant's attention in that hearing.

22               Every subpoena that we serve was noticed to

23  Defendant, as required by Rule 45.  We've been serving

24  subpoenas like this since last year.  Suddenly, Defendant is

25  raising this issue about concerns about the scope of the

1    subpoenas.  Defendant, when the subpoena was served --

2    noticed on Defendant pursuant to Rule 45, Defendant had, I

3    believe, 14 days to raise objections to the subpoena.  No

4    objections were raised.  Defendant's recipients, when they

5    were served the subpoena, had a certain number of time to

6    raise objections about the scope of that subpoena, none, no

7    such objections have been made.

8            And regarding the information that --

9            THE COURT:  Well, where would he raise that?  With

10   me or with the jurisdiction where it was served?

11           MR. CULPEPPER:  Well, first, the plaintiff could

12   serve objections to a subpoena and say, we object to the

13   request as being unduly burdensome.

14           THE COURT:  Where?  What court?

15           MR. CULPEPPER:  When a subpoena is served

16   sometimes the recipient serves on the lawyer's objection to

17   the subpoena, and then the parties meet and confer on the

18   scope of --

19           THE COURT:  No, if you serve a subpoena in Ohio,

20   he doesn't like it and wants to object to it, where's he

21   going to object?

22           MR. CULPEPPER:  He would serve -- well, he could

23   do it here or in Ohio.  But first, his first step would be to

24   serve an objection on plaintiff's counsel to the subpoena,

25   and his objections are limited to, I believe, a request to

1   disclose information that's confidential or privileged with

2   respect to WOW.   Defendant doesn't have standing to object to

3   the scope of these subpoenas, except for those clients that

4   he represents.

5           Now, regard to the social media --

6           THE COURT:  Well, if he makes allegations that

7   it's harming his client, say their existing customers, and

8   they're being in the defendant's view harassed by these

9   subpoenas, you don't think that would give him standing to

10  file a motion to quash or an objection?

11          MR. HOWENSTINE:  I don't believe Rule 45 allows a

12  defendant to file a motion to quash based upon those tactics,

13  but that's not what's happening here.  And, Your Honor, when

14  I motioned for a K Black (phonetic) order one of the

15  discussions I believe was what would be done with that

16  information.  And Plaintiffs are doing exactly what they said

17  they would do, they have served subpoenas on the subscribers

18  to request information.

19          Respect to the social media account issue.  This

20  is an issue we flagged in the amended complaint on Paragraph

21  168.  People who hold themselves out to be subscribers of WOW

22  have made posts on social media that Defendant is great for

23  piracy, that they get to pirate all they want, and the

24  defendant doesn't do anything.

25          And on Paragraph 168 we included two screenshots

 1    of comments on social media about that.  That's the reason

 2    why we requested information on social media accounts.

 3              Another particular reason is in, not this case but

 4    three ISP case, I've attempted to serve a subpoena on the

 5    social media company, Reddit, to obtain information about

 6    these people who made these posts, and the Northern District

 7    of California has stated that they will not compel compliance

 8    of that subpoena until I've tried to obtain that information

 9    from the ISP or the ISP's customers.  So, with respect to

10    subpoenas, I'm acting exactly as the Northern District of

11    California instructed, and their opinion is denying a motion

12    to compel compliance with a subpoena.

13              THE COURT:  Well, so, moving to quash or modify a

14    subpoena has to take place in the district where compliance

15    is required, so.  That's the black letter of Rule 45.  So,

16    that --

17              MR. HOWENSTINE:  We don't disagree with that, Your

18    Honor.

19              THE COURT:  Okay.  All right.

20              So, you good on this issue?

21              MR. CULPEPPER:  Yes, Your Honor, I'm complete.

22              THE COURT:  Okay.  Thank you.  What's the next

23    issue?

24              MR. HOWENSTINE:  We served a Rule 30(b)(6) notice

25    on the plaintiffs.  Another small piece of context --

1            THE COURT:  And that's in your statement, too?

2            MR. HOWENSTINE:  It's in our statement.

3            THE COURT:  All right.  Go ahead.

4            MR. HOWENSTINE:  The parties have agreed to

5    bifurcate discovery in this case, and the current phase of

6    discovery concerns WOW'S DMCA safe harbor defense, which in

7    large part goes to the question of whether WOW implemented a

8    policy for terminating repeat infringers in appropriate

9    circumstances.

10           We had some back and forth with Plaintiff's

11   Counsel about this Rule 30(b)(6) subpoena and they have taken

12   the position that they are not willing to produce a witness

13   to testify as to any topic in the subpoena.  I think there

14   are two important points here.  The plaintiffs agree that

15   these topics would be proper at some point in the case.

16   Their only objection to these topics is that they're not

17   relevant to WOW's safe harbor defense, but, in fact, many of

18   these topics pertain directly to the safe harbor.

19           We have included topics concerning things like the

20   plaintiff's contentions about why WOW is not eligible for the

21   safe harbor, about the basis and authority for Plaintiff's

22   agents to send copyright complaints to WOW, Because, of

23   course, the plaintiffs will contend you are not eligible for

24   the safe harbor because you didn't terminate all of these

25   subscribers in response to our notices, so, in our view,

1    we're entitled to discovery about the basis and authority for

2    those notices.

3           Additionally, most of these topics, and plaintiffs

4    agree with this, or at least a strong majority of them, are

5    relevant to this issue of the discovery rule.  Earlier in the

6    case, there was a dispute between the parties about how far

7    back in time discovery would go on the safe harbor.  The

8    default rule would be three years back from the filing of the

9    complaint, or back to 2018, and the plaintiffs wanted

10   discovery about WOW's safe harbor practices back to 2014.

11          So we had a dispute before this court and Your

12   Honor determined that you couldn't resolve that as a matter

13   of law, so you were going to permit discovery, you did permit

14   discovery, going back to 2014 on WOW's safe harbor practices.

15   So now, zooming forward, we, WideOpenWest, want to take

16   discovery about the facts supporting that discovery rule

17   position with the plaintiffs having inserted that issue into

18   this stage of the case.  And in our view, the District Court

19   ill necessarily need to take up the discovery rule in --

20   well, I should first clarify.

21          We've bifurcated discovery about the safe harbor,

22   then the next step will be summary judgement motions about

23   the safe harbor defense.  So in order for the District Court

24   to entertain those summary judgment motions on the safe

25   harbor, the Court will necessarily need to consider the

1   discovery rule because the Court will need to know what time

2   period the safe harbor defense needs to cover.

3            If the plaintiffs, for example, cannot, in fact,

4   assert any claims prior to 2018, then obviously WOW doesn't

5   need to prove up its safe harbor defense for any earlier

6   point in time, and in our view, it would be wildly

7   inefficient, and it would amount to essentially just an

8   advisory opinion, if the District Court were to attempt to

9   consider whether WOW was eligible for the safe harbor for

10  some broader period of time without knowing which alleged

11  infringements are actually at issue in the case.

12           So, that's point one.

13           Point two.  Judge Domenico very recently issued an

14  order in this case regarding the plaintiff's DMCA claims.

15  They have copyright infringement claims, and they have DMCA

16  claims.  So Judge Domenico ruled that WOW's safe harbor

17  defense does not apply to those DMCA claims.  So, what that

18  means as a practical matter is that barring settlement, there

19  will be a second stage of discovery.  So, given that

20  plaintiffs agree that these topics would be proper at some

21  point, there's no reason to not take them up now considering

22  we're going to be in a second stage at some point, anyway.

23           THE COURT:  Okay.

24           MR. CULPEPPER:  Thank you, Your Honor.  Kerry

25  Culpepper --

1          THE COURT:  Hold on a second.

2          So, are you saying that because of Judge

3    Dominico's order -- which is dated when?

4          MR. HOWENSTINE:  It's Document 198.  I think it

5    was last Thursday, but I'm not sure of the date.

6          THE COURT:  So, what you're saying is the

7    landscape has changed.  Are you suggesting that there be no

8    limits, that all discovery is available?

9          MR. HOWENSTINE:  No, Your Honor.  Because the

10   parties agreed to bifurcate discovery, and it would

11   substantially further the resolution of this case if this,

12   when this safe harbor issue is resolved, one way or the

13   other.  But given that there is going to be a second stage if

14   their only objection is that these topics are not proper at

15   this stage, well, that has a lot less force.  I don't believe

16   that's a legitimate objection in the first place, because as

17   I said at the outset, many of these topics bear directly on

18   the safe harbor.

19         THE COURT:  Well, sure.  Well, my view, just

20   generally -- Mr. Culpepper will be able to say whatever he

21   wants.  My view generally is each party gets to decide what

22   they intend to use as part of a defense or a claim.  So, if

23   you believe the questions, the topics you've submitted will

24   be used in your briefing on the safe harbor defense, then I'm

25   inclined to say, okay, you get your shot.

 1          THE COURT:  All right.  Go ahead.

 2          MR. CULPEPPER:  All right.  Your Honor, regarding

 3   -- Kerry Culpepper speaking.  Regarding Defendant's second

 4   point about this.  The order that was on March 13th, that's

 5   Docket Entry 198, that granted Plaintiff's motion to strike,

 6   Defendant had asserted that the safe harbor barred all the

 7   claims.  Plaintiffs had argued successfully that the safe

 8   harbor only bars monetary damages for copyright infringement,

 9   and that the safe harbor does not bar claims for secondary

10   liability for violations under 17 U.S.C. 1202.

11          That motion was filed in June of last year.

12   Defendant was well aware that that was Plaintiff's position,

13   so this is not anything new on there.  So, although this

14   order came up last week, this is a position Plaintiffs have

15   maintained throughout this case.

16          THE COURT:  Right.  But you got a right to see if

17   you're wrong or right.

18          MR. CULPEPPER:  I just want to make clear that

19   this isn't a new issue or anything such as that.

20          THE COURT:  Okay.

21          MR. CULPEPPER:  All right.  Now, regarding --

22   going back to point one, and Defendant argues that he needs

23   to take depositions to probe the discovery rule assertion,

24   but I would urge the court to take a look at the topics for

25   examination.  Most of these topics aren't related to

1  discovery rule.

2          For example, topic 2, identify each work in suit

3  that Plaintiff owns.  That's ownership issue, that's not

4  about the discovery rule.

5          Then we go to -- well, three is the data

6  circumstances of Plaintiff's first awareness.  If you go

7  through these topics, like, for example, topic 16 are

8  communications regarding the Y2S (phonetic) piracy website.

9  That doesn't have anything to do with the discovery rule or

10  the safe harbor, for the most part.

11          Now, this argument Defendant's making is very

12  circular.  He's arguing that he should be able to take

13  discovery on the infringement, because if we can't prove

14  infringement, then there's no need for Defendant to prove up

15  its safe harbor defense.  That defeats the entire purpose of

16  staging discovery.  We agreed to stage discovery to reduce

17  costs so that we can limit it to Defendant's safe harbor

18  defense.

19          And, you know, I want to point to some statements

20  that Defendant's Counsel made before your court, successfully

21  I may add, to persuade Your Honor to limit the scope of

22  discovery.  For example, on a hearing in June of last year

23  Plaintiffs had originally requested discovery on Defendant's

24  communications about other ISP lawsuits, and opposing counsel

25  argued that defendant's mental state is not an issue.

1    Defendant argued that it's an objective standard, and Your

2    Honor agreed with Defendant, stated, yes, it's not, it's an

3    objective standard.  Defendant's mental state is not an

4    issue.

5             Now Defendant is arguing that Plaintiff's mental

6    state is at issue.  What Plaintiff thinks is at issue.  That

7    isn't consistent with what the opposing counsel argued before

8    --

9             THE COURT:  I didn't hear him argue that.  Did you

10   argue that?

11            MR. HOWENSTINE:  No, Your Honor.

12            MR. CULPEPPER:  I'll show this transcript.  It's

13   Exhibit --

14            THE COURT:  No, I have the transcript in front of

15   me.  I don't hear him arguing that today.

16            MR. CULPEPPER:  Well, he says he wants to know

17   what plaintiffs think about what -- like, if I remember

18   correctly, he wants to know what plaintiffs think about Wiles

19   (phonetic) policy, what plaintiffs think customers should be

20   --

21            THE COURT:  I didn't see -- I didn't hear that.

22   Did you say that?

23            MR. HOWENSTINE:  Well, one of the 18 or so topics

24   at issue is an interrogatory answer that the plaintiffs

25   provided in which they -- it's essentially a contention

1  interrogatory asking them to state their position on why WOW

2  is not eligible for the safe harbor.  In that interrogatory

3  answer their contentions one of the topics for deposition.

4          THE COURT:  Okay.  I don't know any other way to

5  do this than to go through the topics, because it sounds like

6  I'm not going to approve every one, but I might approve some.

7  So, why don't we just -- why don't you start with a good

8  faith argument that any particular topic, going one through

9  whatever, would relate directly to your safe harbor defense

10  and the discovery rule.

11          MR. HOWENSTINE:  Well, if we want to take them up

12  in groups, which I think might be more efficient --

13          THE COURT:  Okay.

14          MR. HOWENSTINE:  -- I would lump topics 5 through

15  7, 9 through 15, and 18 together as all relevant to the safe

16  harbor.

17          THE COURT:  Okay.  What's 5 through 7?  I don't

18  have their answer to an interrogatory in front of me, I

19  guess.

20          MR. HOWENSTINE:  So, Number 5 is Plaintiff's

21  answer to Interrogatory Number 6, which asks plaintiffs to

22  state their position on the minimum requirements of the space

23  -- the safe harbor, and specifically the requirement of a

24  policy for terminating repeat infringers in appropriate

25  circumstances.

1          THE COURT:  Okay.

2          MR. HOWENSTINE:  They provided an answer to that

3   interrogatory at this stage in the case and we just want to

4   depose the plaintiff's representatives about --

5          THE COURT:  What's the answer?

6          MR. HOWENSTINE:  -- that answer.

7          THE COURT:  Can you read it to me?  Read me the

8   interrogatory and the answer.  Do I have it in front of me?

9          MR. HOWENSTINE:  The answer itself?  No.  It's

10  rather lengthy because we asked about various aspects of

11  this.  The number of notices, the frequency, the content.

12  All those sorts of things.

13          And again, Your Honor, I just want to emphasize,

14  the plaintiffs have agreed that all of these topics would be

15  proper at some point in the case.  We had a meet and confer

16  and they very clearly took that position and we're proceeding

17  from a point where these topics are going to be explored at

18  some point.  So, it begs to question if some of these

19  directly refer to the safe harbor, why are we not taking them

20  up during the stage of the discovery that concerns of the

21  safe harbor?

22          THE COURT:  Well, to be clear, if you do it now

23  and I permit it, you don't get it again.

24          MR. HOWENSTINE:  Understood, Your Honor.

25          THE COURT:  So, you never get that, have them

1   serve up a person on Interrogatory Number 6, 7, or 8.

2            MR. HOWENSTINE:  Understood.

3            THE COURT:  Okay.

4            So, Mr. Culpepper, let's do it in groups.  5, 6,

5   and 7 is the first group.

6            MR. CULPEPPER:  All right.  Your Honor, I think

7   it's most effective for me to read some of these

8   interrogatories.

9            THE COURT:  That's fine.

10           MR. CULPEPPER:  Well, 5 is, identify all

11  (unintelligible) in Plaintiff's possession in supporting

12  Plaintiff's contention that While (phonetic) has not

13  satisfied the requirements of 17 U.S.C. 512.

14           MR. HOWENSTINE:  Interrogatory 5 is --

15           MR. CULPEPPER:  Oh, I'm sorry.  Interrogatory

16  Number 6, Defendant asked Plaintiff to describe Plaintiff's

17  position regarding the minimum requirements of ISP policy

18  that satisfies 17 U.S.C. 512.  They're asking Plaintiff's

19  state of mind.  What's Plaintiff's position about this.  We

20  objected to this interrogatory based upon it not being

21  relevant to the safe harbor -- I mean, relevant to this stage

22  of the case, and pointing out that what plaintiffs think is

23  not relevant to the safe harbor, as Your Honor ruled, agree

24  with him.  This is an objective standard and it's based upon

25  what Defendant did, how Defendant (unintelligible) --

1          THE COURT:  But doesn't it call for their legal

2    position, as opposed to facts?

3          MR. HOWENSTINE:  It's their position on the facts,

4    and that's proper for 30(b)(6) testimony.  And again, Your

5    Honor, they are not objecting on that basis.  They're

6    objecting on the grounds of relevance.  Now, I'll emphasize

7    again, they agree that these topics would be proper at some

8    point.

9          THE COURT:  Do you have a copy of -- can I ask you

10   for a copy of these things?

11         MR. HOWENSTINE:  I have an extra copy of the

12   actual interrogatory answers.

13         THE COURT:  All right.  Give them to me, please.

14         MR. HOWENSTINE:  May I approach?

15         THE COURT:  Yes.

16      (Brief pause)

17         THE COURT:  All right.  Interrogatory Number 6,

18   describe in detail each plaintiff's position regarding the

19   minimum requirements of an internet services service

20   providers policy that satisfies 17 U.S.C. 512.

21         MR. HOWENSTINE:  Your Honor, if I may approach

22   again?

23         THE COURT:  All right.  Tell me what you handed

24   me.

25         MR. HOWENSTINE:  Your Honor, what I just handed

1  you is a District Court case regarding the propriety of Rule

2  30(b)(6) topics in the vein of contention interrogatories,

3  and the court concludes that there's no limit under Rule

4  30(b)(6) in that sense, and if subject matter is appropriate

5  for a contention interrogatory it's equally appropriate for

6  30(b)(6) testimony.

7          Again, Your Honor, I brought that case out of an

8  abundance of caution, but this is not an objection that the

9  plaintiffs have made.  Again, their objection has always

10  been, this isn't proper at this stage in the case.

11          MR. CULPEPPER:  Kerry Culpepper speaking.  I'd

12  just like to add, if you see the answer, Plaintiff's objected

13  to the interrogatory to the extent it seeks a legal

14  conclusion.

15          THE COURT:  Yeah, I see that.  I mean, I --

16          MR. HOWENSTINE:  But then they answered the

17  interrogatory.

18          THE COURT:  Well, but, yeah.

19          MR. CULPEPPER:  Your Honor --

20          THE COURT:  Go ahead.

21          MR. CULPEPPER:  In an attempt to avoid the need

22  for judicial intervention, plaintiffs answered the

23  interrogatory subject to their objections, the same

24  objections we make here, this interrogatory calls for a legal

25  conclusion, and that the information requested is not

 1   relevant to the safe harbor.  What plaintiffs think is not

 2   relevant to whether or not Defendant implemented a sufficient

 3   policy.

 4          THE COURT:  I just want to know what benefit it is

 5   for a person to attend and regurgitate a response to an

 6   interrogatory.

 7          MR. HOWENSTINE:  I wouldn't expect them to

 8   regurgitate it, Your Honor.  If their witnesses say I have

 9   nothing further to add beyond what is in the interrogatory,

10   then so be it.  But, in our view, this is a truncated,

11   incomplete answer and it leaves open many questions.  Like,

12   for example, what happens when WOW receives a notice on day

13   one about a particular subscriber and receives a second

14   notice 10 years later about the same subscriber?  Is that

15   subscriber a repeat infringer who should be terminated?

16          THE COURT:  You're asking them for a conclusion of

17   law.

18          MR. HOWENSTINE:  Well, we're asking them for their

19   contentions applying the --

20          THE COURT:  I'm not going to let you, I'm not

21   going to let you take a fact witness and give them

22   hypotheticals.  If they're a fact witness, which the

23   30(b)(6)is, not an expert, what provision of evidence allows

24   you to propose hypotheticals?

25          MR. HOWENSTINE:  Well,  maybe I was a little loose

1    with my language.  This can all be tied to particular WOW

2    subscribers, and plaintiffs will take the position that WOW

3    should have terminated those subscribers because of a

4    particular pattern of notices.

5            THE COURT:  Right.  But you can't --

6            MR. HOWENSTINE:  And we want to understand before

7    we get to the summary judgment phase which subscribers

8    plaintiffs contend should have been terminated and why, and

9    that is what these topics get to --

10           THE COURT:  How many subscribers do you have that

11   might be the subject of this lawsuit?

12           MR. HOWENSTINE:  If you could clarify what you

13   mean by that?

14           THE COURT:  WOW had subscribers.  Those

15   subscribers allegedly illegally downloaded material.  WOW

16   allegedly didn't do it enough to stop it.  That's the premise

17   of the lawsuit.

18           MR. HOWENSTINE:  That's correct.

19           THE COURT:  How many people are we talking about?

20           MR. HOWENSTINE:  How many.  Well, the reason I

21   paused is because are we talking about subscribers accused by

22   the plaintiffs, subscribers accused by anyone?

23           THE COURT:  No.  Well, this is their case, so by

24   them.

25           MR. HOWENSTINE:  I think in numbers in the

 1  thousands.

 2          THE COURT:  Okay.  And don't you think each one

 3  may be dissimilarly situated in their own particular set of

 4  facts of what they did, what notices they might or might not

 5  have received, that if there's thousands, there's also

 6  thousands of different stories?

 7          MR. HOWENSTINE:  Absolutely, Your Honor.

 8          THE COURT:  Then, you just can't explore at a

 9  30(b)(6) thousands of particular circumstances, so how are

10  you going to pose the question?

11          MR. HOWENSTINE:  Well, we can address particular

12  examples that are exemplary.  And again, Your Honor --

13          THE COURT:  You can.  But do you think it's fair

14  to do that on the spot?  For you to provide this deponent on

15  the spot a set of circumstances they've never seen before and

16  have them sit there and give you their opinion.  That doesn't

17  sound like a 30(b)(6) to me.

18          MR. HOWENSTINE:  Well, Your Honor, again, at the

19  risk of repeating myself, they have agreed that these topics

20  would be appropriate at some point.  But on top of that,

21  we're asking them about their contentions, about the

22  contentions in that interrogatory answer.  And I think the

23  case that I've offered Your Honor holds pretty clearly that

24  the subject matter of a contention interrogatory is

25  appropriate for 30(b)(6)testimony.  And again --

1          THE COURT:  That is a very broad rule.

2          MR. HOWENSTINE:  If the witness -- if the

3   witnesses take the position that they do not have anything to

4   add beyond what is in the interrogatory answer, then so be

5   it.  I mean, that's the answer.  But, at a minimum, I think

6   we're entitled to explore whether that is the case.  And on

7   top of that, Your Honor, this isn't the only topic.  This is

8   one of many.

9          As it concerns the safe harbor, we have a series

10   of other topics that are about the particular notices that

11   were sent to WOW by the plaintiffs and their agents,  and

12   considering that they are going to take the position that WOW

13   should have terminated subscribers in response to those

14   notices, I think at a minimum we're entitled to ask questions

15   about the authority that the senders had to send those

16   notices and things along those lines.  Contrary to what Mr.

17   Culpepper said, we're not doing full discovery on direct

18   infringement, but we need to understand a little bit about

19   these notices in order to contend with the arguments we

20   expect the plaintiffs to make on summary judgment.

21          THE COURT:  If all you're asking, for example,

22   with Interrogatory Number 6, is for them to produce somebody

23   that will explain their answer, which is what you're asking

24   literally, then I'm okay with that, but I won't be okay with

25   you then putting a bunch of information outside of their

 1  response and asking them to render opinions.  So, for

 2  example, one of the things they say, such notices should be

 3  forwarded by the internet service provider to the account

 4  holder and the internet service provider should comply with

 5  17 U.S.C. 512 with respect to any dispute or further

 6  communication.

 7          You can explore the parameters of that response,

 8  because whoever signed this, or their designee for purposes

 9  of 30(b)(6), needs to understand what they meant when they

10  said that.  That is okay.  But I think you both have heard

11  what I think is not okay.  So we may have to have this battle

12  after the deposition.

13          MR. HOWENSTINE:  Understood, Your Honor.

14          But again, that's only one --

15          THE COURT:  No, I know.  This is 5, 6, and 7.  So,

16  you said there were groups, I suspect, I haven't read it, but

17  I suspect --

18          MR. HOWENSTINE:  So, 9 through --

19          THE COURT:  Sorry, 6, 7, and 8.  And I suspect 7

20  and 8 are kind of the same formula.

21          MR. CULPEPPER:  7 and 8 ask about Plaintiff's

22  knowledge of other ISP's policies.  Plaintiffs are movie

23  studios.  They produce movies.  They don't know anything

24  about ISP's policies.

25          THE COURT:  And so, what benefit are other ISP's

1  policies to you in a safe harbor defense?

2          MR. HOWENSTINE:  We are just trying to identify

3  information that might come out on summary judgment.

4          THE COURT:  Yeah, I know, but that's not the

5  question.   And the question is this, describe in detail all

6  ISP policies other than ours of which plaintiffs are aware.

7  Tell me how that will relate to your safe harbor defense.

8  Because I assume -- are there going to be cross motions for

9  summary judgment, or will you file a motion and they'll

10 respond?

11         MR. HOWENSTINE:  At a minimum, we will file.

12 Whether they also file a motion will be up to them.

13         THE COURT:  Okay.  So let's say it's just you,

14 okay?  How is that going to be in your opening brief on a

15 motion for summary judgment?

16         MR. HOWENSTINE:  Well, we would like to understand

17 whether the plaintiff's intent to juxtapose what WOW is doing

18 with what any other ISP is doing in terms of their DMCA safe

19 harbor policy.

20         THE COURT:  So, call you a bad guy compared with

21 what other people are doing.

22         MR. HOWENSTINE:  Exactly.

23         THE COURT:  Do you intend to do that?

24         MR. CULPEPPER:  No, Your Honor.

25         THE COURT:  Okay.  Then they've just waived it.

1   They can't do that.

2            MR. HOWENSTINE:  That's fine.

3            THE COURT:  Okay.  So no on Number 7, at least for

4   now, on the 30(b)(6).  And what about number 8?

5            MR. HOWENSTINE:  So, Interrogatory Number 8 is

6   asking them to identify any ISP that they believe has a

7   policy.

8            THE COURT:  Again, if you don't raise that then

9   it's irrelevant.  Are you going to raise their practices

10  compared with other people's?

11           MR. CULPEPPER:  Plaintiffs don't know about other

12  ISPs policies, Your Honor.  Plaintiffs are movie studios.

13  They're not in the business of --

14           THE COURT:  So, you're not going to do that.

15           MR. CULPEPPER:  No, Your Honor.

16           THE COURT:  Okay.  He's just waived it.

17           Okay.  So, the next group is?  So, 5 I'm

18  approving, not 6 and 7.

19           What about 9 to 15?  Give me the general subject

20  matter of those.

21           MR. HOWENSTINE:  9 through 15 are in the vein of

22  what I alluded to earlier.  So, essentially, 9 through 13 go

23  to the copyright complaints that the plaintiff's agents sent

24  to WOW.  Their relationships with the senders, the

25  contractual authority to send those complaints, what

 1  Plaintiff's understanding is of the basis of those

 2  complaints.

 3          THE COURT:  So, how might you use that in your

 4  motion on the safe harbor defense?

 5          MR. HOWENSTINE:  Well, if, for example, the

 6  plaintiffs are taking the position that there is some

 7  particular user who should have been terminated because

 8  plaintiffs sent 200 complaints about that internet user,

 9  well, if we look at this and we obtain this information and

10  we determined that all the complaints that were ostensibly

11  sent about that user were not sent with the plaintiff's

12  authority, that would go to the question of whether WOW

13  really should have terminated anyone in response to those

14  complaints.

15          THE COURT:  Why does it matter who sent the

16  notice?

17          MR. HOWENSTINE:  It's not who sent it, it's

18  whether they had authority from the plaintiffs to send it.

19          THE COURT:  So what if they didn't?

20          MR. HOWENSTINE:  Then it would be an invalid

21  notice, Your Honor.

22          THE COURT:  Okay.  But even if what you call an

23  invalid notice has no legal effect, might it also be used in

24  some way to show that you were, in fact, on notice of

25  infringement?

```
 1           MR. HOWENSTINE:  I think that would be an argument
 2  for the parties to make.  That would be a legal argument, but
 3  I don't think there would be any, I don't think there would
 4  be argument that that's irrelevant to the safe harbor
 5  determination.  They would take one position, we would take a
 6  different position.
 7           THE COURT:  Right.  But I guess I got to make sure
 8  there's something to discover here.  Are you aware of notices
 9  that were sent on your behalf without your approval?
10           MR. CULPEPPER:  No, Your Honor.  And I want to
11  point out the safe harbor is not evaluated based upon notices
12  Plaintiff sent.  It's evaluated based on Defendant's
13  responses to notices from all copyright holders.  On this
14  stage, let's limit it to safe harbor.  The question is
15  whether or not Defendant implemented a policy for responding
16  for terminating repeat infringers.  It's going to be
17  evaluated based on notices from everyone, not Plaintiff's.
18  Not Plaintiff's notices.
19           And the short answer to your question, we have
20  turned over the contracts, the discovery of the contracts
21  between the plaintiffs and the providers who sent the
22  notices.  So we sent --
23           THE COURT:  All of them?
24           MR. CULPEPPER:  Yes, all of the contracts.  We
25  turned those over to Defendant.  Defendant made arguments
```

1  based on those contracts in the opposition to the motion to

2  compel.  We had a series of arguments about whether or not

3  Maverick (phonetic) was an agent of Plaintiffs, because one

4  of the contracts identified Maverick as an independent

5  contractor.  This is an issue that has been within

6  Defendant's knowledge for a long time and --

7            Well, first, let's go back to the short answer to

8  your question.  I don't believe there's any issue regarding

9  whether or not the people who sent the agents had authority

10  to send the notices to Defendant.

11            THE COURT:  No, my question was, are you aware of

12  anybody sending a notice on your client's behalf not

13  authorized by you?

14            MR. CULPEPPER:  I'm not aware of that, Your Honor.

15            THE COURT:  Okay.  So, what are we talking about?

16            MR. HOWENSTINE:  Well, they have admitted that

17  they've produced these contracts in discovery, but now

18  they're taking the position that we're not allowed to ask

19  anyone about those contracts.

20            THE COURT:  No, I think we're talking about a

21  30(b)(6)deposition during the stage we're in, which is your

22  safe harbor defense.  Apply it within that paradigm, what you

23  just said.

24            MR. HOWENSTINE:  Your Honor, I would just go back

25  to this goes to the authority that the senders had to send

1    those complaints.  And I think Mr. Culpepper has it backwards

2    when he says that the safe harbor is about all the notices,

3    and, therefore, we can't ask about the notices that the

4    plaintiff sent.  We're only asking about a subset of the

5    notices at issue.

6              Really, we, in my view, would be entitled to do

7    discovery about all of the notices that we've received, but

8    we're not trying to do that.  We're focusing on a narrow

9    subset of that, what's in front of the court, documents and

10   information that the plaintiffs have already provided in this

11   stage of discovery.

12             And also, you know, I'll note that topics 8

13   through 16, the plaintiffs agree that those topics, at least,

14   are also relevant to the discovery rule.  So, then, that

15   brings in this separate question of whether Your Honor is

16   going to permit 30(b)(6) testimony on the discovery rule

17   issue, because all of these relationships with the notice

18   senders go to the question of whether the plaintiffs knew

19   about their claims, whether they were diligent in uncovering

20   the basis of their claims.

21             Because what's going on here is the plaintiffs

22   hired these companies to send these notices to WOW and other

23   companies, and they sent them for a number of years, and the

24   position that the plaintiffs are now taking is that they

25   didn't know about that, they didn't know about those claims

1  because the senders of the notices didn't tell them, I guess.

2  I guess that's their position.  So, in order to fully vet

3  this discovery rule position we need to understand what the

4  relationships were with the monitoring companies, the

5  companies that were sending the notices, to address this

6  notion that somehow the plaintiffs were completely unaware of

7  these facts and even with diligence couldn't have discovered

8  that these copyright complaints have been sent.  Because

9  frankly, Your Honor, we believe, that that's a baseless

10 position.

11        THE COURT:  The discovery rule would not apply to

12 whether you get a safe harbor defense, but when the

13 Plaintiff's claims accrued?

14        MR. HOWENSTINE:  Right.  And the time period of

15 infringements that is potentially at issue.

16        THE COURT:  Right.

17        MR. HOWENSTINE:  So our default rule is three

18 years back --

19        THE COURT:  Right.

20        MR. HOWENSTINE:  -- from the filing of the

21 complaint.  They want to go back much further than that.  And

22 during this earlier period in time, they were working with

23 these same monitoring companies to have these notices sent to

24 WOW.  So we need to understand what those relationships were,

25 what the plaintiffs knew, what information they had, what

1   information they had the ability to request from the

2   monitoring companies in order to address this whole discovery

3   rule issue.

4           THE COURT:  But the availability of the safe

5   harbor defense depends on your conduct at any given point in

6   time.  So, you may have engaged in conduct in 2018 that would

7   entitle you to that defense, but not in 2014.  Is that the

8   case?

9           MR. HOWENSTINE:  It's possible, yes, Your Honor.

10          THE COURT:  Because your policies may have changed

11  over time in how you treat infringers?

12          MR. HOWENSTINE:  Exactly, Your Honor.

13          THE COURT:  Okay.  So, go ahead, Mr. Culpepper.

14          MR. CULPEPPER:  Your Honor, as Your Honor alluded

15  to, the discovery rule is applicable to damages.  That three-

16  year lookback is limited to damages. If we couldn't establish

17  a discovery rule, plaintiffs wouldn't get damages further

18  than three years back.  Courts, when they are evaluating the

19  safe harbor, courts don't look just at the previous three

20  years.  We cited one case, Grande (phonetic), in that case

21  when the court analyzed the ISP safe harbor policies, it

22  looked at a period pre 2010 and a period from 2010 to 2017.

23  We cited that case on, in our nature of the dispute, on the

24  second page.  It's a Western District Texas case.

25          There, the court compared the ISP's pre 2010

 1  practices to its 2010 to 2016 practices, because prior to

 2  2010, the ISP terminated subscribers, but from 2010 to 2016,

 3  the ISP stopped terminating subscribers.

 4          The point is, the safe harbor is not applicable to

 5  the discovery rule.  That's an issue of damages.  If

 6  plaintiffs can't prove that they were diligent, then

 7  plaintiffs will not be able to get damages further than three

 8  years back.  It's not relevant to the safe harbor dispute.

 9          This is another example of Defendant trying to use

10  a circular argument, arguing that something that would be

11  proved in the general discovery respects infringement needs

12  to be proven now so that the time frame for the safe harbor

13  discovery to be limited.  It's a circular argument, but more

14  importantly, it's not correct because courts don't look at

15  just the three year prior, the prior three year period when

16  they look at whether the defendant has complied with the safe

17  harbor.

18          THE COURT:  Well, I'm interested in his view, his

19  good faith view, of what he will be arguing in his motion for

20  summary judgment, because that's the stage of litigation

21  we're in.  And if any of this information relates to that, I

22  just want him to articulate how.  So, how will you use this

23  in a motion for summary judgment?

24          MR. HOWENSTINE:  Well, simply put, we will seek

25  discovery about the discovery rule in order to show that the

1    plaintiffs are not entitled to rely on it.  And based on

2    that, we will only need to seek summary judgment on our safe

3    harbor defense going back three years in time, because the

4    plaintiffs will not have any viable copyright infringement

5    claims for any pervious time period.  And if we don't address

6    that now, if we take the discovery rule off the table

7    essentially what we would be left with is that we would be

8    forced to move for summary judgment as to  some broader

9    period of time, perhaps unnecessarily, and it wouldn't be

10   tethered to any of the actual infringement claims in this

11   case.

12            THE COURT:  But did your policies change between

13   2014 and 2018?

14            MR. HOWENSTINE:  Yes.

15            THE COURT:  Okay.

16            MR. HOWENSTINE:  And again, Your Honor, the

17   plaintiffs inserted this discovery rule issue into this case

18   at this stage in order to expand the scope of discovery

19   regarding WOW's DMCA safe harbor policies.  So, they are the

20   ones who introduced this issue.  They have provided an

21   interrogatory answer, and this is Interrogatory Number 9, in

22   which they identify their facts and their evidence as to why

23   they believe they are entitled to assert the discovery rule.

24            And then separately, as you've seen in these

25   topics, we also have the topic of, you know, the diligence

1  that the plaintiffs exercised in discovering their claims and

2  their first awareness of their claims.  And it is not as if

3  we can treat all the plaintiffs as one, there are many

4  different plaintiffs with different interests, different

5  management, and in order for us to get to the bottom of this

6  discovery rule issue and to understand this interrogatory

7  answer that they have given, Interrogatory Number 9, at this

8  stage in the case we need to depose their 30(b)(6) witnesses

9  about their first knowledge of their claims, what they did to

10  discover those claims, and the facts that supposedly support

11  that, as detailed in their interrogatory answer.

12          THE COURT:  Well, they said they produced all

13  contracts that might be associated with Interrogatory Number

14  9.  Do you believe that's true?

15          MR. HOWENSTINE:  I believe that it's true that

16  they've said that.

17          THE COURT:  No.  Do you believe it's true that

18  they provided those?

19          MR. HOWENSTINE:  Well, I can't know whether, in

20  fact, they have produced all contracts that might exist.

21  Certainly, they have produced contracts --

22          THE COURT:  In this world, you can never know

23  perfectly anything in regard to discovery, but we take one

24  another's word.  Do you have any reason to doubt his word?

25          MR. HOWENSTINE:  No.

1          THE COURT:  Okay.  And what about Number 10?  The

2    same thing, any reason to doubt that they have produced

3    those?

4          MR. HOWENSTINE:  I'm sorry, I'm not sure what

5    you're on, number --

6          THE COURT:  The identities of and each contractual

7    relationship with, the Crawl Law (phonetic), doing business

8    as rights enforcement, et cetera.

9          MR. HOWENSTINE:  Well, I'm not sure that we do

10   understand the identities of all of the parties involved in

11   this because we have kind of a convoluted factual scenario in

12   which the plaintiffs -- again, there are different

13   plaintiffs, have hired different companies to do rights

14   enforcement for them, and then those companies have in turn

15   hired other companies to do peer to peer monitoring and send

16   notices.  And then perhaps even in some instances, further

17   third parties have been the ones to actually send the

18   complaints they were generated by someone else.

19         So, we just want to understand what all those

20   facts are, who all the parties are, what their relationships

21   are to the various plaintiffs in order to be able to tease

22   out their knowledge of their claims, what they did to

23   discover them, and how they support their discovery rule

24   positions.

25         And considering that this discovery would happen

1   at some point anyway, given that this case is going to

2   proceed to a second stage, I don't believe there's a good

3   reason to foreclose it now, because it does bear directly on

4   this discovery rule issue that will need to be resolved.

5              MR. CULPEPPER:  Your Honor, I want to point out

6   that Interrogatory Number 9, once again, that interrogatory

7   was answered subject to our objection about this not being

8   relevant to this stage of the case, it was served on December

9   18th, 2023.  We have two months left, I believe, for fact

10  discovery in this case.  We raised the issue of the discovery

11  rule last year when we filed the motion to compel.

12  Defendant has been aware of Plaintiff's position for quite a

13  long time.  Now on the umpteenth hour, Defendant has served

14  this notice of deposition on plaintiffs, and Defendant has

15  demanded that the depositions take place in person.

16             THE COURT:  When was it served?

17             MR. CULPEPPER:  The notice of deposition or the

18  interrogatory answers?

19             THE COURT:  The 30(b)(6).

20             MR. HOWENSTINE:  February 16th, I believe.

21  February 13.

22             THE COURT:  Okay.

23             MR. CULPEPPER:  February 13.

24             THE COURT:  Yeah.  Well, I just I'm not going to

25  find 9 and 10 appropriate.  11 does concern the defendant

 1  specifically, so I'm inclined to permit that one to the

 2  extent that there's any additional response to be provided.

 3          MR. HOWENSTINE:  I'm sorry, Your Honor, did you

 4  say 9 and 10 would not be permitted, but 11 would?

 5          THE COURT:  Each plaintiff's communications with

 6  people, with the people identities in connection with topics

 7  9 and 10 regarding WOW, or any user of WOW's internet

 8  service.  So, yeah.  I view them as distinct.

 9          They've already provided you the identities of 9

10  and 10.  Now you want to know their communications with them

11  and the nature of those communications, that's a different

12  question.

13          MR. HOWENSTINE:  Well, just to be clear, so,

14  they've already provided the identities by producing

15  contracts.

16          THE COURT:  Right.

17          MR. HOWENSTINE:  So, I think, necessarily, in

18  order for us to address topic 11 there would need to at least

19  be some prefatory discussion of those agreements and who

20  those entities and people are in order to discuss the

21  communications with them.

22          THE COURT:  I don't know if that's true.  I mean,

23  you know the identities.  Let's say one of them is, whatever

24  --

25          MR. HOWENSTINE:  Crawl Law.

1          THE COURT:  Crawl Law.

2          MR. HOWENSTINE:  So we can ask about

3  communications with Crawl Law.

4          THE COURT:  Yeah.

5          MR. CULPEPPER:  Your Honor, Crawl Law is a law

6  firm.

7          THE COURT:  Okay.  Well, but law firms can act in

8  multiple capacities.  Just because it's a law firm doesn't

9  per se excuse or protect them from discovery.  I mean --

10          MR. CULPEPPER:  That's right.  We just wanted to

11  point out it's a law firm, so the communications would be

12  privileged.  But more importantly --

13          THE COURT:  Well, wait a second.  Communications

14  with outside vendors wouldn't necessarily be privileged.

15          MR. CULPEPPER:  We were talking about Crawl Law.

16  In Number 10 they asked for communications with Crawl Law

17  doing business --

18          THE COURT:  Okay.  What did Crawl Law do in this

19  case?

20          MR. CULPEPPER:  Crawl Law was a law firm for some

21  of the plaintiffs.  They represented plaintiffs --

22          THE COURT:  Right.

23          MR. CULPEPPER:  -- in copyright infringement

24  lawsuits.  Crawl Law also sent notices, DMCA style notices,

25  to ISPs in a period in 2016 through 2017.

1          THE COURT:  Well, including WOW?

2          MR. CULPEPPER:  Including WOW, yes.

3          THE COURT:  Okay.

4          MR. CULPEPPER:  But I want to point out, this

5    deposition asks for plaintiff's communications with these

6    people and the identities.  The communications with Crawl Law

7    would, for the most part, be --

8          THE COURT:  I'm not asking you to waive privilege.

9          MR. CULPEPPER:  Your Honor --

10         THE COURT:  If everything's privileged, that's an

11   easy answer for your deponent.

12         MR. CULPEPPER:  Right.  But there's an important

13   point --

14         UNIDENTIFIED MALE:  (Unintelligible) object.

15   Because we're also, as law firms, we are the ones that have

16   largely been the ones sending out the subpoenas, receiving

17   the responses back from the individuals --

18         THE COURT:  Right.

19         UNIDENTIFIED MALE:  -- and having conversations

20   with the plaintiff.  In large measure these topics are going

21   to have to be answered.  If you're going to put a 30(b)(6) on

22   here, there's not going to be individuals from plaintiffs who

23   can testify to this.  It's going to be me, or it's going to

24   be -- it's going to be Mr. Culpepper.

25         MR. CULPEPPER:  That's exactly.  In topic Number

1  15, Defendant asks for Plaintiff's communications with users

2  of Wiles Internet Service (phonetic).  Those communications,

3  you know, as we've discussed in the first dispute, subpoenas

4  were sent to some of Wiles customers.  Wiles customers

5  responded to those subpoenas.  Those subpoenas were sent by

6  Plaintiff's Counsel, namely, I.

7         Defendant has made clear in our meet and confers

8  and regarding their interrogatory -- regarding our

9  interrogatory responses Defendant's position is that

10 Plaintiff's Counsel is an agent of Plaintiffs and that we are

11 obligated also to respond to discovery.

12         THE COURT:  Well, what do you say about that?  If

13 it's their law firm that's communicating directly with a

14 customer of WOW, what are you going to ask?

15         MR. HOWENSTINE:  Well, any communications that the

16 plaintiffs are having with WOW subscribers --

17         THE COURT:  They're not privileged, I understand,

18 but what are you going to ask about it?

19         MR. HOWENSTINE:  The nature of the communications,

20 what the subscriber told them, they've received information,

21 affidavits from some subscribers, what was the content of

22 those, of their back and forth with those subscribers.  Those

23 sorts of things.

24         MR. CULPEPPER:  So, clearly, Your Honor, he's --

25         THE COURT:  But in a 30(b)(6)?  I think you're

1  viewing 30(b)(6) a little bit over broadly, in my view.

2          MR. HOWENSTINE:  Well, as we see it, we need to

3  understand what those communications were in order to

4  understand what information was provided to the plaintiffs

5  from our subscribers, and we've asked for documents and --

6          THE COURT:  Well, have you received them?

7          MR. HOWENSTINE:  We've received a handful of

8  documents.  But we also understand --

9          THE COURT:  You don't think you've received all

10  communications from your clients to the plaintiffs --

11          MR. HOWENSTINE:  I believe we received --

12          THE COURT:  -- or the plaintiff's counsel?

13          MR. HOWENSTINE:  I believe we've received all

14  written communications, but we'd like to ask about oral

15  communications.

16          THE COURT:  Okay.  In a 30(b)(6).

17          MR. HOWENSTINE:  Well, we need --

18          THE COURT:  So, what's a person supposed to do?

19  How are they going to accumulate all that information?

20          MR. HOWENSTINE:  They can be prepped on it.  I

21  mean, Your Honor, I don't know the volume of information that

22  we're even talking about here, but, you know, for example,

23  the plaintiffs have provided affidavits from certain WOW

24  subscribers about their use of BitTorrent, file sharing,

25  things like that.

1              THE COURT:  Okay.

2              MR. HOWENSTINE:  Were any promises made in

3    exchange for those people providing those affidavits orally?

4    What was the circumstances of those --

5              THE COURT:  Those sound like great

6    interrogatories.  They don't sound like great 30(b)(6)

7    topics.

8              UNIDENTIFIED MALE:  They can also depose those

9    subscribers.  I mean, they're welcome to do all those things

10   as well.  The problem we're having here, and we're getting

11   way off track, this discovery is limited to what their

12   policies are, that's it.  With regard to notices they

13   receive, that's it.  Not with regard to whether or not the

14   notices they think are sufficient or not.  If they don't

15   think the notices are sufficient and they make it -- they

16   have a policy that adjudges that, they can explain why they

17   disregarded that notice and they can say, by our policy, this

18   notice was insufficient and that's why we think we're within

19   the safe harbor.  That has nothing to do with us.

20             THE COURT:  I understand.  That's not a bad

21   argument.

22             MR. HOWENSTINE:  Well, what I understood Your

23   Honor to say was that we could seek this information by

24   interrogatory.  And, if the understanding is that they will

25   provide topic 15 information in response --

1          THE COURT:  Well, either provide it or object to

2   it.

3          MR. HOWENSTINE:  -- to an interrogatory --

4          THE COURT:  But, you know, it just, it's not

5   amenable to 30(b)(6), is my view, I guess.  So, I don't find

6   any of the 9 through 15 to be amenable to the 30(b)(6).

7          How about 18?

8          MR. HOWENSTINE:  But I thought you already said 11

9   was amenable.

10          THE COURT:  I'm taking it back.

11          MR. HOWENSTINE:  Okay.

12          THE COURT:  All right.

13          MR. HOWENSTINE:  So you just said 9 through 15?

14          THE COURT:  You grouped 9 through 15.  You said 5

15   to 7, 9 to 15, and 18.

16          MR. HOWENSTINE:  So 18 is the -- are you saying

17   that 18 is not appropriate?

18          THE COURT:  No, 18 sounds appropriate, but I'm

19   willing to hear from the plaintiff.

20          MR. CULPEPPER:  This is Kerry Culpepper speaking.

21          18 asks about the WOW subscribers each plaintiff

22   contends should have had their internet service terminated by

23   WOW.  Plaintiffs are movie sales.  They're not going to know,

24   have anything to say about WOW subscribers, or --

25          THE COURT:  No, but that's your argument.  Your

1    argument is they should have terminated subscribers, correct?

2              MR. CULPEPPER:  Yes.  Repeat infringers should

3    have been terminated.

4              THE COURT:  Okay.  All they're saying is, which

5    ones and why?

6              MR. CULPEPPER:  Plaintiffs are not going to have

7    anything to say about that.  They don't know.

8              THE COURT:  Well, they have to have a

9    representative do it, not themselves.  Some executive sitting

10   in a movie studio, I agree, is not going to have anything to

11   say about that.  But you're asserting claims on their behalf.

12             UNIDENTIFIED MALE:  The answer is the same one

13   we've always given.  They were given notices of infringement

14   and didn't take them down.  That's the answer.  And we

15   provided all of those to them.  The question then is, do they

16   think those notices are adequate to give them the safe harbor

17   defense.

18             THE COURT:  Right.  What would you expect to

19   receive out of this?  Give me a response that might be useful

20   to you.

21             MR. HOWENSTINE:  The identities of particular

22   subscribers, particular exemplary subscribers.

23             THE COURT:  You haven't already asked for

24   subscribers they contend illegally downloaded material?

25             UNIDENTIFIED MALE:  They have the notices, Your

1    Honor.

2              THE COURT:  haven't asked for those?

3              MR. HOWENSTINE:  No, we have the notices.  I mean,

4    the notices were sent to us, but --

5              THE COURT:  Okay.  So what question would you ask?

6              MR. HOWENSTINE:  We would ask them to identify the

7    particular subscribers who should have been terminated and

8    weren't.  That's their contention in this case.

9              THE COURT:  Well, haven't they given you the IP

10   addresses of every one of those?

11             MR. HOWENSTINE:  No.  They've given us the IP

12   addresses of the subscribers that they sent complaints about,

13   but I don't believe that even the plaintiffs would take the

14   position that every single subscriber who received one notice

15   should've had their internet service terminated.

16             THE COURT:  I think there was a minimum notice

17   even under this sort of theory that you would think should

18   have produced corrective action by WOW, right?

19             UNIDENTIFIED MALE:  Yeah.  I mean, the thing is,

20   though, this is their policy.  They're going to have to come

21   in -- they need to come forward and say, we have a policy

22   that when we receive a notice, we receive two notices from

23   the same subscriber, they have.  They have a policy that

24   basically says until we get 21 notices, we're not acting.

25   And then our data show that they don't even act then.  So

1  they have a policy.  It has nothing to do with us.

2          They are going to have to explain to the Court's

3  satisfaction that their policy is adequate to meet the safe

4  harbor defense.  Whether or not -- what we believe is the

5  appropriate amount or not is a legal analysis based on what

6  we think they're doing and whether it's effective.  It's not

7  an issue of fact.

8          THE COURT:  I agree.

9          MR. HOWENSTINE:  If I could add one thing to that,

10 Your Honor?

11         THE COURT:  Okay.  Yes.

12         MR. HOWENSTINE:  When it comes time for WOW to

13 file a motion for summary judgment, if the plaintiffs refuse

14 to identify the subscribers who should have been terminated,

15 then, essentially, we will be shooting in the dark without

16 being able to address head on --

17         THE COURT:  No.  Your reply will be a very strong

18 reply if they don't do that, right?  Number one.  Number two,

19 you understand that 56(d), if they file a response that gets

20 into information that I haven't permitted in discovery but

21 now you need it, 56(d) allows you to go get it before you

22 file your reply.  Agreed?

23         MR. HOWENSTINE:  Agreed.

24         THE COURT:  So, I will entertain, I mean, I'm not

25 going to probably be deciding the 56 motion, Judge Domenico

1   is, but if you get the response and you file 56(d) a motion

2   for discovery, I think that would probably be referred to me.

3   And if I'm convinced that they've gone into areas that today

4   they've argued are irrelevant, but now suddenly they use

5   those in their response, and you've been prevented from

6   having discovery, then I will give you that discovery.  And

7   we'll know exactly what to do then, because we'll open up

8   their response and go through item by item and you could

9   point out to me where you tried to get discovery but couldn't

10  and now they are, in fact, relying on an argument where you

11  might have had discovery to combat it, but you don't now,

12  then that's a whole different story.

13              MR. HOWENSTINE:  Understood, Your Honor.

14              THE COURT:  Right.  Okay.

15              MR. CULPEPPER:  Your Honor I want to explain

16  something, if I may.

17              THE COURT:  Sure.

18              MR. CULPEPPER:  The first plaintiff's are movie

19  studios.  Plaintiffs engage certain associations to send

20  notices to ISPs.

21              THE COURT:  I'm very familiar with that.  Sure.

22              MR. CULPEPPER:  Right.  Now, all, even the

23  agencies that they're in, is an IP address where infringement

24  occurred, and notices sent to the ISP regarding that IP

25  address.

 1              THE COURT:  Right.

 2              MR. CULPEPPER:  But because an IP address is

 3   dynamic, plaintiffs will not know if that IP address was from

 4   the same, like, even if notices are sent for a year to the

 5   same IP address there's a way for plaintiffs to know whether

 6   or not that's the same customer for that same year.

 7              THE COURT:  Right.

 8              MR. CULPEPPER:  There is no way for plaintiffs to

 9   know if multiple IP addresses are from the same customer.

10              THE COURT:  Understood.

11              MR. CULPEPPER:  So, I'm bringing that up in the

12   context of Defendant has asserted that we need to disclose

13   every subscriber who should have been terminated, but it's

14   just not feasible for plaintiffs to know that information by

15   specific --

16              THE COURT:  Well, we're not there yet, because I

17   didn't authorize it as a 30(b)(6) topic.  Okay.  I'm not even

18   sure, I mean, I'm not even sure, the only one I did authorize

19   is --

20              MR. HOWENSTINE:  Well, I think we're back with the

21   discovery rule, Your Honor.  Topics 3 and 4.  And we didn't

22   address 2 yet.  And also, topic 8 is Interrogatory Number 9,

23   which is the discovery rule interrogatory answer.

24              THE COURT:  Okay.  But that's not, I asked you

25   right at the beginning to identify those 30(b)(6) topics

1   that you need for your safe harbor defense, and then you gave

2   me three sets.  So, now you're including more, right?

3            MR. HOWENSTINE:  Well, I was taking them in sets.

4   One related specifically to the issues of the safe harbor and

5   the safe harbor policy, and then separately the discovery

6   rule, which is bound up in the safe harbor.

7            So, again, you know, the plaintiffs are a number

8   of discrete entities and in order for the Court to rule on

9   the summary judgment motions on the safe harbor the Court

10  needs to know what time period is at issue, so we need to

11  address this discovery rule issue.  They inserted the issue.

12  They have this interrogatory answer detailing when they

13  learned certain facts, and we want to explore those issues

14  with the plaintiffs.  Because we're bearing in mind that the

15  plaintiffs, although they are disparate entities under

16  disparate management, have essentially taken the position

17  that they all learned about the relevant facts at the same

18  time, in the same way, and we need to unpack that and

19  understand how that happened.

20           MR. CULPEPPER:  As I stated earlier, Your Honor,

21  the discovery rule is applicable to damages.  Damages will be

22  an issue for the next stage of the case during general

23  discovery.  Courts in ISP cases have looked at periods prior

24  to that three years to evaluate whether that policy was

25  reasonable.  We don't need to open up general discovery now

1    with two months left before the fact discovery cut off.

2            THE COURT:  Well, when Judge Domenico decides the

3    issue of the safe harbor defense, okay, what time period do

4    you expect him to look at to judge the defendant's conduct?

5            MR. CULPEPPER:  From my understanding of the facts

6    of this case, we will be asking the judge to look at content.

7    Like, as Defendant said, their policy was implemented in

8    February of 2018, I believe.  There were certain key events

9    that happened in 2016 and 2017 related to the buildup of the

10   procedure they chose to use from 2018 forward.

11           THE COURT:  Right.

12           MR. CULPEPPER:  There's some key events.  They

13   used a software program that one of their executives told

14   them had flaws and those flaws ended up resulting in numerous

15   thousands and thousands of notices falling in a black hole.

16   So, those fact -- that factual evidence from that 2016 to

17   2018 period is relevant for showing how their 2018 forward

18   policy was not reasonable.

19           So that's an example of the type of arguments we

20   would make in a motion for summary judgment.  And these

21   aren't new.  We had a deposition a few weeks ago and that was

22   one of the topics that we had with a former executive of WOW.

23   But I want to reiterate, the discovery rule is an issue for

24   damages.

25           THE COURT:  I understand.  I understand your

1  argument.

2          So, they've just proffered that they're going to

3  ask the Court to judge the defendant's actions related to

4  their February 2018 policy.  You heard that.  Okay.  Give me

5  the interaction between that and the discovery rule.

6          MR. HOWENSTINE:  Well, what Mr. Culpepper is not

7  saying is that they are going to forego infringement claims

8  from an earlier point in time, because they still intend to

9  assert copyright infringement claims regarding alleged

10 infringements in 2017, in 2016, in 2015, and 2014.  We don't

11 think they're entitled to do that, because they have no valid

12 discovery rule argument, which is why we need to conduct this

13 discovery on the discovery rule to take that off the table

14 for safe harbor purposes.

15         THE COURT:  Okay.  So, are you going to seek

16 damages for a time period before February of 2018?

17         MR. CULPEPPER:  Yes, Your Honor.

18         THE COURT:  Okay.  Then if you seek it for 2015,

19 would their policies be relevant for 2015 for a safe harbor

20 defense?  Can they assert a safe harbor defense for 2015 if

21 you seek damages for conduct they engaged in in 2015?

22         MR. CULPEPPER:  They could assert that, but I'm

23 pretty sure they wouldn't because -- well, I won't go there.

24         THE COURT:  Okay.  You just heard him say he's

25 going to seek damages back to 2014.  Is that what it is?

  1              MR. CULPEPPER:  No, no, no.  I believe damages we

  2    would -- first, I would say this is a premature issue, but we

  3    would likely seek damages for infringements going back to

  4    2015.

  5              THE COURT:  2015.  Okay.  And do you believe in

  6    good faith that your client has a safe harbor defense from

  7    2015 to 2018?

  8              MR. HOWENSTINE:  I'm not in a position to say

  9    that.  I think for at least some period of that time, yes,

 10    and potentially for all of that time, but I'm not in a

 11    position to say.  But for at least part of the 2015 to 2018

 12    period, yes.

 13              THE COURT:  Okay.  So, I mean, the whole purpose

 14    of staging discovery is to keep it narrow and limited and

 15    save costs and expense in order to decide a preliminary issue

 16    like the safe harbor defense.  All right.

 17              MR. HOWENSTINE:  Right.  And that's exactly what

 18    we're trying to do.

 19              THE COURT:  Well, and so --

 20              UNIDENTIFIED MALE:  Actually, Your Honor, if I

 21    may?

 22              THE COURT:  Go ahead.

 23              UNIDENTIFIED MALE:  The safe, they have all of the

 24    information necessary to identify what their policy was in 20

 25    -- they can make their explanation for why their safe harbor

 1  was fine --

 2          THE COURT:  Of course.

 3          UNIDENTIFIED MALE:  -- in 2015 through 2018.

 4  There's no discovery they need from us to make that

 5  representation.  The only thing they're trying to do is

 6  increase the costs and demand of discovery exponentially by

 7  having us now come in and bring in a host of other persons to

 8  talk about all of these other entities and vendors that were

 9  used to do all of this, all of these discovery issues, right?

10  To identify whether or not there was adequate communication

11  back to the plaintiffs that they should have known or should

12  have been able to be more diligently aware of when these

13  claims first arose.

14          THE COURT:  Well, it's hard to, I think it's hard

15  to argue that a 30(b)(6) deposition increases discovery

16  exponentially.  That's a pretty tough argument to make.  I

17  mean, it may be more expensive, but it's not going to

18  increase at this point.

19          UNIDENTIFIED MALE:  All right.  I stand corrected.

20          THE COURT:  Okay.

21          UNIDENTIFIED MALE:  I'm being a little bit

22  overbroad.

23          THE COURT:  Sure.  Rhetoric is fine.

24          UNIDENTIFIED MALE:  But it's a huge, it's going to

25  be a huge expense to try and do when for safe harbor purposes

 1  they know what their policies were.  They can articulate why

 2  they were either good or not in 2015 or 2018.

 3          THE COURT:  Well, of course.  I mean it --

 4          UNIDENTIFIED MALE:  Right?

 5          THE COURT:  Yeah.

 6          UNIDENTIFIED MALE:  So that's a very minor

 7  additional thing for them to deal with.  And when we get to,

 8  when we get to general discovery, which is when we're going

 9  to get into all this issue, then we can address that issue

10  much more --

11          THE COURT:  Well, tell me this --

12          UNIDENTIFIED MALE:  -- effectively and fairly.

13          THE COURT:  Do you believe that if the court finds

14  they're entitled to the safe harbor defense, beginning with

15  any claims for 2018 to whenever, that this lawsuit is over?

16          MR. CULPEPPER:  No, Your Honor.  Based on the

17  ruling on March 13th that there's no safe harbor for 1202

18  violations, this lawsuit would not be over.  And even if they

19  did establish a safe harbor, one of the requests for release

20  we've requested is an injunction ordering Defendant to block

21  certain foreign piracy websites.  So, according to 17 U.S.C.

22  512J, even if a safe harbor is established, the copyright

23  holder is --

24          UNIDENTIFIED MALE:  It would be narrowed, though.

25  I mean, obviously.

1          MR. CULPEPPER:  Yeah.  Yeah.  The case would be

2    narrowed.

3          MR. HOWENSTINE:  Your Honor --

4          THE COURT:  And probably resolvable through a

5    settlement after that.

6          UNIDENTIFIED MALE:  (Unintelligible).  Yeah.

7          THE COURT:  Okay.

8          MR. HOWENSTINE:  Your Honor, if I may?  Mr.

9    Culpepper has said that they intend to pursue pre 2018

10   damages claims for copyright infringement.

11         THE COURT:  Right.  But we're not at damages

12   discovery.

13         MR. HOWENSTINE:  Well, but if the safe harbor

14   applies to a pre 2018 claim, or if a pre 2018 claim just

15   cannot be brought, then it's off the table and it's been

16   resolved.

17         THE COURT:  I know, but if you file that motion

18   are you going to put a time frame on your entitlement to the

19   safe harbor?  Are you going to tell the Court, we're asking

20   for you to find that we're entitled to the safe harbor

21   defense for this period of time?  Is that what you're going

22   to do?

23         MR. HOWENSTINE:  As to these particular

24   infringements, yes.

25         THE COURT:  What period of time are you going to

1    be asking for?

2           MR. HOWENSTINE:  Well, it's hard to know.  That's

3    the purpose of this discovery rule discovery is to know what

4    time period we need to cover.  My expectation is that the

5    plaintiffs do not have a valid discovery rule position, so

6    the summary judgment motion would be two fold.  One, to

7    establish that the plaintiffs cannot bring any pre 2018

8    damages claims for copyright infringement, and second, to

9    establish that WOW is entitled to the safe harbor for the

10   period of 2018 forward.

11          THE COURT:  Well, why don't you just --

12          MR. HOWENSTINE:  And that would dispose of the

13   copyright infringement case.

14          THE COURT:  What's wrong with the topic that just

15   says, produce a person to discuss the plaintiff's collective

16   decision, or position, on the discovery rule and its

17   applicability to this case?

18          MR. HOWENSTINE:  That is essentially what we've

19   done.  It's just a little --

20          THE COURT:  Yeah, but --

21          MR. HOWENSTINE:  Worded a little more granular

22   than that.

23          THE COURT:  Okay.

24          MR. HOWENSTINE:  These are the elements of the

25   discovery rule.

 1            UNIDENTIFIED MALE:  Is that not a legal conclusion

 2  you're asking?  I mean, what's your position on the discovery

 3  rule in this case?

 4            THE COURT:  Well, not what it says under the law.

 5  But why it doesn't apply here, or it does apply.  Either way.

 6            MR. HOWENSTINE:  Well, and to be --

 7            THE COURT:  To the facts of this case.

 8            UNIDENTIFIED MALE:  It does apply.  It does apply.

 9  But yeah, but you're now, if we're going to get into facts

10  we're talking about a lot of discovery that we're going to

11  need to produce, and we've got a month and a half now to do

12  that, because we've now just blown up this whole discovery.

13            THE COURT:  No, just to produce a 30(b)(6, you're

14  going to have to do written discovery?

15            UNIDENTIFIED MALE:  If he's going to file a motion

16  for summary judgment trying to defeat the entire claim for

17  infringement and all damages based on the discovery rule,

18  we're going to want to be able to put in the entire case.

19            THE COURT:  But he said he's going to do that, so

20  you're --

21            UNIDENTIFIED MALE:  Right.  So now we're talking

22  about blowing up discovery way beyond just looking at the

23  safe harbor.

24            THE COURT:  Right.  But I can't limit him at the

25  moment on what he's going to include as his arguments in a

1  motion for summary judgment, right?  He's previewing it for

2  you.

3          MR. HOWENSTINE:  And, Your Honor --

4          UNIDENTIFIED MALE:  But he has control over

5  whether he can produce a policy that explains why the safe

6  harbor was fine in 2015 to 2018.  That's entirely within his

7  control.  It's all his own, it's all his own client's

8  information.  He can make that argument today.  It does

9  nothing -- nothing he gets from us changes that.  All he's

10 looking for is an out to force us to go through a whole lot

11 of discovery way beyond the safe harbor so that he doesn't

12 have to, he doesn't have to go ask his client to look at the

13 documentation he's got about his own policy, which is a very

14 narrow issue to analyze over a three-year period.  They could

15 find that out in a matter of hours.

16          THE COURT:  Okay.

17          MR. HOWENSTINE:  Your Honor, if I may?

18          THE COURT:  Yeah.

19          MR. HOWENSTINE:  The plaintiffs are the ones who

20 decided to introduce this discovery rule issue --

21          UNIDENTIFIED MALE:  That is false.

22          THE COURT:  No, no, no, no.

23          UNIDENTIFIED MALE:  I'm tired of hearing that over

24 and over again.

25          THE COURT:  You got to do it one at a time.  I'm

 1  not going to let you speak anymore if you don't do it

 2  orderly, okay?

 3          UNIDENTIFIED MALE:  Sure.

 4          THE COURT:  Go ahead.

 5          MR. HOWENSTINE:  The plaintiffs made the decision

 6  to insert this discovery rule issue because they wanted more

 7  discovery from WOW.  To date, we have produced a huge amount

 8  of discovery, over 10,000 documents, nearly 100,000 pages, at

 9  great expense, at great burden.  We are not asking them to

10  undertake some incredible document production exercise.

11          They have made representations about when they

12  learned of their claims and about their diligence to uncover

13  their claims.  They made these representations in written

14  interrogatory answers.  We want to ask a witness about those

15  representations.  We want to ask a witness about the facts.

16  Not about their legal contentions, but about the facts.  When

17  did you learn of these claims?  What diligence did you

18  exercise to learn about the facts giving rise to your claims?

19  These are the facts underlying the discovery rule issue.

20  This is a 30(b)(6) deposition.  This is not blowing up the

21  case.

22          Again, I take exception to this notion that we're

23  attempting to impose some huge burden on them when to date

24  all of the burden has been on WOW, and now that we want to

25  take one 30(b)(6) deposition and explore some facts on an

1  issue that the plaintiffs themselves inserted into this case,

2  they're claiming that that's unduly burdensome.

3           I mean, these are big Hollywood movie production

4  companies.  These are not pro se parties.  This should not be

5  a big deal.

6           THE COURT:  Well, all the plaintiffs in this kind

7  of a lawsuit are not pro se parties.  They're always some

8  record label or movie production company, so that's no

9  surprise.

10           MR. CULPEPPER:  Your Honor, one thing I want to

11  add.  With respect to these movies, half of them were

12  released after 2018, so the only, you know, a minority of

13  these movies that would be applicable to this issue if, of

14  course, our position would be that this isn't relevant to the

15  safe harbor, but if Your Honor is inclined to agree with

16  Defendant, this should be limited to only the titles for

17  which damages possibly be asserted prior to the 2018 time

18  period.

19           THE COURT:  That's not a bad point.

20           MR. HOWENSTINE:  That's fine.

21           THE COURT:  Okay.  I would like you to issue a

22  revised 30(b)(6).  The one that exists is not workable for

23  me.  Okay?  So, you've heard what I had to say.  Issue a

24  revised, narrowed, and work it out.  I'll hear any further

25  argument regarding the revised notice.

 1             How soon can you get that out?

 2             MR. HOWENSTINE:  Within a week, Your Honor.

 3             THE COURT:  Okay.

 4             MR. HOWENSTINE:  And just to clarify, just to make

 5   sure we're doing what you've ordered.  As I understand it, a

 6   30(b)(6) topic regarding the discovery rule as to pre 2018

 7   infringement claims would be proper.

 8             THE COURT:  Facts.

 9             MR. HOWENSTINE:  Facts.  Yes.

10             THE COURT:  I'm not going to require them to

11   produce somebody to state their position of law, why they

12   think you violated the law.  You can ask them facts.

13             MR. HOWENSTINE:  Right.  The facts underlying the

14   discovery rule.  That's fine.

15             THE COURT:  The facts underlying anything relevant

16   to what you're going to put in your motion for summary

17   judgment.  Because you might as well have this now rather

18   than later.  Okay.

19             MR. HOWENSTINE:  Understood, Your Honor.

20             MR. CULPEPPER:  My issue regarding this.

21   Plaintiffs had requested that the court order that

22   depositions be held remotely.  Plaintiffs are --

23             THE COURT:  Be held what?

24             MR. CULPEPPER:  Remotely.  At the meet and confer

25   we asked that the depositions be held remotely.  Defendant

1  wouldn't agree to --

2           THE COURT:  Well, where did he think they ought to

3  be?

4           MR. CULPEPPER:  He wanted in person depositions.

5           THE COURT:  And where?  Why do you care about

6  remotely or in person if it -- are you willing to travel?

7           MR. HOWENSTINE:  Absolutely, Your Honor.

8           THE COURT:  What's the issue then?

9           MR. CULPEPPER:  These plaintiffs are in different

10 cities.  Some are in Miami, some are in California, some are

11 in New York.

12          THE COURT:  I know, but you're not going to

13 produce a person for each plaintiff, are you?  Don't they

14 have a collective theory that they're pursuing?

15          MR. CULPEPPER:  No.  These are distinct groups.

16 If he's serving a 30(b)(6) notice, we would have to have a

17 representative of that particular company.

18          THE COURT:  Each of the companies.

19          MR. CULPEPPER:  There's seven group -- I believe

20 five to seven groups of plaintiffs.  So, we would need to

21 produce a representative for each of those groups, and some

22 of them are in California, some of them -- one is in NY, one

23 is in Florida, Plaintiff's Counsel, I'm in Hawaii, my co-

24 counsel's in Nevada.  We just think in this day and age it

25 would be, especially since we're trying to reduce costs in

1  this stage of discovery, obviously we want remote

2  depositions.

3            THE COURT:  Well, that's a hard argument to go

4  against, because you're not doing a videotaped trial

5  preservation, you're just asking for information.  So, what

6  is the problem with doing it remotely?

7            MR. HOWENSTINE:  Well, there's not necessarily a

8  problem, but I'm not -- we don't know how the plaintiffs

9  intend to group themselves.  If we are talking about seven or

10  eight different depositions, we wouldn't intend to go out and

11  conduct individual, eight individual depositions in eight

12  places.  But we don't have that information, Your Honor.

13  They may decide to put up one witness, and if it's going to

14  be one witness speaking on behalf of everybody --

15            THE COURT:  Well, we'll have this battle when they

16  do that.  But if it's going to be multiple witnesses, as

17  they've represented, then I think remote is fine.  Okay.

18            MR. CULPEPPER:  Thank you, Your Honor.

19            THE COURT:  However, if you do one, if there's

20  going to be six or seven -- he said there's five to seven

21  plaintiff groups.  If you do one and you come back to me and

22  say it is impossible to do this remotely for this reason,

23  then I'll listen to it.  Okay.

24            MR. HOWENSTINE:  Understood.

25            THE COURT:  All right.  Anything else?

1      MR. CULPEPPER:  Oh, yes, Your Honor.  I believe

2  the remaining topics are plaintiffs, are issues that

3  plaintiffs have risen.  We assert that Defendant has failed

4  to answer certain requests for admissions.  We attached those

5  to Defendant's answer -- well, first, Plaintiff's requests

6  are in Exhibit 6.

7      THE COURT:  Okay.

8      MR. CULPEPPER:  The important point is, in our

9  request for admissions, we made specific definitions.  If you

10 look at the second page, we have definitions 11 through 13.

11     THE COURT:  Okay.

12     MR. CULPEPPER:  We defined violation, total

13 violations, and violation count.  The definition is based

14 upon a document produced by Defendant.  Internally, Defendant

15 uses a parameter total, underscore, violations --

16     THE COURT:  So, you're using their words.

17     MR. CULPEPPER:  Yeah.  We're using their words.

18     THE COURT:  Okay.

19     MR. CULPEPPER:  But they've objected and said that

20 that's unclear.  We don't believe that's reasonable.  And

21 what the issue is, Defendant has, they keep a count of the

22 total violations, which is basically the total number of

23 notices that a customer's received.  They also have a

24 variable --

25     THE COURT:  Each time a customer is notified, you

1  also notify WOW.

2          MR. CULPEPPER:  Well, let's say a notice is sent

3  by one of plaintiff's agents, or all copyright holders to WOW

4  concerning a specific IP address.  WOW investigates and

5  figures out which account holder that is and adds a count for

6  a notice.

7          THE COURT:  Understood.

8          MR. CULPEPPER:  And that would go into a total

9  underscore of violations.

10          THE COURT:  Per customer.

11          MR. CULPEPPER:  Per customer, yes.

12          THE COURT:  Okay.

13          MR. CULPEPPER:  For a specific customer.  But

14  while it has a system, they have a system called violation

15  count and they only count, no matter how many notices a

16  customer receives in a certain date in a 24 hour period, it's

17  only one violation counted.

18          THE COURT:  Understood.

19          MR. CULPEPPER:  And the customer has to reach

20  violation count 21 to be terminated according to their

21  policy.  We asked specific questions about total underscore

22  violations, not the violation count.  And in particular, for

23  example, we asked about --

24          THE COURT:  So, total underscore violations would

25  include however many in one calendar day occurred?

1          MR. CULPEPPER:  Well, not the count.  It would be

2    how many total notices a customer -- WOW received for a

3    particular customer.

4          THE COURT:  Understood.

5          MR. CULPEPPER:  So, in request for admission 5

6    through 15, and WOW's answer is in Exhibit 7.  If you see,

7    for example in request for admission 5 we asked them to admit

8    that there is a subscriber that received more than 1,000

9    total violations but had not been terminated.  And there's a

10   series of questions where we go through different numbers,

11   and what the defendant has done is rather than answering that

12   question about total violation, they have chose to answer the

13   question base on violation count.

14          So, the defendant can't answer the question it

15   wants, it has to answer the question that's given them.  And

16   the question is, do you have a customer that has received

17   more than 1,000 total violation and had their service not

18   been terminated?  If you read their answer they answer about

19   violation count.

20          Also, I should add, this request asks -- well,

21   I'll leave it there for more.

22          THE COURT:  That's fine.  That's simple enough.

23          MR. CULPEPPER:  Right.  The same issue applies to

24   basically RFAs 5 through 15.  You see Number 15, there's a

25   customer that received more than 24,000 total violations but

1   was not terminated.  We believe that's an important point,

2   and so we asked WOW to admit that point.  But once again,

3   rather than admitting the questions asked, WOW chose to

4   discuss the violation count rather than the total violations.

5           This is a, we believe it's an important issue to

6   raise on summary judgment concerning the reasonableness of

7   their policy, and to simplify this issue we ask for Defendant

8   to amend it.  Defendant won't amend it, and these are amended

9   responses.  I had a meet and confer with Defendant's Counsel,

10  and I'll let Your Honor go --

11          THE COURT:  Okay.  Well, no, I'll just say as a

12  general proposition it's hard for me to stomach any response

13  to a request for admission that says it's unduly burdensome

14  and not proportional.  I mean, requests for admissions are

15  there for a reason.  They're rarely used, but they're not

16  unduly burdensome and they're not disproportional.  So, it's

17  just a matter of admit or deny.  And if not admit, then deny

18  why.

19          So, I don't get that objection, first of all, but

20  go ahead and -- do you agree that you can hardly be heard to

21  object to your own term?

22          MR. HOWENSTINE:  Well, it is by no means clear

23  that we are using our own term, because we're using the term,

24  total violations, untethered from any particular document.

25          THE COURT:  But if he just references right now,

1   maybe he didn't before, but if he just limits it to the term

2   total violations as used by your client, which in document

3   is in definition 12, refers to the term as used in WOW 144,

4   isn't that enough specificity?

5           MR. HOWENSTINE:  Yeah.  I mean, if it was tethered

6   to that particular term as used in the document, yes.

7           THE COURT:  Okay.  Stop there.  Are you tethering

8   nit to their term only and not any other generic meaning of

9   the words total violations?

10          MR. CULPEPPER:  No, Your Honor.  We specifically

11  define it as total --

12          THE COURT:  No, no.  Are you tethering your

13  request to their definition as used in Document 144, rather

14  than a general definition of the words total violations?

15          MR. CULPEPPER:  Yes, Your Honor.  It's tethered to

16  Document 144.

17          THE COURT:  Okay.  There you go.

18          MR. HOWENSTINE:  Then if that is the case, then I

19  think the RFA should be reframed, and it can be targeted

20  specifically at notices or copyright complaints or something

21  instead of violations.

22          THE COURT:  Well, wait a second.  If in

23  definitions they provide a definition of the two words

24  together, total violations, and if in the actual request for

25  admissions they use the word total violations and they don't

1    use it in any other reasonable context besides the definition

2    provided in Number 12, then I don't understand.  It sounds a

3    little cute on your part to object on any basis that you

4    don't understand the term.

5            MR. HOWENSTINE:  Counsel may be right about the

6    definitions.  I don't have them in front of me.  If that's

7    correct, then I missed that, and I apologize.

8            THE COURT:  Do you have WOW 144 with you, by any

9    chance?

10           MR. CULPEPPER:  WOW 144.  Well, Exhibit 7 --

11           MR. HOWENSTINE:  That one uses the term total

12   violations.

13           THE COURT:  Okay.

14           MR. HOWENSTINE:  I don't dispute that.  What we

15   can do is, with this understanding, we will serve amended

16   answers

17           THE COURT:  Okay.

18           MR. HOWENSTINE:  -- that answer it directly as to

19   violation count.

20           THE COURT:  Great.  Thank you.  Because I don't

21   find it vague, I find it fairly clear.

22           MR. HOWENSTINE:  But I think that we have a

23   separate issue.  So, I think that essentially covers 5

24   through 15.

25           THE COURT:  All right.

1          MR. CULPEPPER:  Your Honor, 5 through 15, I had a

2    meet and confer with Defendant's Counsel and raised this

3    exact issue with her, and the Defendant's Counsel said they

4    would provide an amended answer.  What is provided as Exhibit

5    6 is -- I'm sorry, Exhibit 7, is Defendant's amended answer.

6    We raised this issue with them.  They chose to stand on this

7    proposition.  So, I would urge the Court to deem these, to

8    deem requests for admissions 5 through 15 admitted.

9          And I would urge the Court to look at Exhibit 7.

10   There's no reasonable -- Exhibit 7 is a screenshot of WOW

11   144.

12         THE COURT:  Hold on.

13         MR. CULPEPPER:  Column F is total underscore

14   violations.

15         THE COURT:  So, we have number account underscore

16   number, last underscore violation, underscore date, system

17   created on, total violations, violation count.  So, I guess

18   when we're getting down to requests for admissions everybody

19   wants to make sure exactly what they're doing.  And yeah, I

20   mean, I believe that the definition is adequate.

21         MR. HOWENSTINE:  Well, Your Honor --

22         THE COURT:  I don't understand why you're amending

23   and not -- what didn't you understand when you submitted

24   amended objections and responses?

25         MR. HOWENSTINE:  I don't recall offhand what we

1  amended when we amended it.  Maybe we didn't amend these

2  answers at all.

3            MR. CULPEPPER:  They added more objections.

4            MR. HOWENSTINE:  I don't recall.

5            THE COURT:  Hold on.  Hold on.  Hold on.  Go

6  ahead.

7            MR. HOWENSTINE:  But the issue that we have with

8  this series of RFAs is that this term violation is used

9  differently within WOWO, and for the most part essentially,

10 with the exception of in this one document that they're

11 referring to, the term violation means a day in which the

12 subscriber received at least one notice.

13            THE COURT:  But it doesn't get any more clear than

14 they take your own document, shove it in your face and said,

15 this is what we mean.  That's clear.  I don't get it,

16 honestly, and I need to know why you didn't get it.

17            MR. HOWENSTINE:  Well, I didn't get it because we

18 interpreted this RFA as calling for information about

19 violations, total violations, which can be understood with

20 reference to that particular document and can separately be

21 understood as violations a day receiving at least one notice.

22            THE COURT:  I understand.  But if they go ahead

23 and limit their definition to your document --

24            MR. HOWENSTINE:  But I think what we're offering

25 to do is exactly that, to amend and clarify our answer and

1    admit it as tethered to that particular definition in

2    particular document.

3            THE COURT:  Right.  Because whatever happens from

4    here on doesn't require any work on your part, Mr. Culpepper.

5    It just requires them to do something.  If somehow what I

6    found to be wrong required you to engage in extra work, then

7    I might be more sensitive to just requiring them to be

8    admitted.  It's not the preferable way to proceed because I

9    don't know, I'm not going to look through 5 through 15

10   sitting here right now and determine whether it's either fair

11   or unfair for them to be deemed admitted, so I'm just going

12   to ask you to, with the explanation I've given, and they've

13   given, and your understanding walking away from today, you'd

14   better do it right this next time, okay?

15           MR. HOWENSTINE:  Understood.

16           THE COURT:  What else, Mr. Culpepper?

17           MR. CULPEPPER:  All right.  Request for admissions

18   38 through 41.  Here, we ask for the defendant to admit that

19   it received a certain number of notices concerning  pirated

20   file names that included the terms RARBG, ARBJ, YTS, and

21   Stutter, SHIT, and also TGX.  These tags are from notorious

22   foreign movie piracy websites.

23           THE COURT:  Uh-huh.

24           MR. CULPEPPER:  The U.S. Government has published

25   a list and included these there.  The reason we looked

1  through what was produced and we could tell that they've

2  received thousands of notices that include these specific

3  tags as pirated file copies.  This is an important issue

4  because the defendant has argued, as he kind of said earlier,

5  that these notices are not --

6         THE COURT:  Well, how long did it take you to do

7  that?  How long did it take you to realize that they had over

8  10,000 notices under file title including YTS?

9         MR. CULPEPPER:  Like, 10 seconds, and probably

10 most of that was from loading the Excel sheets.  And I

11 included as exhibit, for example, Exhibit 9, by using the

12 Control F feature in Excel, we were quickly able to see that

13 there are thousands of notices that were received by

14 Defendant that included specific tags.

15        UNIDENTIFIED MALE:  It's (unintelligible).  Do you

16 see it there, Your Honor?

17        THE COURT:  No, I see YTS right in the middle on

18 9.

19        MR. CULPEPPER:  On 9 did you see the sign, the

20 popup window find and replace, and R-E-R-B-G is put in find

21 what --

22        THE COURT:  The front or back of 9?

23        UNIDENTIFIED MALE:  On the bottom.

24 (Unintelligible) saying five, minus, five two.  That's

25 another file (unintelligible).

1          MR. CULPEPPER:  All right.  Exhibit 9 should be,

2   you should see a partial screenshot.

3          THE COURT:  Yeah.  Exhibit 9 has a front and a

4   back.

5          MR. CULPEPPER:  Exhibit 9 has a front and a back?

6          THE COURT:  That's what I have.  Maybe it's tabbed

7   wrong.

8          MR. CULPEPPER:  Oh, yes.  Yeah, the figure nine

9   has a front and back.  So, on both --

10          THE COURT:  And it consumes the Bodyguard movie

11  and the Hitman.

12          MR. CULPEPPER:  Yes.  These are a list, this is an

13  Excel sheet that was produced by Defendant.

14          THE COURT:  Okay.

15          MR. CULPEPPER:  And using that Excel sheet, you

16  know, we did control F and put in the key term.

17          THE COURT:  I do it all the time.

18          MR. CULPEPPER:  And you can see that there's

19  thousands of cells where the file name included this

20  particular -- like, for example, ARBAGE, the same was done

21  for YTS and another --

22          THE COURT:  So, for example, on the front page of

23  Exhibit 9, on the left hand column, you have colon 12, colon

24  54, which probably is a time of day, on March -- February

25  4th, 2018.  That's what you're referring to, right?

1           MR. CULPEPPER:  Yes, Your Honor.

2           THE COURT:  Okay.  And that you're representing to

3  me is evidence of a violation that occurred on that date at

4  that time by an IP address associated with WOW.

5           MR. CULPEPPER:  This was produced by WOW, Your

6  Honor.

7           THE COURT:  Right.  But you're saying that your

8  understanding is this is a violation on that date at that

9  time by a subscriber of WOW.

10          MR. CULPEPPER:  This is the date, I think, that

11  they -- it's either the date of the violation or date that

12  they got the notice.  But generally, for the most part, Your

13  Honor's understanding is correct.  This is a date of a

14  violation and the file name in the violation.

15          THE COURT:  So, let me ask Ms. Howenstine, what's

16  the problem?

17          MR. HOWENSTINE:  Two things, Your Honor.  Number

18  one, WOW will not and cannot, I don't believe, admit that any

19  of these notices indicate that infringing copies of

20  copyrighted material are being shared.  We don't believe that

21  these notices give, confer knowledge of infringement.

22  They're bare allegations.  As to whether the material is

23  copyrighted, there's, again, a bare allegation.  There's no

24  information in there sufficient to determine that anything is

25  copyrighted.  And then separately --

1          THE COURT:  But wait a second.  Why do they exist

2    in your database?

3          MR. HOWENSTINE:  Because they're allegations as

4    part of our DMCA policy.

5          THE COURT:  No, no, no.  Allegations by whom?

6          MR. HOWENSTINE:  By copyright owners.

7          THE COURT:  Okay.  And so you documented it, your

8    client documented it.

9          MR. HOWENSTINE:  Absolutely.

10          THE COURT:  Put it in a database.  So, all it is

11    an allegation according to you.

12          MR. HOWENSTINE:  Correct.

13          THE COURT:  So, if their request for admission,

14    for example, said, admit that WOW received over 10,000

15    notices alleging infringement, then it would be all right.

16          MR. HOWENSTINE:  As to that point, yes.

17          THE COURT:  Okay.

18          MR. HOWENSTINE:  The separate point is that Judge

19    Domenico has now ruled -- well, these RFAs go to the

20    plaintiff's DMCA claims, because they concern the alteration

21    of copyright management information.  The plaintiffs contend

22    that inserting these initials constitutes alteration of

23    copyright management information.  That's the basis of their

24    DMCA claims.  Judge Domenico just ruled that the safe harbor

25    is not, doesn't bear on the DMCA claims, so none of these

1   RFA's are relevant to the safe harbor issue.

2           THE COURT:  Are they relevant to safe harbor?

3           MR. CULPEPPER:  Yes, Your Honor.  As opposing

4   counsel just said, he doesn't believe these notices are -- he

5   doesn't believe these notices are reliable as indications of

6   infringement, but we have multiple copyright holders sending

7   notices concerning the same thing, pirated movies that have

8   the tag ARBAGE, YTS and stutter.  That shows that these

9   notices are reliable, and it rebuts a point Defendant has

10  made in their motion to dismiss and in other papers that

11  these notices are unreliable.  They don't prove anything.

12          If you get notices from hundreds of different

13  copyright holders complaining about the same thing --

14          THE COURT:  Yeah, I mean, I agree.  So, I'm going

15  to, by inter lineation, I do agree with the defendant on this

16  that indicating violation -- I'm not going to require them to

17  admit they indicate violation, but if you change that to

18  indicating that infringing copies of copyrighted material

19  were allegedly being shared, if you put that word in there,

20  then I think we're okay.

21          Do you see where we are?

22          MR. CULPEPPER:  I understand, Your Honor.

23          THE COURT:  So, I'll require a response to that by

24  -- why don't you go ahead and admit, or resubmit amended

25  request for admissions so we can have a clean record where

1  you add that word allegedly being shared.

2          MR. CULPEPPER:  Will do, Your Honor.  And we're on

3  the home stretch.  I've only got a few more.

4          THE COURT:  Okay.  That's fine.  I mean, this is

5  what I do for a living, so.

6          MR. CULPEPPER:  Okay.  Regarding, well, RFA 42.

7  This is another case of Defendant answering a question it

8  wants rather than the question that was given.  You know,

9  request 42, it says, admit that in 2019 WOW terminated fewer

10 than 20 subscribers for excessive notice violations.

11         Instead of addressing that question --

12         THE COURT:  No, no, no.  You don't have to do any

13 more than that.  That seems straightforward.  Let me see why

14 that wasn't an answerable question.

15         MR. HOWENSTINE:  But we have answered it, Your

16 Honor.  We say, in the middle of this paragraph, WOW was

17 actively processing copyright infringement allegations

18 received by mail, and 19 of WOW's subscribers reached the

19 notice violation milestone requiring termination in this time

20 frame.  So, we're saying we terminated less than 20.  We

21 terminated specifically --

22         THE COURT:  So, why isn't that an admit?

23         MR. HOWENSTINE:  Because of this term, excessive

24 notice violations, which excessive notice is a term of art

25 used --

 1               THE COURT:  You mean, if they exercise the word

 2   excessive, then you could admit it?

 3               MR. HOWENSTINE:  No.  This whole term excessive

 4   notice violations is from a document in a different case that

 5   we are litigating.  So, it's completely off base as to WOW.

 6   We were just clarifying we terminated 19 people.

 7               THE COURT:  But you used the word notice violation

 8   in your answer.

 9               MR. HOWENSTINE:  Right.

10               THE COURT:  You said 19 WOW subscribers reached

11   the notice violation milestone.  So, if they say -- I mean, I

12   don't understand the distinction you're trying to make.

13               MR. HOWENSTINE:  Well, and, frankly, I don't

14   understand what's insufficient about our answer, because

15   we're saying we terminated -- we're admitting that we

16   terminated 19.

17               THE COURT:  It sounds like it.  Why isn't that a

18   good enough answer?

19               MR. CULPEPPER:  We won't admit it or deny it.  The

20   word admit it isn't used inside this answer.

21               THE COURT:  Okay.  So, what if it said, WOW

22   admits?

23               MR. CULPEPPER:  That would be acceptable, Your

24   Honor.

25               THE COURT:  All right.  Change your answer.

1           MR. HOWENSTINE:  That's fine.

2           MR. CULPEPPER:  Respect to the RFAs, the last one

3   we have is number 46.

4           THE COURT:  Okay.

5           MR. CULPEPPER:  Number 46, this is, I found a

6   screen -- I found from another complaint.  This is all I

7   could find was an image of a letter that was sent from WOW's

8   general counsel in 2008 to the U.S. Congress concerning the

9   issue of these --

10          THE COURT:  So, this is just a document

11  authentication request?

12          MR. CULPEPPER:  Yes, Your Honor.

13          MR. HOWENSTINE:  No.  It's not a document that was

14  produced in discovery.

15          THE COURT:  Well, they don't have to -- all

16  they're asking you is admit that this is authentic.  Can you

17  admit or deny that?

18          MR. HOWENSTINE:  No.  Well, number one, Your

19  Honor, this is a document from 2008, and we've objected on

20  relevance grounds, because we're now talking -- the Court has

21  allowed plaintiffs to go back to 2014, now we're talking

22  about another six years before that.  We don't believe this

23  document is relevant to any issue in this case, which is why

24  we have refused to answer it.  But in addition, we have

25  looked for this particular document, and internally at WOW,

1  we don't have it.

2          But first and foremost, this document is not

3  relevant to anything and it's way outside the relevant time

4  frame in this case.

5          THE COURT:  Well, is D. Craig Martin (phonetic)

6  still employed by your client?

7          MR. HOWENSTINE:  No.  He's the former general

8  counsel.

9          THE COURT:  Okay.  So, okay.  Recognizing your

10 obligation of candor, you don't know standing here today,

11 whether that can be admitted because your client has no

12 record of this.  Is that what you're saying?

13         MR. HOWENSTINE:  Yes.

14         THE COURT:  Then that's enough.  I don't know what

15 else I can require other than them to respond based on

16 information and knowledge.

17         MR. CULPEPPER:  I understand, Your Honor.  Just

18 for the record to note, in RFAs 35 through 36, Defendant has

19 denied that it ever engaged in deep packet inspection since

20 January 1st, 2008.

21         THE COURT:  Engage in what?

22         MR. CULPEPPER:  Deep packet inspection.  It's a

23 tactic.  It's a process where when packets are flowing

24 through the network to a customer, when you're receiving your

25 data, you know, when you're accessing a website, there's a

1  process where some provider will randomly take one of those

2  packets, or copy one of those packets, and use it to analyze

3  what websites the customer is using at and maybe generate

4  advertisements that are more tailored to that customer's

5  behavior.

6           THE COURT:  Okay.

7           MR. CULPEPPER:  This is an important issue because

8  one of the elements of the 17 U.S.C. 5128 is that the

9  material cannot be stored on the server of the ISP.  Now, in

10 RFAs 35 through 36, Defendant has denied that it ever engaged

11 in deep packing inspection since January 1st, 2008.

12          THE COURT:  Uh-huh.

13          MR. CULPEPPER:  Congress had hearings on this

14 issue.  Unfortunately, I'm not able to find the congressional

15 record of that particular document, but in one lawsuit I

16 found a screenshot of -- the letter is described as a letter

17 from WOW's general counsel to Congress in 2008 where they

18 admit that they engaged in it for a brief period.

19          I'm just bringing -- if Defendant says he can't

20 find the document, I agree that's the end of this issue, but

21 I want to flag that issue because Defendant's denied that

22 they ever engaged in this activity since 2008.

23          THE COURT:  Well, if you're able to authenticate

24 it as an actual statement by the defendant, then it's

25 admissible on 801D2 as a statement by a party opponent, and

1    it'd be great impeachment material at trial.  But as the

2    matter stands now, I don't think I can require anything other

3    than their best efforts to answer that request for admission.

4             Okay.  Anything else?

5             MR. CULPEPPER:  Yes, there's two more items.  All

6    right.  On topic number 5, the nature of dispute.  Your

7    Honor, on November 13th, 2023, at Docket Entry 186, you

8    ordered the defendant to answer specific Interrogatory Number

9    15.  Basically this, as I discussed earlier, from Plaintiff's

10   position all we see is an IP address where we know the

11   infringement has happened.  We're not able to know if the

12   same customer for that period was assigned that IP address.

13   We don't know if multiple IP addresses were assigned to that

14   customer.  The challenge we have is Defendant has turned over

15   excerpts of it's DMC database, but in some cases the IP

16   address is tied to a violation number.  Then in other cases

17   of violation numbers are tied to an incident number.  There's

18   no one document that shows that the account number is tied to

19   this IP address.

20            THE COURT:  Okay.

21            MR. CULPEPPER:  And in your order on November

22   13th, you ordered the defendant to explain how plaintiffs can

23   determine what account numbers are related to what IP

24   address.  And by coincidence, before that order was issued,

25   that same day I served a -- well, plaintiffs served in an

1  interrogatory on Defendant asking defendants to explain how

2  to do this, and we called out a specific example.  This is

3  Exhibit 11.  We called out a specific example of one

4  particular very, rather egregious IP -- one rather egregious

5  account.  This is on, if you look at -- if you're looking at

6  Exhibit 11, this is Interrogatory Number 15.

7          We asked, they said, A question:  Explain how to

8  determine IP addresses assigned to account numbers shown in

9  WOW 144, and we gave a specific example of how can we

10  determine IP address assigned to a WOW customer account 146.

11  This was a very egregious account and we'd like to see what

12  IP addresses were assigned to it.  And if you see the

13  defendant's answer, even Defendant can't explain how to tie

14  that particular account number to an IP address.  Defendant

15  said they would provide a supplemental response.  That was

16  January 12th.  Your Honor's order was November last year.

17  This response was January 12th.  As of this day, we still

18  have not received this supplemental document that explains

19  this.

20          THE COURT:  Okay.  And you can -- you did a

21  conferral on this, a meet and confer, and what did they say?

22          MR. CULPEPPER:  Defendant said he was going to

23  provide this by today, if I remember right.

24          THE COURT:  Okay.

25          MR. HOWENSTINE:  And I believe we are.  The issue

1   is that --

2               THE COURT:  Believe you are what?

3               MR. HOWENSTINE:  We are going to provide the

4   document.

5               THE COURT:  By today?

6               MR. HOWENSTINE:  I believe so, yes.

7               THE COURT:  Okay.  How are you going to do that?

8   You're standing here.  Who's doing it?

9               MR. HOWENSTINE:  I have other people working on

10  it.

11              THE COURT:  Okay.  I hope you do, I guess.

12              MR. HOWENSTINE:  And I talked to someone before

13  this hearing.

14              THE COURT:  Okay.

15              MR. HOWENSTINE:  Essentially, we have produced all

16  these outputs.

17              THE COURT:  Well, no, if your answer is it's

18  coming today, that's all I need to hear.  I don't need any

19  more explanation.

20              MR. HOWENSTINE:  Okay.

21              THE COURT:  Okay.  Mr. Culpepper.

22              MR. CULPEPPER:  Yes.  Now, one moment.  All right.

23  We're have a problem, an issue with Defendant's aggressive

24  redaction of documents and designation of almost everything

25  as confidential or highly confidential.  And, you know, for

1    the most part, my policies are let the opposing party have

2    the benefit of the doubt, but the problem came when

3    Defendant's over aggressive designation hindered plaintiffs

4    from developing relevant evidence.

5              And to give you an example of how --

6              THE COURT:  You mean by impeding your ability to

7    show it to experts?  Or exactly how is it impeding you?

8              MR. CULPEPPER:  For example, one communication we

9    received in discovery from WOW were communications with a

10    representative of IHE, International Hotel Group, concerning

11    infringement that was happening at that account.  From the

12    communications we can tell that WOW knew that there was

13    extensive infringement happening, but rather than terminate

14    the account, they discussed ways to filter service there, or

15    filter out ongoing infringement.  But the problem was, WOW

16    had redacted the hotel name that was going on and the

17    particular subscriber name, but I could see it was someone at

18    IHG.

19              I served a subpoena on IHG and IHG got back to me

20    and first pointed out that because they have hotels all over

21    the world, unless I told them what specific hotel was at

22    issue, they weren't going to be able to provide responsive

23    documents.  I went back to Defendant's Counsel and pointed

24    this out to them and asked them to remove the confidential

25    designation.  I couldn't even show this email to ISG, because

1  ISG is a worldwide hotel company.  There's a different

2  management company, a separate corporate entity, that does

3  the management, so I could not confirm if this email

4  communication was the same group who was talking to me then.

5          THE COURT:  Okay.

6          MR. CULPEPPER:  Defendant would only state they

7  would reduce it from attorney's eyes only highly confidential

8  to just confidential, and they actually increased their

9  redaction of the document when they served a revised version.

10 That's one example.

11         Another example of how, you know, ridiculous

12 Defendant's designation has come, in Exhibit 12 I showed

13 communications Defendant produced with Bay County Florida.

14 Defendant designated those communications confidential,

15 although Bay County states in its communication that they're

16 an open record company.  All their records are open to

17 inspection -- open to public inspection.

18         There was no reasonable reason to designate this

19 document as confidential.  And again, this was an act that

20 hindered plaintiffs in our way to develop evidence.  Because

21 when we contacted Bay County we weren't able to show them the

22 exact document, particularly the individual there, we --

23         THE COURT:  Well, hard to argue about that with a

24 public entity, I agree.

25         MR. HOWENSTINE:  Well, Your Honor, as we pointed

1    out in our statement, the protective order has a carveout for

2    people who authored the information or who received the

3    information.  So, under the protective order there's no

4    barrier to plaintiffs showing a document to --

5              THE COURT:  So, they can show IHG a document you

6    sent to IHG.

7              MR. HOWENSTINE:  Right.

8              MR. CULPEPPER:  The communication we had wasn't

9    with IHG, it was with the management company.

10             THE COURT:  I understand that.  But this Bay

11   County, that would apply to that.

12             MR. CULPEPPER:  Yeah, the Bay County, I gave that

13   example of there was no reasonable reason to designate that

14   as confidential.

15             THE COURT:  Well, I guess that's true.  So, let's

16   start with that one.  Was there a reason to designate a

17   communication with a public entity as confidential?

18             MR. HOWENSTINE:  Well, Your Honor, as I laid out

19   before, we have produced, like, 12,000 -- 10,000 emails, and

20   we can't do individualized research --

21             THE COURT:  So, you agree it was over designated.

22             MR. HOWENSTINE:  Right.  And as we told the

23   plaintiffs, if they have particular issues with particular

24   documents, we will work with them --

25             THE COURT:  Okay.

1      MR. HOWENSTINE:  -- on those issues.

2      THE COURT:  I agree.  All right.  And so what

3  about the IHG issue?  See, well, obviously I can't today, or

4  ever, go through each example of something they designated

5  confidential and you disagree with.  I just have to take them

6  as they become necessary for you to use, and you can.

7      So, with regard to the IHG document, what's your

8  position?  They want to show IHG this document so IHG could

9  identify what hotel.

10     MR. HOWENSTINE:  Right.

11     MR. CULPEPPER:  And, Your Honor --

12     MR. HOWENSTINE:  And the protective order says

13  that if it's a document that IHG received, they're entitled

14  to see it.  But on top of that, we, WOWO, have the Cable Act

15  issue where we are not entitled to disclose subscriber

16  information absent a court order.  That's why we're always

17  very careful about redacting subscriber names and we have

18  this whole process in which we were entitled, allowed,

19  ordered, to disclose the identities of specific subscribers.

20  But as to other subscribers we have to protect that

21  information because the Cable Act says we have to.

22     THE COURT:  Okay.  Mr. Culpepper.

23     MR. CULPEPPER:  All right.  First, I want to, for

24  the interest of expediency, I want to point out that in the

25  end IHG did provide me some documents.  They're responsive.

1   We're still not able to confirm if the hotels that IHG

2   prepared, or provided to us, are the same hotels that are

3   referred to.  And for example, Exhibit 14 is a correspondence

4   between WOW and IHG where they talk about what specific hotel

5   this issue was going at, and they list on the Exhibit 14, on

6   the second page, there is a list of all of the infringement

7   that happened in this account.

8          But the main point that this is leading to is

9   these are examples of how Defendant's heavy redactions have

10  hindered Plaintiff's ability to develop relevant evidence.

11  And if we go to the last example we gave on Exhibit 16, you

12  know, Defendant redacted certain documents that gave the

13  false impression that they were talking about a third party

14  subscriber.  Defendant was talking about it itself.

15  Defendant was discussing a certain account at a warehouse

16  where infringement was happening, or where certain modems

17  were actively engaged in infringement.

18         When you first look at it from the signing

19  redactions, our assumption was that this was about a

20  subscriber, because as opposing counsel said, they're

21  redacting subscriber information.

22         But from the context, we saw it as a discussion

23  about a warehouse.  In the deposition on March 1st with WOW's

24  former officer, he confirmed that that warehouse is

25  Defendant's warehouse.

1             So, those people who were engaged in infringement

2    are Defendant's employees.  That's an important issue.  If

3    Defendant's employees are the ones engaged in infringement,

4    there's no safe harbor for that.

5             THE COURT:  I don't disagree, but again, this

6    might fall under the category of they're trying to mass

7    produce tens of thousands of documents and maybe even

8    regularly they over designate.  So, what am I supposed to do

9    about that?

10            MR. CULPEPPER:  At least order the defendant to,

11   first on this one specific document, Exhibit 16, order

12   Defendant to produce an unredacted copy of Exhibit 16.

13            MR. HOWENSTINE:  I'm not sure that it is in fact

14   the case that the redactions refer to a WOW facility.  But

15   certainly, if they do, and it's not subscriber information,

16   we'll produce an unredacted version.

17            THE COURT:  Okay.

18            MR. CULPEPPER:  I just, you know, this issue is

19   not particularly there.  In Exhibit 16, there's a page where

20   they say if it's at --

21            THE COURT:  I can't even tell it's redacted, the

22   print is so small.  I don't even know what's redacted.

23            MR. CULPEPPER:  It's because for some reason,

24   unfortunately, the email is the way that they were produced.

25   This is how they come up, but the redaction itself is on the,

1  if you go to the very last page of the exhibit, it says, can

2  you help locate who has -- do you have reading glasses?

3  Yeah, this one.

4          MR. HOWENSTINE:  Like I said, Your Honor, if this

5  is not subscriber information, we'll unredacted it.

6          THE COURT:  I agree.

7          UNIDENTIFIED MALE:  Yeah.  Can you help locate who

8  has and/or had these modems below?  Looks like two are --

9          MR. CULPEPPER:  No, this one right here.

10          UNIDENTIFIED MALE:  This one right here?  Yeah.

11          THE COURT:  I don't even see what you're reading.

12          UNIDENTIFIED MALE:  Yeah.  It looks like two are

13  related to this 1111.  One's redacted.

14          MR. CULPEPPER:  So, from there, it looks like the

15  redactions, the only impression that we would get is that

16  this is another customer --

17          THE COURT:  Okay.  Well, the only way I can handle

18  this, I think, is for you on a document by document basis

19  when you have a need, and one is either redacted or it's

20  designated as confidential and you believe that's

21  inappropriate, send them a letter, get a conferral, and then

22  we'll have to bunch these together, I guess.  But I don't

23  know how else to deal with it.

24          MR. CULPEPPER:  Well, I would just order -- for

25  one thing, we could start by ordering the defendant to

1   produce an unredacted version of this document right here at

2   issue.

3            THE COURT:  He said he would if it doesn't involve

4   subscriber information, so that's already been done.

5            MR. CULPEPPER:  And also, an unredacted version of

6   the IHG document where the hotel names are redacted.

7            THE COURT:  Did you say your position on that?

8            MR. HOWENSTINE:  Well, the issue with IHG is I

9   don't believe that's a subscriber who we've been entitled to

10  disclose.

11           But in addition, he already has the email back and

12  forth.  Due to the protective order carveout, he can show the

13  back and forth to IHG because they're a recipient of the

14  document.  So, I'm not even sure what we're arguing about.

15           MR. CULPEPPER:  We don't know which hotels were

16  specifically referred to in this Exhibit 14.

17           THE COURT:  Well, take Exhibit 14, you have a copy

18  of it, if you can provide the name of the hotel, do it.  If

19  you can't, tell them why.

20           MR. HOWENSTINE:  Understood.

21           THE COURT:  Mr. Culpepper, anything else?

22           MR. CULPEPPER:  I have nothing further, Your

23  Honor.

24           THE COURT:  Okay.  And, Mr. Howenstine?

25           MR. HOWENSTINE:  No, Your Honor.

114

 1              THE COURT:  Safe travels from wherever you came.
 2  At least there's no snow here.  At least, well, not active.
 3  And these cases involve a lot of discovery disputes.
 4              When I had the previous case against Charter, I
 5  guess, Charter?  I had to appoint Gina Rodriguez to be
 6  master, and she ended up being a district judge.  That's
 7  Judge Rodriguez right now.
 8              MR. HOWENSTINE:  Yeah, I was going to say, I think
 9  we've kept it to a minimum compared to the Charter case.
10              THE COURT:  It's not bad.  I don't feel the need
11  to do a master right now, but just keep it that way.
12              MR. HOWENSTINE:  All right.  Thank you, Your
13  Honor.
14              MR. CULPEPPER:  Thank you very much, Your Honor.
15              THE COURT:  Okay.
16              THE COURTROOM CLERK:  Court is now in recess.
17                      (Time noted:  3:46 p.m.)
18                          *  *  *  *  *
19
20
21
22
23
24
25

CERTIFICATE

1       I, RANDEL RAISON, certify that the foregoing is a

correct transcript from the official electronic sound

recording of the proceedings in the above-entitled matter, to

the best of my ability.

_____      March 28, 2024

Randel Raison