1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
        CIVIL ACTION NO. 21-cv-01901-DDD-MEH
 3      _____

 4      AFTER II MOVIE, LLC, ET AL.,

 5              Plaintiff,

 6      v.

 7      WIDEOPENWEST FINANCE, LLC,

 8              Defendant.

 9      _____

10          Proceedings before MICHAEL E. HEGARTY, United States

11      Magistrate Judge, for the District of Colorado, commencing

12      at 1:38 p.m. on May 30, 2024 in the United States

13      Courthouse, Denver, Colorado.

14      _____

15      WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE
        HEREIN TYPOGRAPHICALLY TRANSCRIBED...
16      _____

17                          APPEARANCES

18          KERRY CULPEPPER, Attorney at Law, appearing on

19      behalf of the Plaintiffs.

20          JONATHAN MOSKIN, Attorney at Law, appearing on

21      behalf of Plaintiff Screen Media Ventures, LLC.

22          ZACHARY HOWENSTINE AND KATHRYN FORD, attorneys at

23      Law, appearing on behalf of the Defendant.

24      _____

25                      DISCOVERY CONFERENCE
```

2

```
 1              P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE COURT:  Okay.  21-cv -1901, After II Movie,

 6    LLC v. WideOpenWest Finance, LLC.  Make your appearances

 7    starting with the plaintiff.

 8              MR. CULPEPPER:  Kerry Culpepper appearing on

 9    behalf of the plaintiffs, Your Honor.  Good morning.

10              THE COURT:  Good morning.  Where are you?  Jeez.

11    I wish I was where you were.  Are you Hawaii?

12              MR. CULPEPPER:  Yes, Your Honor.  I'm in Kona,

13    Hawaii.  It's 9:30 in the morning here.

14              THE COURT:  It's mid-afternoon here.  So okay.

15    And anybody else for the plaintiff, please.

16              MR. MOSKIN:  Yes, Your Honor.  For Screen Media

17    Ventures, this is Jonathan Moskin of Foley & Lardner.  Good

18    afternoon.  And thank you for the opportunity to appear

19    remotely.

20              THE COURT:  Oh, sure.  It's -- it's just what we

21    do, right, anymore?

22              MR. MOSKIN:  Right.

23              MR. HOWENSTINE:  And Your Honor, Zach Howenstine

24    for the Defendant WideOpenWest.

25              THE COURT:  Thank you so much.
```

3

1              MS. FORD:  And Kathryn Ford for the Defendant

2    WideOpenWest.

3              THE COURT:  Thank you.  All right.  So must be New

4    York City.  We hear sirens.  Motion to amend scheduling

5    order, to extend deadline to complete expedited discovery by

6    one day.  I might actually cut that out, but that is a title

7    up on my board of free speech.  Is that still a live issue?

8              MR. CULPEPPER:  Yes, Your Honor.

9              MR. HOWENSTINE:  Yes, Your Honor.

10             MR. CULPEPPER:  This is Kerry Culpepper appearing

11   for plaintiffs.  It's --

12             THE COURT:  Go ahead.

13             MR. CULPEPPER:  -- my motion, and I'll argue it.

14             THE COURT:  Go ahead.

15             MR. CULPEPPER:  This is effectively a continuation

16   of a dispute that was brought before Your Honor in March.

17   I'm sure Your Honor doesn't remember, but I'm just briefly

18   explain.

19             We had an issue with some request answers that

20   defendant made to requests for admissions.  Your Honor

21   ordered -- basically involved using control F to search for

22   information.  Your Honor ordered defendant to serve amended

23   answers to those requests for admissions.  I believe this

24   was on March 17th or so.

25             On April 22nd, defendant produced those amended

4

1    answers, but defendant continued to take the same approach

2    that Your Honor told them not to do.  They denied the answer

3    -- they denied the request for admissions when they could

4    have easily used control F to find the answers they needed

5    to find.

6              On that very same day on April 22nd, I served

7    requests for admissions to defendant again rather than

8    bringing that issue to the Court, and what I did in those

9    new requests for admissions was I broke down the range that

10   was getting them to admit by five different ranges just so I

11   can get a specific idea on if there was some logical reason

12   they had for denying what control F would have easily found.

13             Another issue in the new requests for admissions

14   that were served on April 22nd is some issues that were

15   basically made clear during the depositions the previous

16   week.

17             Despite defendant asserting that they had some

18   type of policy for terminating infringers between 2014 and

19   2017, it became clear during the depositions where the

20   30(b)(6) representative admitted that no one was terminated

21   in 2014, no one was terminated in 2015, no one was

22   terminated in 2016, no one was terminated in the first half

23   of 2017.

24             We'll dispose of half the issues that will be

25   relevant in the summary judgment motions.  So I served those

5

```
1    requests for admissions to simplify issues for the summary

2    judgment practice.  All of the issues in the new requests

3    for admissions that were served on April 22nd relate

4    directly to issues that were clarified during the

5    depositions that previous week of April 17th, and the

6    defendant's failure to follow this Court's order on March

7    17th to answer those requests for admissions using the

8    control F approach.

9             Now, to defendant's credit, a few days ago they

10   served amended answers to the requests for admissions that

11   finally goes ahead and does what Your Honor told them to do,

12   but that doesn't change the fact that was -- that was part

13   of the impetus for serving these requests for admissions on

14   April 22nd.

15            I -- when -- April 22nd was a Monday.  Now, April

16   22nd was a Monday, and that's important because defendant is

17   arguing that those requests were untimely because they'd be

18   due in 29 rather than 30 days.  I -- Your Honor, I -- your

19   plaintiffs don't agree with defendant's theory that because

20   the requests were served with 29 days left for the discovery

21   period that those requests are untimely, but to just nip

22   this issue in the bud, I made a motion for a one-day

23   extension of time to the discovery cutoff so that those

24   answers would be timely.

25            And I would request the Court to grant this motion
```

6

1   and order defendant to respond to those requests for

2   admissions within seven days so that we can move forward.

3         One point I want to make too, as I said earlier,

4   those requests for admissions were drafted based on

5   admissions in the depositions that previous week.  Those

6   depositions were held that week of April 16th because we had

7   an agreement that the depositions would be held after

8   defendant completed rolling production of documents.  That

9   was a stipulation that was entered, I believe on January

10  17th or so that defendant would begin rolling production.

11        The requests for admission that was at issue in

12  the previous hearing that -- and that defendant served on --

13  amended answers to on April 22nd, those requests for

14  admissions were original served back in November of last

15  year.  So it took five months to get the answer that we

16  should have gotten.

17        I would ask, Your Honor, that there's good cause

18  to amend the scheduling order so that we can get answers to

19  requests for admissions and simplify issues and summary

20  judgment motion practice.  I'm ready to answer any questions

21  Your Honor has for me.

22        THE COURT:  No.  That was a lot for a one-day

23  extension.  Go ahead and respond.

24        MR. HOWENSTINE:  Your Honor, in our view, these

25  are just discovery requests that were served out of time.

7

1 So while plaintiffs characterize this as a motion for a

2 one-day extension, really they're just asking the Court to

3 grant them leave to serve discovery out of time.

4    THE COURT:  Amended scheduling order is what

5 they're asking.

6    MR. HOWENSTINE:  Right.

7    THE COURT:  Yeah.

8    MR. HOWENSTINE:  So as -- as we laid out in our

9 papers, you know, we're in a phase of expedited discovery.

10 It's limited to WOW's DMCA safe harbor defense.  Just in

11 this limited phase of discovery --

12    THE COURT:  At your request?

13    MR. HOWENSTINE:  By the parties' agreement.

14    THE COURT:  Well, but it benefits you.  Avoiding

15 full-blown discovery on all aspects of the case benefits the

16 defendant more than it benefits the plaintiff, always,

17 right?

18    MR. HOWENSTINE:  Well, sure.

19    THE COURT:  It's self-evident.

20    MR. HOWENSTINE:  But the parties agreed to it.

21    THE COURT:  Sure.

22    MR. HOWENSTINE:  And even within this limited

23 phase, we've already responded to 50 -- 50 requests for

24 admission, 100 requests for production.  We've produced four

25 or five witnesses for deposition.  There's been a lot.  This

1    is just more discovery and I --

2              THE COURT:  How many requests is it?

3              MR. HOWENSTINE:  I'm sorry?

4              THE COURT:  How many total discovery requests?

5              MR. HOWENSTINE:  It's 30 new RFAs and one new

6    request for production.

7              THE COURT:  And that -- would that still be within

8    the limit I set?

9              MR. HOWENSTINE:  There's no limit on the number of

10   RFAs.

11             THE COURT:  Okay.  By stipulation?

12             MR. HOWENSTINE:  Well, just by operation of the

13   rules.

14             THE COURT:  No, no, no.  But you often put one in

15   the scheduling order.  You didn't here?

16             MR. HOWENSTINE:  Correct.

17             THE COURT:  Okay.

18             MR. HOWENSTINE:  So I -- I disagree also with the

19   characterization that -- that something else that happened

20   in discovery sort of occasioned these new RFAs or -- or

21   required them.

22             THE COURT:  It's just a clean hands argument.  You

23   know that.

24             MR. HOWENSTINE:  I'm sorry?

25             THE COURT:  It's a clean hands argument.  It's

9

1   inequity.

2           MR. HOWENSTINE:  Well --

3           THE COURT:  You're just trying to justify being

4   late by things you've done in the past.  That's -- it's

5   common.  I'm not saying it's a good argument either.  I'm

6   just saying it's what everybody does.

7           MR. HOWENSTINE:  Right.  But -- but my -- my

8   point, Your Honor, is there's no real tie between the

9   previous RFAs and -- and what we responded in this new set.

10  I mean, really the -- the primary set of RFAs that Mr.

11  Culpepper highlighted have to do with the copyright

12  management information issue, you know, whether WOW received

13  copyright notices that had certain websites identified in

14  them.

15          And Judge Domenico has ruled recently that that

16  issue is irrelevant to the safe harbor.  So that topic has

17  nothing to do with this phase of discovery anyway.

18          And these -- the other RFAs, you know, I'll --

19  I'll grant that maybe they bear some relationship to things

20  that came out in deposition testimony, but that's always the

21  case when depositions happen.  You -- it occurs to you that

22  you could have served more written discovery on some topic.

23          These depositions took place on April 17 and 18.

24  So Mr. Culpepper, plaintiffs had time to turn around and

25  timely serve this discovery.  Instead, they waited a few

10

1     more days, and so it wasn't timely.  This discovery is just

2     additive.

3          We -- we've done so much discovery in this case

4     anyway.  I would be doing a disservice to my client to

5     suggest that we're just going to agree to respond to 30 more

6     RFAs and another request for production and all the attorney

7     time that that entails.

8          I mean, the underlying evidence they have.  It has

9     been produced.  They can characterize it and present it

10    however they want on summary judgment.  You know, this is --

11    this is just a matter where they miscalculated the deadline

12    or -- or whatever, and -- and so they're asking for -- for

13    leave.  And there's just simply not good cause for it.

14          THE COURT:  Well, RFAs are supposed to be the

15    least burdensome kind of discovery requests to respond to.

16    Do you expect that your responses will be more than an

17    unqualified admit or deny?

18          MR. HOWENSTINE:  Your Honor, frankly I -- I can't

19    say.  I think at least certain of them would be more

20    complicated than that.  And you know, this is a big case,

21    this is a complicated case.  We have to vet the answers.

22    There's, you know, a certain amount of attorney time that's

23    going to go even into the simplest admission, and these are

24    just requests that could have been timely served.

25          THE COURT:  Sure.

11

1          MR. HOWENSTINE:  But they weren't.

2          THE COURT:  Sure.  Okay.  Yeah.  Do you know --

3    just in full transparency having been on that side and this

4    side of the bench, those are good arguments, and yet sitting

5    here, it's hard to say, "No, you don't get them.  You're a

6    day late, a dollar short," when that is the rule, although

7    the rule permits relaxation and upon good cause.

8          I don't -- I'm not sure I heard good cause.  I

9    agree with you.  So that is a standard that has to be met.

10   It can't just be, you know, "We simply missed it."

11         Now, in most scheduling orders, and I suspect this

12   one doesn't do it because you would have pointed it out,

13   actually say when -- does it say that they have to be

14   propounded in such way that answers are due by the close of

15   discovery?  What does it say about that?

16         MR. HOWENSTINE:  Your Honor, I don't -- I don't

17   recall the scheduling order say anything about that;

18   however, we did in our papers cite cases to that effect,

19   including a case from the Tenth Circuit.

20         So in our view, whether or not the scheduling

21   order says it or not, it's black-letter law that a discovery

22   request is not timely if the responses are not due within

23   the discovery period.

24         THE COURT:  Unless there's a scheduling order,

25   which is an order of the Court, which can override any rule,

1    says something different obviously.

2        MR. HOWENSTINE:  Right.  And --

3        THE COURT:  So --

4        MR. HOWENSTINE:  And I do not believe that the

5    scheduling order says anything different.

6        THE COURT:  All right.  So let me look at it.

7        MR. CULPEPPER:  Your Honor, this is Kerry

8    Culpepper appearing for plaintiffs.  I was going to add that

9    the scheduling order does not set a deadline for document

10   production as -- and I wanted to emphasize the two cases

11   that defendant cites.

12       THE COURT:  Yeah.  It does, it does.  So it does.

13   "The parties agree that any interrogatories, requests for

14   production of documents, or requests for admissions must be

15   served no later than 30 days prior to the discovery

16   deadline."  That's black and white, that's the rule.

17       And in this case, had April had 31 days, we

18   wouldn't be here, would we?  But April has 30 days.  So they

19   were served on the 22nd, is that right, or when?

20       MR. HOWENSTINE:  They were served on the 22nd.

21       THE COURT:  On the 22nd.  So 30 days plus the 22nd

22   is the 22nd.

23       MR. HOWENSTINE:  Correct.

24       THE COURT:  That's just what the scheduling order

25   says.  You don't disagree with anything I just said, do you,

13

1    Mr. Culpepper?

2              MR. CULPEPPER:  Your Honor, I'm pulling the -- are

3    you -- are you looking that original scheduling order that

4    was in --

5              THE COURT:  Maybe.

6              MR. CULPEPPER:  Which docket number -- which

7    docket entry is that?

8              THE COURT:  This one is 142 at Page 7.

9              MR. CULPEPPER:  Give me one moment, Your Honor.

10             THE COURT:  Sure.  Is there a later one?

11             MR. CULPEPPER:  Well, it's been amended a few

12    times, but I -- I'm not doubting Your Honor.

13             THE COURT:  Yeah.

14             MR. CULPEPPER:  I'm just looking at it.

15             THE COURT:  So those are substantive terms that

16    don't get amended by simply changing dates unless changing

17    the dates changes it directly.

18             MR. HOWENSTINE:  There was -- there was no

19    wholesale revision of the scheduling order.

20             THE COURT:  I suspect not.  There usually isn't.

21             MR. CULPEPPER:  Okay.  And Your Honor, I -- I see

22    that part that you -- of the scheduling order that you're

23    pointing to.  I -- I agree it's there.  I would and just add

24    that, emphasize respect to the good cause, there was an

25    order entered on January 17th, a stipulation of parties to

14

1    give defendant more time to answer the requests for

2    admissions that were served in November, and in that

3    stipulation, the defendant agreed to do a rolling

4    production.

5              So it's just -- my point is we couldn't have serve

6    -- we couldn't have prepared these requests for admissions

7    and served them until after the depositions that were the

8    prior week, and that -- that -- and that -- those -- so

9    these are based on requests for admissions that were served

10   in November, and the depositions were held later in this --

11   in this discovery period due to the agreement on -- that

12   stipulation on January 17th.

13             THE COURT:  No, no, but Mr. Culpepper --

14             MR. CULPEPPER:  And respect to good cause --

15             THE COURT:  Nothing you just said --

16             MR. CULPEPPER:  I'm sorry.  Go ahead.

17             THE COURT:  Nothing you just said would support an

18   argument that it couldn't have been done on Sunday, April

19   21st versus Monday, April 22nd.  That's -- that's where

20   you've got to --

21             MR. CULPEPPER:  I'm --

22             THE COURT:  -- focus, okay?  What happened between

23   the --

24             MR. CULPEPPER:  I -- I was going to go there.

25             THE COURT:  What happened on April the 21st that

15

 1   prevented you from doing it that day or two days prior to

 2   that?

 3          MR. CULPEPPER:  I would just say April 1st -- 21st

 4   was a Sunday.  It may be old-fashioned, but I observe

 5   religious customs on that day.  So I try to spend -- I try

 6   to spend at least one day a week with my family doing

 7   things, and to be very frank, that's what I was trying to do

 8   on April 21st.

 9          The -- those -- those requests for admissions --

10   well, I'll just leave it there, and that's -- that's why I

11   didn't serve them on that Sunday --

12          THE COURT:  Oh.

13          MR. CULPEPPER:  -- the --

14          THE COURT:  Well, I observe --

15          MR. CULPEPPER:  -- on that Sunday.

16          THE COURT:  I follow exactly the same procedure,

17   but what you just said is not inconsistent with submitting

18   them on Saturday or Friday before.  So what I need to know

19   is, what act of the defendant prevented you from doing it on

20   Friday the 19th?

21          MR. CULPEPPER:  I'm not asserting that an act of

22   defendant prevented me from doing it on Friday, April 19th.

23          THE COURT:  Yeah.  I mean, it -- well, honestly at

24   some point, rules are rules, and I can't avoid that.  So I

25   -- by the black letter of your scheduling order, it's too

16

1   late.  So --

2            MR. CULPEPPER:  Yeah.  I would just say, Your

3   Honor, I agree the scheduling order says that, but Your

4   Honor can amend it for good cause.  And the good cause would

5   be simplifying the issues for summary judgment because those

6   requests for admissions, which defendant did not argue in

7   its nature dispute that it would be burdensome for them to

8   respond to, they will significantly simplify issues for

9   summary judgment with respect to the years that defendant

10  didn't have a policy for terminating repeat infringers.

11           THE COURT:  No, I get that.

12           MR. CULPEPPER:  I'll leave it there.

13           THE COURT:  But under no authority I know of would

14  that go into the analysis of good cause.  Good cause goes

15  into the analysis of the actions of the parties seeking the

16  extension, not of how really important everything would be.

17  If it was just a matter of importance, deadlines would mean

18  nothing.

19           So I -- I am typically not a really technical, but

20  I do have to find some kind of cause, and I haven't heard it

21  on the record yet.

22           MR. CULPEPPER:  But if Your Honor's going to be

23  technical, I would just point out that those requests for

24  admissions that defendant served on the 22nd were late

25  because the order was on March 17th or so.  So if Your Honor

17

1    is going to be --

2              THE COURT:  I'm sorry.  Repeat what you just --

3              MR. CULPEPPER:  -- if we're going to force these

4    rules strictly --

5              THE COURT:  Explain what you just said, please.

6              MR. CULPEPPER:  Well, as I started at the

7    beginning, I served those requests for admissions on April

8    22nd in response to the answers -- the amended answers to

9    the requests for admissions that defendant served on April

10   22nd.

11             If you look at the record, your Court -- Your

12   Honor issued the order for defendant to serve the amended

13   answers, I believe it was on March 19 or March 18th.

14             THE COURT:  Hold on.  What --

15             MR. CULPEPPER:  So if --

16             THE COURT:  -- docket number, please?

17             MR. CULPEPPER:  One moment.

18             THE COURT:  I'm at -- I'm at ECF 201.

19             MR. CULPEPPER:  And so 201, that order was dated

20   March 19th, I believe.

21             THE COURT:  Yes.  But --

22             MR. CULPEPPER:  So --

23             THE COURT:  Read the language of my order that

24   you're relying on.

25             MR. CULPEPPER:  I -- I'm opening.  One moment.

1          MR. HOWENSTINE:  Your Honor, perhaps I can

2     simplify this.

3          THE COURT:  Please.

4          MR. HOWENSTINE:  I don't want to butt in, but to

5     be clear, we're not talking about --

6          MR. CULPEPPER:  (Indiscernible) admission to --

7          THE COURT:  Shh, shh.  Hold on, Mr. Culpepper.

8          MR. CULPEPPER:  -- on the last line.

9          THE COURT:  Hold on.  Mr. Culpepper, hold on.  Go

10    ahead.

11          MR. HOWENSTINE:  We're now talking about the

12    (indiscernible).

13          MR. CULPEPPER:  This is dated -- although this --

14          THE COURT:  Mr. Culpepper --

15          MR. CULPEPPER:  -- ECF entry --

16          THE COURT:  -- can you hear me?

17          MR. CULPEPPER:  -- is on the 20th, this order was

18    on March 19th.

19          THE COURT:  Clearly he can't.  Mr. Culpepper, can

20    you hear me?

21          MR. CULPEPPER:  Yes, sir.

22          THE COURT:  Okay.  Defense counsel was saying

23    something.  Please hold.  Go ahead.

24          MR. HOWENSTINE:  We're now talking about the

25    timeliness of WOW's responses to different RFAs coming out

19

1      of the last discovery conference.

2                THE COURT:  Right.

3                MR. HOWENSTINE:  In the March 19 conference, Your

4      Honor ordered WOW to provide certain amended supplemental

5      RFA answers, but what happened after that was that the

6      plaintiffs served amended RFAs on WOW.

7                THE COURT:  Even to those?

8                MR. HOWENSTINE:  No.  Pursuant to Your Honor's

9      direction --

10               THE COURT:  Right.

11               MR. HOWENSTINE:  -- coming out of that March 19

12     conference.  So --

13               THE COURT:  I said -- so I said, "Defendant shall

14     serve amended responses to Plaintiffs' Requests for

15     Admissions No. 5 to 15 and 42."  My minutes don't say a

16     date.  Did I give a date?

17               MR. HOWENSTINE:  You didn't give a date, but --

18     but the point I was going to make is that because certain of

19     your directions require plaintiffs to reframe some of their

20     RFAs, they then served amended RFAs on us on March 22nd.

21               THE COURT:  So I --

22               MR. HOWENSTINE:  Which is why we submitted the --

23     the amended responses on April 22nd --

24               THE COURT:  Which was --

25               MR. HOWENSTINE:  -- which was 30 --

1           THE COURT:  -- 31 days late.

2           MR. HOWENSTINE:  -- 30 days later.

3           THE COURT:  31, I think.  30?  30.  Okay.

4           MR. HOWENSTINE:  I mean, we -- we --

5           MR. CULPEPPER:  Your Honor --

6           THE COURT:  (Indiscernible).

7           MR. HOWENSTINE:  -- calendared and calculated the

8    deadline and believe that to be the right deadline.

9           THE COURT:  Okay.  So --

10          MR. CULPEPPER:  May I (indiscernible)?

11          THE COURT:  Just a second.

12          MR. HOWENSTINE:  But I -- I do want to be clear

13   that we're now talking about a different issue than the one

14   that we started out with.

15          MR. CULPEPPER:  And Your Honor, I disagree.  My

16   argument was the basis for me serving those requests for

17   admissions on April 22nd was defendants serving both his

18   amended responses to the requests for admissions on April

19   22nd.

20          Now, the order instructed plaintiffs to serve

21   amended particular (audio interference).  Can you still hear

22   me?  Can everyone hear me?

23          THE COURT:  Yeah.  Well, I mean, you did it 31

24   days later because --

25          MR. CULPEPPER:  I'm sorry.  Can you hear me now?

21

 1          THE COURT:  -- March 22nd to April 22nd is in fact

 2    31 days.

 3          MR. HOWENSTINE:  Maybe I have my dates wrong, Your

 4    Honor, but --

 5          THE COURT:  Okay.

 6          MR. HOWENSTINE:  -- in any event, Your Honor

 7    didn't -- Your Honor didn't specify a date for -- for the

 8    amended answers, and -- and again, this is -- this is

 9    spinning off into a separate issue.

10          THE COURT:  Well, no, no.  I didn't specify a date

11    because your scheduling order would have already controlled

12    that date.  If you're allowed to do written discovery, the

13    scheduling order controls all written discovery and says

14    responses are due -- well, I guess it just says responses --

15    in a normal course, responses are due 35 -- 33 or 35 days

16    later because we build in days for notice.  But if it's just

17    30 days, then you were a day late too, weren't you?

18          MR. HOWENSTINE:  Your Honor, I don't have all of

19    these papers in front of me, but -- but again, like this is

20    -- this is a side show to the issue that we're actually

21    arguing about, which is whether they should be permitted to

22    serve these different -- this different set of RFAs.

23          THE COURT:  So are you saying that whatever they

24    served on April 22nd had no nexus with what you served on

25    April 22nd?

22

1          MR. HOWENSTINE:  I'm saying that only six of the

2    31 new RFAs are on the same subject matter, and also that

3    subject matter, the existence of copyright management

4    information and copyright notices is something that Judge

5    Domenico has ruled is irrelevant to WOW's safe harbor

6    defense.

7          THE COURT:  Right.  And so I -- I don't feel sort

8    of prepared to say because of an order Judge Domenico issued

9    in a different case, is it?

10          MR. HOWENSTINE:  No.  In this case.

11          THE COURT:  In this case?  Well, let me --

12          MR. CULPEPPER:  Your Honor, can everyone hear me?

13    This is Kerry Culpepper again.

14          THE COURT:  Go ahead.

15          MR. CULPEPPER:  All right.  I didn't want

16    interrupt you.  I just -- I lost the -- the feed for a

17    second.  I just wanted to make sure I'm back.  I'm -- I'll

18    let you speak, but I could respond to what I just heard

19    defense counsel --

20          THE COURT:  No.  The question is this:  Did Judge

21    Domenico rule those irrelevant to the DMCA defense?

22          MR. CULPEPPER:  Well, first, I don't agree that

23    those requests for admissions that ask about specific --

24    specific piracy sites aren't related to the safe harbor

25    because defendant has argued that the noticed are

1   unreliable, that the data service provider used is famously

2   not reliable, but the evidence that notices from different

3   sources are all pointing to the same source of piracy sites

4   undermines defendant's argument.

5           So I don't agree that those requests are not

6   related to the safe harbor.  It will show that defendant

7   knew these notices were reliable, that defendant knew that

8   they customers were using the same privacy site to engage in

9   massive piracy.  That -- so I -- I think I would add that.

10          And the other point I think I heard opposing

11  counsel say was that this has no nexus to the requests for

12  admissions that they served on April 22nd.  I disagree with

13  that.  That -- I think that has been established that there

14  was a nexus.

15          And when I got cut off, I was -- I think Your

16  Honor already picked up on that, but the paper we served

17  with the amended requests for admissions, it was a paper by

18  itself that just had 38 through 41.  So they -- you know, if

19  we're going to interpret the rule strictly, then the

20  defendant had 30 days from the date of the order to serve

21  the answers to Requests for Admissions No. 5 through 15 and

22  42.

23          But I'm willing to just take a -- I think the

24  expression is a mulligan, and if defendant agrees to give us

25  the one day to extend the -- extend the order, then we'll

24

1  excuse his untimeliness with his requests for admissions.

2          THE COURT:  Well, you didn't --

3          MR. CULPEPPER:  And Your Honor, by the --

4          THE COURT:  -- you didn't -- yeah.  You didn't

5  raise that, so you've waived it already, and it's not a tit

6  for tat.  But if I'm going to be -- apply strictly a

7  deadline, unless you can tell me that in fact you responded

8  within 30 days of receipt, that if you took 31, I'm going to

9  let them take 31 too.  So can -- can you tell me you didn't

10  take 31?

11          MR. HOWENSTINE:  As I stand here right now, I -- I

12  can't.  I mean, we could -- we could look that up and --

13          THE COURT:  That's --

14          MR. HOWENSTINE:  -- figure it out.  I didn't

15  really appreciate that it was going to be an issue for --

16          THE COURT:  Yeah.  So I'm going to -- I'm going to

17  authorize the discovery.  I'm going to also rule that it is

18  -- it unnecessarily multiplied a proceedings, and you'll

19  have your fees for today, okay?

20          MR. HOWENSTINE:  That's fine, Your Honor.

21          THE COURT:  All right.

22          MR. HOWENSTINE:  Can we just go ahead and so -- so

23  there's no mystery, set a deadline for us to --

24          THE COURT:  Of course.  Give me a deadline.

25          MR. HOWENSTINE:  -- respond to these new RFAs.  I

1    would say 14 days.

2              THE COURT:  Your call.  Okay.

3              MR. HOWENSTINE:  That's fine.

4              THE COURT:  Yep.  14 days from today is June 6th

5    -- June 13th.

6              MR. CULPEPPER:  Your Honor, may I -- sorry, Mr.

7    Howenstine.  You -- I'll let you go.  I was -- I mean, maybe

8    you're about to say the same thing I'm going to say, is that

9    the -- right now, the deadline for summary judgment is June

10   21, 2024.

11             Maybe this is an issue we can save until last, but

12   if they're -- if they're going to get 14 days to respond to

13   those, we -- I mean, having said that, I'm going to wait and

14   confer with opposing counsel on this issue.

15             THE COURT:  Fine.

16             MR. CULPEPPER:  So let's just set that aside.

17             THE COURT:  What else can we do today?

18             MR. HOWENSTINE:  We have a number of other

19   discovery disputes that are --

20             THE COURT:  Love that word.

21             MR. HOWENSTINE:  Yeah.

22             THE COURT:  Okay.  Go ahead.

23             MR. HOWENSTINE:  One of -- one of them is

24   WideOpenWest's issue.  The remainder of them are

25   plaintiffs'.  I defer to Your Honor on where you'd like us

26

1    to start.

2             THE COURT:  Let's go issue by issue.  Just bring

3    them to me.

4             MR. HOWENSTINE:  So the -- the issue that we have

5    raised relates to a 30(b)(6) deposition.  Your Honor, you --

6    you may recall that in the -- in the last discovery

7    conference, you ordered that we could conduct 30(b)(6)

8    depositions of the plaintiffs regarding their discovery rule

9    claims in this case.

10            So -- and this relates only to plaintiff Screen

11   Media Ventures.  Screen Media Ventures is asserting the

12   lion's share of works at issue in this case, and they are

13   claiming -- they have represented just in communications

14   between counsel that they intend to rely on the discovery

15   rule with respect to 125 works.

16            So we did a 30(b)(6) deposition of a Screen Media

17   Ventures representative about their discovery rule position,

18   and the -- you know, the core issue is when did Screen Mania

19   -- Screen Media learn about the infringement that's at issue

20   in this case.  That's the -- that's the nut of the entire

21   discovery rule inquiry.

22            And Screen Media's corporate representative, put

23   simply, did not know, and we've -- we've submitted a

24   highlighted copy of the deposition transcript, but basically

25   he did not have any idea which company, which monitoring

1    company even detected the infringement that's at issue in

2    this case.  And in interrogatory answers, the plaintiffs

3    identified what they contend are the documents representing

4    the infringements at issue.

5         And we put those documents in front of Screen

6    Media's representative.  He had never seen them before.  He

7    didn't know where they came from.  He didn't know who

8    provided them.  And so essentially for purposes of the

9    discovery rule, there was no information of any value that

10   their witness could provide.

11        And subsequent meet and confers, Screen Media's

12   counsel has basically said that, well, the attorneys know

13   these facts, but their client doesn't know them, and that's

14   simply not an excuse.  They have to educate their client on

15   those facts.  We cited a case.  It's a Vitamins Antitrust

16   Litigation case that says exactly that.  I -- I don't think

17   that's a real controversial principle --

18        THE COURT:  I don't either.

19        MR. HOWENSTINE:  -- in general.  So you know,

20   essentially this -- this witness wasn't able to provide any

21   material information, and then it was clear why that was

22   because he admitted he didn't really do anything to prepare

23   for the deposition.

24        He only glanced at the original interrogatory

25   answer.  He wasn't familiar with the supplemental

28

1    interrogatory answer about the discovery rule at all.  He

2    hadn't spoken to anyone within his company in preparation

3    for the deposition, and that included people who have direct

4    anti-piracy responsibilities, and in total, he spent less

5    than an hour preparing with his counsel.  That was the sum

6    total of what he had done.  So it was no surprise that --

7            THE COURT:  No.  You can stop.

8            MR. HOWENSTINE:  Okay.

9            THE COURT:  How much do you --

10           MR. CULPEPPER:  Your --

11           THE COURT:  How much do you believe they'll be

12   asking for in this case?

13           MR. HOWENSTINE:  I think with -- with these new

14   works, we're in the -- I don't know.  I think we're in the

15   100 million-plus territory.

16           THE COURT:  So I -- I hesitate to use the word

17   outrageous, but for a 30(b)(6) deposition in such an

18   important case, and I'm reading the deponent's responses, he

19   didn't review any documents except interrogatories, and he

20   spent under an hour preparing for the deposition.

21           MR. CULPEPPER:  If --

22           THE COURT:  You better have a darn good

23   explanation for that.

24           MR. CULPEPPER:  I was just going to say, Your

25   Honor, Jonathan Moskin will be speaking on this topic.

29

1          THE COURT:  Fine.

2          MR. MOSKIN:  Thank you.  Thank you, Your Honor.

3    This -- I think the place to start here is Your Honor's

4    instructions at the March 19th hearing to Mr. Howenstine,

5    which he accepted that was a sufficient answer for the

6    30(b)(6) deponents to rely solely and exclusively on the

7    interrogatory answers provided, which is what Mr. Fannon

8    (ph), the designated witness, was prepared to do.

9          I don't want to disclose attorney-client

10   privilege, but the fact is I spent more than an hour with

11   him two or three weeks before the deposition and an hour

12   with him before -- the day before the deposition, and I

13   spoke with him again the morning of the deposition to

14   reiterate that he had reviewed the interrogatory answers,

15   that he prepared to answer the interrogatory answers, and

16   confirm that those represented the extent of Screen Media's

17   knowledge.

18         Reading Mr. -- we had a following -- follow-up

19   meet and confer with Mr. Howenstine the next day on May

20   16th.  He confirmed in that, despite a lengthy list of --

21   similar to the list he's repeated to Your Honor in the

22   motion, he acknowledged in that meet and confer that there

23   really was only one issue as to which he -- he needed

24   further information, and that was the date on which Screen

25   Media began its relationship with Factera (ph), which is the

30

1  entity that in fact was retained by Screen Media to gather

2  evidence of the infringements.

3       Mr. -- I had a series of follow-up emails.  Mr.

4  Howenstine never specifically responded in disagreement to

5  that, at least not with any specific facts.  He identified

6  some -- some general concerns, but even reading his

7  submission now to the Court, I don't believe there is any

8  witness at Screen Media who could provide more information

9  beyond what is in the interrogatory answers, and part of

10 that is because one needs to consider what this case -- how

11 this case evolved.

12      The discovery rule, it was only in 20 -- in the --

13 in 2020, I think it was through the offices of Mr.

14 Culpepper, that we first discovered through a lawsuit in

15 Hawaii against a company called YTS that there had been

16 infringing conduct on the -- the WideOpenWest platform.

17      Shortly thereafter, a cease and desist letter went

18 out, and the -- then the litigation began in the following

19 year.  So the only person with direct knowledge of -- of

20 that -- the first notice, which is really what triggers the

21 discovery rule, was Mr. Culpepper.

22      The person that I believe Mr. Culpepper then -- at

23 Screen Media who was the initial recipient of any

24 information, frankly for the first several years, was

25 somebody named Mark Damon.  His name appears briefly in the

31

1    deposition transcript because he died shortly before the

2    deposition, and he was grievously ill for several months

3    before he died.

4         So whatever personal knowledge he has was taken to

5    the grave with him, and so that is part of the reason I say

6    now that there really was nobody else that Mr. Fannon could

7    have spoken with.  And what he did, and I -- I will say if

8    there's something else that he should have done, I would

9    like to know what it is, but Mr. Howenstine has not

10   identified that in the two weeks we've been meeting and

11   conferring about this.

12        So the -- the way then after -- frankly, he's

13   misleadingly cited certain points in his -- in his

14   submission to the Court.  For example, he said that -- that

15   Mr. Fannon didn't know -- this was the second bullet.  So

16   I've touched on the first bullet point on Page 3 of his

17   submission.

18        The second bullet point, he says that Mr. Fannon

19   didn't know who was involved in detecting the infringement.

20   What he cites to in fact in the deposition transcript is

21   work that was done by a company called Irdeto.  Irdeto was

22   not in the position of tracking infringements.  I mean,

23   incidentally it may have, but it was a different company,

24   Factera, that was tracking the infringements.

25        And it's based on the Factera records that Screen

32

1    Media relies on, not on Irdeto, to identify when -- you

2    know, under the discovery rule when the infringements began,

3    when the infringing conduct began.

4           Separately in the deposition transcript, he

5    doesn't say -- cites to Page 52 and 53, and I think there

6    are other passages where Mr. Fannon did acknowledge have a

7    general understanding of what Factera was doing.

8           Mr. -- I don't believe Mr. Howenstine probed that

9    further than just acknowledge what's stated in the

10   interrogatory answer on which Your Honor directed and Mr.

11   Howenstine agreed we were entitled to rely.

12          The only thing that Mr. -- Mr. Fannon, the

13   designated witness, was not able to say was exactly when

14   that relationship with Factera began, and that relationship

15   in fact began substantially after 2020.  The earliest

16   contract I've seen, a draft contract was in 2022.

17          As a result, when it began, that relationship was

18   not part of the -- the -- how it discovered the initial

19   infringements back in 2020.  That trigger -- is triggered to

20   Mr. Culpepper's discovery in this infringement suit against

21   the company YTS.

22          Once again, once Factera was retained by Screen

23   Media, virtually all of the communications between Factera

24   and the company have been through counsel.  This is -- these

25   are not typical business records that, you know, would

33

1    anticipate having.  So where they're -- they're not

2    generated by the company.  They're generated, again at that

3    point, largely in contemplation of litigation.

4            So this is -- one needs to be very mindful of the

5    very specific facts in this case.  One of the documents that

6    this witness was supposed to have greater knowledge of --

7    and I'm happy to show you, by the way, and show Your Honor

8    some of the documents that were shown, but what he couldn't

9    -- what -- what is difficult -- in fact, it would be

10   difficult for me or Your Honor, these -- these spreadsheets

11   are very lengthy and elaborate, and it's difficult to tell

12   one from the other.

13           One thing that the witness was able to identify

14   was the column in all these spreadsheets that listed the --

15   the titles of the -- of the works that were infringed.  So

16   again, I don't know if -- if Your Honor were to say we need

17   to produce another witness, I don't know what else another

18   witness could say.

19           These -- you know, the -- the -- the -- the meat

20   of the -- these spreadsheets is something that Mr.

21   Howenstine, I think would more profitably have explored with

22   a witness he did not subpoena, which would have been

23   Factera.  There's a -- there's an individual there I deal

24   with on a regular basis.

25           These are highly technical documents.  Again,

34

1    they're -- they're -- I -- I'd be willing to show Your Honor

2    an example of what they are so you have a sense.  This is

3    not something that an executive running a motion picture

4    production company would in the -- in the order of --

5    routine order of business have any reason to have knowledge

6    of.

7            And the -- the -- again, it was -- would have been

8    sufficient, as I understood Your Honor's prior instructions

9    and Mr. Howenstine's acknowledgment, simply for the witness

10   to say, as he did, that he has nothing to add beyond what

11   was in the interrogatory answers.

12           I also think that it's -- it's the -- I -- I'm --

13   I am a little curious, and I know -- I don't really get to

14   ask the questions of Your Honor.  I think it's the amount of

15   -- I don't know how Mr. Howenstine calculates the damages

16   amount.  That is something for the second phase of

17   discovery, as Your Honor acknowledged and as Mr. Howenstine

18   acknowledged in the opening arguments.

19           We're in a very limited phase of discovery, and to

20   the extent that damages are -- are at issue, that's

21   something I certainly did not prepare the witness to -- to

22   -- to discuss.  I never anticipated it.  It's not within the

23   scope of the deposition notice.

24           And -- and so I -- it -- even after several weeks

25   of having discussed this with Mr. Howenstine, we've had

1    several conversations.  We had one lengthy conversation.

2    There were several emails back and forth.  I candidly don't

3    know what it is he thinks we -- we -- we -- he can gain

4    from, for example, a further deposition.

5           I also don't know who to designate at Screen Media

6    because the things he's asking about are the details, not

7    only are they outside the scope of the deposition notice,

8    but they're things that were generated between a retained

9    expert consulting firm and counsel.  So again, I -- I --

10   maybe I should stop there.

11          THE COURT:  Okay.  Yeah.

12          MR. MOSKIN:  I mean, we do --

13          THE COURT:  It's getting a little repetitive.

14          MR. MOSKIN:  Yes.

15          THE COURT:  My design is to allow you to

16   effectively brief your motion.  If you can propose to me

17   what you need for that, then I'll do what I can.  So what is

18   it that you need in order to effectively prepare for that

19   motion?

20          MR. HOWENSTINE:  I'm sorry.  So you want me to lay

21   out the -- the information that we need from Screen Media

22   for purposes of our summary judgment motion?

23          THE COURT:  Well, I guess it has to be in an

24   admissible sort of form for purposes of summary judgment,

25   and it has to be clear enough for the Court to look at it

36

1    and say, "Yes, you're correct."  A 30(b)(6) does serve that.

2    I see the arguments on both sides here that, you know, this

3    is not a typical 30(b)(6).

4            MR. HOWENSTINE:  Could -- could I respond though

5    briefly to some of the things that Mr. Moskin said?

6            THE COURT:  Briefly.

7            MR. HOWENSTINE:  I -- I -- I think the things he

8    -- he was laying out the relationship between Screen Media

9    and Factera and the YTS company and the Irdeto company, and

10   that's -- that's really exactly the problem because those

11   are facts, those are facts that are known to Screen Media,

12   but all we have is Mr. Moskin saying these things.  That's

13   the information that we were trying to get out of Mr.

14   Fannon.

15           THE COURT:  Right.

16           MR. HOWENSTINE:  But he didn't know any of those

17   answers.  We don't --

18           THE COURT:  Okay.  So --

19           MR. HOWENSTINE:  We don't want to depose anyone

20   about technical subjects.

21           THE COURT:  I understand.  Now, this is a novel

22   idea, I suppose, but is there a way to get those facts in

23   admissible form, I know it sounds crazy, by deposing without

24   making a witness an attorney?

25           MR. HOWENSTINE:  I -- I think all of this

37

1    information could be easily supplied to Mr. Fannon.  And

2    another thing I wanted to highlight is we also deposed

3    various other groups of plaintiffs who were able to supply

4    this information.  You know, they identified which

5    monitoring companies they worked for and when.  They talked

6    about when those contracts began.

7             I showed them the -- what's -- what's going to be

8    the infringement evidence.  They confirmed yes, this is a

9    document that came from Maverickeye pursuant to our

10   agreement with Maverickeye to do this monitoring work, and

11   that's -- I mean, that's really what --

12            THE COURT:  Did you disclose all the information

13   you need in the inadequate 30(b)(6) that's already been

14   taken?

15            MR. HOWENSTINE:  Do you mean, did we ask the

16   questions to which we needed the answers or --

17            THE COURT:  Correct.

18            MR. HOWENSTINE:  Yes.

19            THE COURT:  Okay.

20            MR. HOWENSTINE:  I mean, that's -- that's what's

21   in the highlighted deposition transcript of us --

22            THE COURT:  Okay.

23            MR. HOWENSTINE:  -- is us asking those questions

24   and not getting those answers.

25            THE COURT:  Can -- Mr. Moskin, can Mr. Bannon be

1    made -- Bannon or Fannon?  Fannon --

2          MR. MOSKIN:  Fannon.

3          THE COURT:  -- be educated by being prepped with

4    the deposition transcript and acquiring the knowledge

5    necessary to answer all of Mr. Howenstine's questions?

6          MR. MOSKIN:  I'm not entirely sure.  I think some

7    of -- perhaps some of the questions, but there are a lot of

8    technical questions about how the -- that Mr. Howenstine was

9    asking him about how the document was prepared, what certain

10   columns in the document mean, and those are things that I

11   don't know why -- that's -- that's outside the scope of, you

12   know, what a fact witness would know at the company.

13         So it -- it -- it seems like -- I mean, I would

14   say this, if it's helpful, because we're not disputing and I

15   don't think there is any dispute that there records that

16   were produced are the records from Factera on which Screen

17   Media relies.  That's why they are recited in the

18   interrogatory answers.

19         And by the way, the interrogatory answers are --

20   are certainly -- represent a document that Mr. Howenstine

21   can rely upon in the summary judgment briefing.  The -- but

22   I don't know that it would be very profitable given the

23   technical -- highly technical nature of the documents that

24   -- I mean, this is really something that's much better

25   suited for the expert testimony or testimony of -- of the

39

1    company that prepared them, not necessarily, you know, a

2    fact witness from the company.

3            I don't really honestly know.  I -- I might very

4    -- frankly, I have -- I would have considerable objections

5    to the relevance of many of the questions that Mr.

6    Howenstine was asking concerning the specific documents, but

7    I would say -- I would say this, it seems to be quite

8    possible if we could have a further meet and confer, we

9    could work out something so we would I think admit what are

10   the documents, when they were prepared, and so forth.  We're

11   not trying to hide anything.

12           THE COURT:  Right.

13           MR. MOSKIN:  It's just they're -- they're

14   technical documents.

15           THE COURT:  Well, you're both making relevance

16   objections.  Mr. Howenstine made relevance objections to

17   certain of the RFAs, that it's irrelevant because what

18   Domenico said.  You're making relevance objections.  I'm not

19   going to rule on those.

20           I'm going to let discovery be discovery.  It's

21   broad within the scope of the MCA safe harbor defense, but

22   if -- if any collection of human beings could answer the

23   questions Mr. Howenstine asked, then one human being can by

24   being educated, and that's the nature of 30(b)(6).

25           He walks in -- he or she walks in, gets educated

1    by a bunch of other people ahead of time, wasn't the primary

2    holder of the knowledge before that deposition, but now is

3    the repository for purposes of giving admissible answers to

4    the questioner.  That's what has to happen.

5            If you can work out something else that he's

6    satisfied with, I'm fine with that.  But otherwise, I'm

7    going to let you use the existing transcript as the

8    playbook.  You make this -- you choose whoever you want to

9    to answer those questions that he asked in that deposition.

10   If they're capable of being answered by anybody on your side

11   of the fence, then they need to be answered, okay?  So work

12   it out.

13           MR. HOWENSTINE:  Understood, Your Honor.

14           MR. MOSKIN:  Thank you, Your Honor.

15           THE COURT:  What's next?

16           MR. HOWENSTINE:  We -- we now have a series of

17   issues raised by the plaintiffs in their papers.  So I'll --

18   I'll let Mr. Culpepper start.

19           THE COURT:  Are you done with yours?

20           MR. HOWENSTINE:  Yeah.  That was the only issue

21   that WideOpen wants to ask.

22           THE COURT:  Very good.  Go ahead.  Whoever wants

23   to speak for the plaintiff.

24           MR. CULPEPPER:  Your Honor, this is Kerry

25   Culpepper speaking for the plaintiffs.  I'm having some kind

1    of choppy connection, so if I drop off, please be patient

2    with me.

3            This case is about -- is limited to the

4    defendant's DMCA safe harbor defense in this case.

5    Ultimately what this is about is whether or not defendant

6    implemented a policy -- a reasonable policy for totaling

7    repeat infringers.

8            Key evidence or key to us disputing that point is

9    defendant's DMCA database.  What steps did they take to

10   their customers when they received noticed from copyright

11   holders?  That's the most important key thing in this case.

12           And to this end, on November of last year, Your

13   Honor ordered defendant to turn over the DMC database.

14   Defendant didn't do that.  Defendant turned over some

15   excerpt -- excerpts, spreadsheet excerpts of the DMC

16   database.

17           I'd like to -- now, the -- the problem with that

18   is defendant has been submitting documents that shows, you

19   know, terminations of customers by account numbers or other

20   actions, but plaintiffs were never able to link the IP

21   addresses of those customers to those accounts numbers.

22           To that end, what's important is in Exhibit 1 to

23   plaintiffs' statement identifying the nature of dispute,

24   that was an interrogatory we served on defendant on -- I

25   believe it was in November asking them how do you link the

42

1    IP addresses -- the account numbers, rather, in that

2    document you produced showing the actions you took against

3    customers with the IP addresses based on the documents you

4    produced?

5           And I'm -- this is Interrogatory No. 15.  And

6    defendant answered.  Defendant said there were two

7    spreadsheets, WOW 028677 and WOW 028678, that could be used

8    to link IP addresses to all the account numbers that was in

9    the document WOW 000144.

10          This is very important because, you know,

11   plaintiffs are now in -- we have records of noticed that,

12   you know, our data providers sent to certain IP addresses,

13   but of course, we don't know the account numbers of these

14   customers.

15          So you know, when defendant produces a document

16   that has, you know, a list of customers terminated by

17   account number, there's no way for us to see how many

18   notices did we send to WOW concerning that customer.

19          So going back to Interrogatory No. 15:  Defendant

20   said that these two spreadsheets were sufficient to linking

21   account numbers to IP addresses, and they said that a small

22   number of -- a small number of accounts can't be identified.

23          There's a specific account that we asked him to

24   show how the IP addresses are linked to it, and defendants

25   admit in this interrogatory that you can't find the IP

43

1    addresses for that account number by these two documents.

2            Those two spreadsheets that defendant said could

3    be used to identify all but a small number of the account

4    numbers, each of those spreadsheets have roughly 15,000

5    rolls in them.  So adding those two up, that's 30,000 rolls.

6    But the document WOW 000144 has 90,000 rolls in it.

7            So at this point in -- when they answered this

8    interrogatory in January, our understanding was based upon

9    an interrogatory answer that was verified by their executive

10   was that somehow those two spreadsheets would be sufficient

11   for linking all IP addresses with account numbers.

12           And we went, based on your understanding, trying

13   to formulate further interrogatories or make further

14   requests for admissions, plan our questions in the

15   depositions.

16           It wasn't until the deposition of Teri Blackstock

17   the week of April 16th, I believe, where I showed her those

18   two spreadsheets and showed her the master spreadsheet and

19   asked her how could I find the account numbers -- how could

20   I link the IP addresses to the account numbers from using

21   these two spreadsheets?  And Ms. Blackstock admitted, she

22   said it's impossible.

23           And if you go to Exhibit 2, it's a transcript from

24   Mrs. Blackstock, and you will look at the last page of it

25   where there's a question, "And we agree it would be

44

1    impossible for these two spreadsheets to show the IP

2    addresses for all those accounts numbers in WOW 000144?"

3    Answer, "That is correct."

4            So what that means is they never produced all of

5    the DMC database as Your Honor ordered them to do in

6    November.

7            THE COURT:  Okay.  Stop there.  I mean, that's way

8    too much information.  Please respond.

9            MR. HOWENSTINE:  So where Mr. Culpepper is going

10   ultimately is that he is going to ask the Court to strike

11   our safe harbor defense on the grounds that we delayed --

12           THE COURT:  I'm not going to strike the defense.

13   That's a district judge's job.  So you --

14           MR. HOWENSTINE:  I --

15           THE COURT:  You can do that --

16           MR. HOWENSTINE:  -- appreciate --

17           THE COURT:  -- by motion.  We're not -- that's not

18   a discovery issue.  That's a merits issue, which anybody's

19   free to do.  I can only deal with discovery.  He's a

20   assuming there is this thing called a DMCA database.  I

21   assumed the thing -- same thing in my order.  That might

22   have been out of ignorance.  Is there such a document in

23   your client's possession, custody, or control?

24           MR. HOWENSTINE:  Well, let me -- let me explain

25   what happened here.  So we do have a database more or less,

45

1    and I'm using that term broadly.  It's a system for

2    processing all these --

3              THE COURT:  It's data in a computer?

4              MR. HOWENSTINE:  Exactly.

5              THE COURT:  All right.

6              MR. HOWENSTINE:  You know, it exists in a series

7    of tables.

8              THE COURT:  Sure.

9              MR. HOWENSTINE:  You know, there are -- you have

10   to output it by selecting certain fields and --

11             THE COURT:  Of course.

12             MR. HOWENSTINE:  -- creating outputs, and we did

13   that.

14             THE COURT:  We do the same thing in our courts.

15             MR. HOWENSTINE:  Mr. Culpepper, after we made this

16   initial production in the summer of last year, raised some

17   complaints about the ability to tie IP addresses to customer

18   accounts --

19             THE COURT:  Clearly.

20             MR. HOWENSTINE:  -- in that data.  We went back

21   and forth on this.  On March 19th of this year, in

22   connection with the last discovery conference, we produced

23   some new tables, after talking to people within the company,

24   about different ways to pull the data and organize it, that

25   more directly ties that information together.

46

1          THE COURT:  For all the customers?

2          MR. HOWENSTINE:  Well, I'm -- I'm going to get to

3     that.  So we -- we thought we had produced everything.  It

4     came to light in the deposition of the person who gathered

5     this information, which took place roughly a month later in

6     mid to late April, that because of a system conversion, when

7     she pulled that data, it only pulled it for a specified time

8     frame, like up to 2021, and she needed to pull an additional

9     set of tables to provide the same information from 2021 to

10    the present.

11         THE COURT:  But was the data up to 2021 complete

12    as far as you know?

13         MR. HOWENSTINE:  Yes.

14         THE COURT:  Okay.  Go ahead.

15         MR. HOWENSTINE:  And then so when that came to

16    light in her deposition that there was this time frame that

17    hadn't been covered, we gathered that information and

18    produced it later that week and --

19         THE COURT:  Last month?

20         MR. HOWENSTINE:  Right.  And Ms. Blackstock, the

21    -- the WOW employee who gathered the information, explained

22    in her deposition what all these tables are, what the

23    content represents.

24         So as a result, when we made that additional

25    production, the plaintiffs never said, "Well, we need to go

47

1   back and depose Ms. Blackstock again about that

2   information," because they effectively already had -- they

3   have all this information.  They have it now.  I'm not sure

4   what basis or what authority would support striking our safe

5   harbor defense --

6           THE COURT:  Well, I'm not going to do that, so

7   that's irrelevant.

8           MR. HOWENSTINE:  -- under these circumstances.

9   And that's the only thing they're asking for.

10          THE COURT:  All right.  I'm not -- you have to

11  file a motion to strike.  I'm not going to address a motion

12  to strike.

13          MR. CULPEPPER:  Your Honor, that wasn't -- an

14  alternative, we asked -- can I further elaborate on this?

15  Because it's very important, and I would direct the Court to

16  Pages 5 through 6 of defendant's summary dispute.

17          THE COURT:  Okay.

18          MR. CULPEPPER:  So defendant has a timeline of

19  what documents they produced from their DMCA database.  I

20  would direct the Court to the last roll, May 3, 2024, where

21  they produced the 15 spreadsheets.

22          Up until May 3rd, they had not -- they had not --

23  they had not produced the complete DMCA database.  All

24  defendants did was produce selected excerpts that were

25  limited only to the plaintiffs' movies.  It wasn't until May

48

1    3rd that we got the complete database excerpts.

2            Now, this was highly prejudicial to plaintiffs.

3    We weren't able to -- you know, as we just went through in

4    the previous dispute, we weren't able to submit, you know,

5    requests for admissions or interrogatories based upon our

6    knowledge of the complete database.

7            And these are huge spreadsheets, these 15

8    spreadsheets that are here.  It's been a lot of work to try

9    to pull them together as of right now.  So going back to

10   relief, we said it.  In the alternative, I think Your Honor

11   has the -- has the authority to not allow defendant to use

12   these spreadsheets as evidence of their actions because they

13   waited until three weeks before the discovery cutoff to

14   finally produce the complete database.

15           And you know, defendant kind of dodged your

16   answer, but he conceded they have a DMCA database.  They

17   could have put it on a hard drive back last year in April

18   and mailed it to me.  Like I've gotten other types of ISP

19   cases like this, and I could have had an IT guy put it

20   together on my end, and back last year, plaintiffs would

21   have known the exact inner workings of DMC's database

22   system.

23           But they chose to only, you know, send pieces of

24   the puzzle over a year, and I'm still referring to Pages 5

25   to 6 of defendant's motion.  They started in June 8, 2023.

49

1   So over 11 months, they send bits and pieces of this DMC

2   database system to plaintiffs, and we don't get the last bit

3   until June -- May 3, 2024.

4          It's not very fair, and it's very prejudicial to

5   plaintiffs.  So we would ask Your Honor consider not

6   allowing defendants to use, particularly WOW 000141, which

7   they say is the evidence of the actions they took on

8   customers as listed by account number if they're not going

9   to turn over the database that shows what exactly was going

10  on there.

11         THE COURT:  By the way, your co-counsel --

12         MR. CULPEPPER:  I await your questions.

13         THE COURT:  Your co-counsel no longer is on the

14  video.  Is that intended?

15         MR. CULPEPPER:  I don't think so, Your Honor.

16  Hopefully he'll come back, but we -- oh, he's back now.

17         THE COURT:  Okay.

18         MR. MOSKIN:  No.  I -- I was just trying to save

19  bandwidth, Your Honor.

20         THE COURT:  No, no, no.  Good.

21         MR. MOSKIN:  I was muting myself.

22         THE COURT:  I was trying to help you, but you

23  don't need help.

24         MR. MOSKIN:  Good.

25         THE COURT:  That's in the nature, Mr. Culpepper,

50

1    of a motion for sanctions, which you may file.  I predict

2    you would not have an answer on that motion before January

3    1st.  So feel free to file a motion for sanctions if you

4    want to, okay?

5            MR. CULPEPPER:  I understand, Your Honor.  The

6    next issue we have is -- and if you're referring to

7    plaintiffs' statement of the dispute, we go to -- one

8    moment, Your Honor.  There's a -- so we had some topics we

9    noticed for the -- for our depositions of defendant.

10           Oh, wait.  I'm sorry.  One other order.  Going to

11   the Court order.  I'm sorry.  This is on Page 3 through 4 of

12   our nature of dispute.  When we first had a hearing back

13   last year in June or July, one -- one -- one -- one dispute

14   we had was that plaintiffs had requested information on the

15   revenue that defendant received from these customers who

16   were engaged in piracy.

17           Your Honor stated that okay, you thought that was

18   relevant discovery, but asking for 20,000 customers was too

19   burdensome.  So at first we cut it down to 900 in the

20   hearing, and I voluntary said, let's limit it to 367

21   customers because pursuant to the Cable Act order earlier in

22   the case, defendant was already working to disclose the

23   customer names of 367 customers.  So the logic was, okay, if

24   you're pulling those customers' names, you should be able to

25   get the revenue.

51

1          That order was made last summer, summer of last

2     year.  I noticed a deposition on the same topic.  The note

3     was served June of last year, and the deposition was

4     conducted in April.

5          During the deposition, it became clear that

6     defendant hasn't been producing the revenue of the

7     customers.  They're producing the revenue of the customer's

8     customer.

9          For example, if they have a customer that's a

10    business customer, although Your Honor's order said to

11    produce the revenue from those customers, they did their own

12    calculation and isolated only the -- the part of the revenue

13    that was attributed to the customer's customer.

14         I believe that's inconsistent with Your Honor's

15    order.  They -- they didn't get a chance -- Your Honor's

16    order doesn't allow them to just do some math and try and

17    calculate which part of the -- of the revenue is attributed

18    to a particular customer.

19         And this an important thing and it's -- it -- it

20    came to light more that there's more going on here, and

21    that's why I attached to, I think it's Exhibit 5 a

22    declaration of a -- of a general lady named Gretchen Jones.

23         This is a person that WOW said is one of the 367

24    subscribers assigned an IP address, but Ms. Gretchen Jones

25    said she's never been a WOW customer.  She's been a customer

52

1    of a different ISP called Neacom (ph).

2             So it appears that this ISP is one of WOW's

3    customers.  Rather than disclosing the name of this

4    customer, which is its business, defendant chose to do some

5    kind of math and isolate how much of that revenue is

6    attributed to Ms. Gretchen Jones and only disclose that

7    amount.

8             I -- I'm bringing that up because this ties into

9    the issue.  I think defendants should disclose the revenue

10   for each of the 300 -- the customers that were assigned

11   those IP addresses, not the customer's customer.  They

12   should disclose the revenue for each of those customers as

13   Your Honor ordered in the order of November.  That's what

14   this second issue is about.

15            THE COURT:  Go ahead.

16            MR. CULPEPPER:  I'll --

17            MR. HOWENSTINE:  I find this a little bit

18   frustrating because what -- what Mr. Culpepper is saying is

19   -- he's making a different argument and raising essentially

20   a different issue than what the parties met and conferred

21   about.

22            As we understood it, the issue was that when we

23   produced this witness to supply this revenue information,

24   there were two customers for whom the witness was unable to

25   supply information, and that was because these were what are

53

1   called bulk customers, like it's Ohio State University, and

2   they have a bunch of sub accounts related to different

3   properties and different departments.

4          THE COURT:  And it's one account within all those

5   that had a violation allegedly?

6          MR. HOWENSTINE:  And it's one account.  And so

7   when we identified that account and that account was sent to

8   the accounting department, they came back and said, "We

9   don't have anything," because there was just a top line

10  number and no way to segregate it between all the sub

11  accounts.

12         So to put this issue to bed, we went ahead and we

13  produced all the revenue information for those two accounts.

14         THE COURT:  For Ohio State University?

15         MR. HOWENSTINE:  For Ohio State University and

16  another customer.  We -- we produced that to the plaintiffs.

17  And now I'm not really -- I'm not really sure what this

18  broader issue is that plaintiffs are raising, but we

19  provided a witness to testify to this information.  We

20  produced in documentary form, although we didn't have to, to

21  aid in that testimony.  So I -- I'm -- I'm sort of at a loss

22  as to what the dispute even is.

23         THE COURT:  Me too.

24         MR. CULPEPPER:  Your Honor, this is -- this is --

25  the -- the problem is they didn't disclose the revenue of

54

1    the customers.  They disclosed the revenue of a customer's

2    customer.  Now, one point --

3            THE COURT:  Wait, wait.

4            MR. CULPEPPER:  -- if you go to Exhibit 1.

5            THE COURT:  Hold on, hold on, hold on.  He said he

6    disclosed the two accounts, not sub accounts.  You guys are

7    disagreeing on what happened.

8            MR. HOWENSTINE:  Right.  We subsequently -- we

9    produced within, I don't know, the last couple days, the top

10   line revenue information for Ohio State -- that Ohio State

11   University bulk account and another for one something called

12   Kunkel Properties.

13           THE COURT:  Okay.

14           MR. HOWENSTINE:  And they have that.

15           THE COURT:  So I -- I can't decide something that

16   he says he's done and you say he hasn't, okay?

17           MR. CULPEPPER:  Well, wait.  The -- we -- one

18   moment please, Your Honor.  The -- the first thing, Mr.

19   Howenstine said he's confused.  If you go to Exhibit 1, his

20   own email, the meet and confer issue, there's an email from

21   me, May 23, 2024 at 10:09, when I raised the issue of Mrs.

22   Gretchen Jones to him.  So this isn't something he's

23   confused about.

24           The issue is of the 367 subscribers who WOW said

25   are the subscribers, now we know those weren't the

55

1    subscribers.  Some of those people were customers of

2    customers, and this Gretchen Jones declaration shows it.

3            Now, during that deposition of Ms. Tracy -- of the

4    WOW representative where it came to light, okay.  These --

5    WOW had taken the approach that they're only going to

6    disclose the revenue of the customers of the customers, yes,

7    I raised the issue of those two specific accounts because

8    those are the first two we knew.

9            But after that deposition is when I got the

10   communication from Mrs. Jones' attorney, who said that she's

11   never been a customer of WOW.  So this -- I would say this

12   raises a big issue.  Are those 367 customers names that WOW

13   disclosed, are they really the customers or are they

14   customers of the customers.  I know at least one is not the

15   customer.  It's the customer of the customer.

16           I -- you know, I hope this getting lost in the --

17   all of the words, but this is a really important issue

18   because the whole point of the Cable Act order and

19   disclosing the customers was so that we could vet if what

20   WOW says they did is what they really did.

21           If someone like Ms. Gretchen Jones isn't a

22   customer of WOW, she's not going to get any notices from

23   WOW, she's not going to get any phone calls from WOW.  I

24   mean, that's exactly what she says.

25           So I -- I -- you know, this is a clear issue, I

56

1    raised it with Mr. Howenstine, if you see the email on

2    Exhibit 1, and I think it's a fair issue to raise here.  I

3    think they should follow your -- Your Honor's order to

4    disclose the revenue of the customers and not pick and

5    choose.

6            THE COURT:  I don't know what else to say except

7    work it out.  I mean, he says he did, you said he didn't.

8    Work it out or file a motion, okay?

9            MR. CULPEPPER:  All right.  There's two more

10   issues, and I believe they're all at least simpler than this

11   issue.  I'm going to skip to Issue No. 4, and this is on

12   Page 5 through 6 of the nature of the dispute.

13           This regards to one of the -- in the order of

14   November or the -- the hearing actually we had back in June

15   and July, Your Honor agreed that plaintiffs could profound

16   discovery on WOW's agreements on live sports or videos on

17   demand because the theory was that they would take some

18   action differently when it was someone that they had a

19   business relationship with.

20           So to this end, I served an interrogatory on this

21   topic.  I think that's Interrogatory No. -- well, it's on --

22   I served an interrogatory on that topic and also noticed --

23   one of the topics of the notices of deposition was on this

24   topic.

25           Now, defendant consistently said in response that

1    they had no documents on this topic, no agreements with

2    parties to show live sports or videos on demand.  I -- so I

3    want to show, Your Honor, if you look to Exhibit 7 --

4    actually, sorry.  It's Exhibit 8.  Exhibit 8, we see here

5    advertised from WOW, the customers about videos on demand

6    and live sports.

7            Now, during the deposition, which WOW agreed that

8    their 30(b)(6) representative, Mrs. Arnold, would be

9    prepared to discuss that top, when I confronted her with

10   these exhibits that show that yeah, WOW does have, you know,

11   partners for which it shows live sports and videos on

12   demand, Mr. Howenstine first interrupted me and argued that

13   this wasn't one of the topics that she had been noticed for.

14           Then if you look at the deposition transcript, and

15   that's at Exhibit -- one moment, Your Honor.  It's Exhibit

16   --

17           THE COURT:  9 probably, maybe.

18           MR. CULPEPPER:  It's not -- it's not 9.  It's --

19   hold on one moment.  Well, it -- wait, wait, wait.  It's

20   Exhibit 10 I think.  Hold on.  Well, we don't need to see it

21   because I'm -- I'm sure defendant counsel's not going to

22   deny that he conceded during the deposition that they had

23   made a mistake, that wasn't -- she wasn't prepared to

24   discuss that topic, and that they would give a witness for

25   that topic.

1          Now, afterwards, you know, we (indiscernible), and

2    defendant offered to provide a declaration describing their

3    profits from, you know, revenue.  And in light of the

4    previous issue we had with whether or not the revenue

5    statements they provided are true or even the subscriber

6    names are true, I wasn't inclined to accept from WOW a

7    declaration about their profits and revenue.

8          I would like to depose a witness about that.  I

9    would like to explore why they repeatedly said for a year

10   that they have no documents on video on demand or live

11   sports agreement, yet they're advertising their customers

12   that you can get live sports or live agreements.

13         You know, once again, I'd say this was an order.

14   Your -- Your Honor ordered WOW to allow discovery to proceed

15   on this issue, and they -- they did not.  So you know, if we

16   -- if we need to order, ask for a separate motion on this

17   issue, we can, but I'd just say, these are two -- we're up

18   to three orders that Your Honor issued that the defendant

19   has violated.

20         MR. HOWENSTINE:  So this is a situation again

21   where they're not asking for any more discovery.  They want

22   some sort of sanction.  So I'll say that at the outset.  So

23   I'm not sure that there's anything --

24         THE COURT:  Well, wait.  So you don't want

25   anything new you haven't gotten, Mr. Culpepper?

59

1          MR. CULPEPPER:  Well, I had asked to depose a

2     witness on the topic, but WOW refuses to allow it.  They --

3     they -- they wanted me to accept the declaration from a WOW

4     representative.

5          MR. HOWENSTINE:  Well --

6          MR. CULPEPPER:  So it's not true that we didn't

7     ask for further discovery on this topic.

8          THE COURT:  In what -- what manner did you refuse

9     a deposition, if at all?

10          MR. HOWENSTINE:  So here's what happened:  Ms.

11     Arnold was WOW's principle 30(b)(6) witness.  There was a

12     miscommunication, it was my fault she was not prepared to

13     discuss this particular topic.

14          Subsequent to that -- so backing up.  The topic

15     itself is WOW's agreements and negotiations with providers

16     of basically in-demand and, you know, pay-per-view content,

17     including revenues and profits from those agreements.  We

18     don't believe that information is relevant, but be that as

19     it may, we agreed to produce a witness on it.

20          There was never any document request for those

21     underlying documents.  So no documents like that have been

22     produced.  So when we realized that after talking stock of

23     the situation after Ms. Arnold's deposition, what we

24     proposed to plaintiffs on May 14 before the close of

25     discovery was what -- that we just provide a sworn statement

60

1   saying, "These are our revenues and profits from this

2   pay-per-view and video-on-demand content."

3        Because otherwise, if we put up a witness on the

4   topic, they would just have to try to memorize a bunch of

5   information.  Plaintiffs don't have any documents on this

6   subject.  So it seemed like a much easier solution for us to

7   just provide this information by sworn statement.

8        So we offered that on May 14 before the close of

9   discovery, and they didn't respond to that offer until after

10  the close of discovery to say it was not acceptable.  And so

11  now they want some sort of sanction.

12       I mean, we were prepared if they said no to prep

13  some witness to try to recite revenue and profit information

14  from video-on-demand and pay-per-view content, but they

15  didn't take us up on the issue -- they didn't engage with us

16  on the issue at all.

17       And considering that this topic has such marginal

18  relevance to our safe harbor defense, if any, we don't see

19  the point in continuing any discovery on this now.  But in

20  any event, that doesn't really even seem to be the issue

21  because they're not asking for that deposition.  They're

22  asking for some sort of adverse inference or something.

23       THE COURT:  Okay.  Well, the primary solution for

24  discovery deficiencies is more discovery.  So Mr. Culpepper,

25  why don't you take him up on his offer to answer the

61

1    question that you want answered?

2            MR. CULPEPPER:  The -- my hesitancy, Your Honor,

3    was because I -- to be, I believe some of the documents they

4    have submitted are not true, and I'm -- I'm -- I don't want

5    to take a document -- accept a declaration from WOW on this

6    issue that is curated by defendant's counsel.

7            I believe we noticed the topic on it.  We had a

8    right to have a witness sit in front of us and have -- and

9    let me ask her questions about these advertisements, and you

10   know, the purpose of a 30(b)(6) witness.

11           Now, if defendant's willing to put the witness

12   forward, and then that's what we'll be -- we're willing to

13   still do, to take their deposition, but --

14           THE COURT:  So --

15           MR. CULPEPPER:  -- that's --

16           THE COURT:  -- do it.

17           MR. HOWENSTINE:  Put -- put up a witness?

18           THE COURT:  Correct.

19           MR. HOWENSTINE:  On that topic?

20           THE COURT:  Yeah.

21           MR. HOWENSTINE:  Will do.

22           THE COURT:  Okay.

23           MR. CULPEPPER:  All right.  A next topic, the next

24   one is another deposition notice.  There were -- if you look

25   at the deposition notice, and I believe it's at -- well,

62

1    I'll just tell you.

2              There were two topics for notice of a deposition.

3    One was the issue of defendant's ability to remotely reset

4    or monitor any equipment that it supplies to customers,

5    including, but not limited to routers and cable boxes.  That

6    was Topic No. 21.

7              Now, there was a topic, Topic No. 13, generally to

8    monitoring.  Objected to Topic No. 21 and said that it was a

9    duplicate to Topic No. 13.  Now, I take a duplicate to mean

10   you're saying it's redundant, which would mean both of them

11   are the same.  So there's two topics here, Topic 13 and

12   Topic 21.

13             During the -- WOW designated a gentleman named Mr.

14   Swanson as their 30(b)(6) witness for Topic No. 13.  When --

15   during the deposition of Mr. Swanson, when I asked him about

16   -- specific questions about his modem, the modems that WOW

17   used, something that's generic to both Topic 13 and Topic

18   21.

19             Mr. Swanson said he didn't know anything about the

20   modems, he couldn't talk about whether or not, you know, WOW

21   could use the modems to reset -- you know, whether or not

22   WOW could remotely control the modems to reset the

23   customer's equipment.

24             And I would like to direct Your Honor to Exhibit

25   9.  This is a excerpt of the transcript.  The first part is

63

 1   you see Page 38.  I -- I asked him -- I'll wait until you

 2   get there, Your Honor.

 3            THE COURT:  I'm here.

 4            MR. CULPEPPER:  All right.  So you see on Part 38,

 5   I highlighted it.  You know, I asked him, "Are you prepared

 6   to discuss modems or anything about the functions of WOW's

 7   modems?"  He said, "No."  And then you can see the back and

 8   forth between me and WOW's counselor during this where WOW's

 9   counsel argued that Topic 21 is different from Topic 13.

10   But the objection is based upon 21 being duplicate to --

11   Topic 21 being duplicate to Topic 13.

12            Now, if we go to (audio inference) page of the

13   transcript, WOW's 30(b)(6) witness, if you look at Page 41,

14   he agrees that the word redundant means it's a duplicate.

15   And I'm -- if you go to Page with the No. 41 on it, the

16   WOW's 30(b)(6) representative agreed that Topic 13 and Topic

17   21 were duplicates, but he wasn't able to discuss the

18   specific part about Topic 13.

19            I want to -- there's something important here

20   about a modem.  If you see, there's some questions I ask

21   about the -- the DOCSYS standard, whether or not WOW uses

22   that standard for the modems.  There -- that's a published

23   standard, it's a public record.  I can see what kind of

24   functions WOW has to control their modems or to monitor a

25   customer's traffic by that DOCSYS standard.

64

1          You know, and in defendant's opposition paper, he

2    says I was asking I believe irrelevant questions about the

3    modem's functions, but that issue is relevant to both of

4    these topics.

5          So my position is -- is if -- if WOW's 30(b)(6)

6    witness or even WOW says that Topics 13 and 21 are

7    redundant, well, the witness should have been able to

8    discuss the issues in Topic 21 as well as in Topic 13.

9          THE COURT:  Okay.  So what's your position on

10   whether this is relevant to the safe harbor defense?  Is it?

11         MR. HOWENSTINE:  Well, I mean, I don't -- I don't

12   think it is, but we're trying to act in good faith and avoid

13   disputes.  So we agreed to put someone up on this general

14   Topic 13, which is --

15         THE COURT:  Of?

16         MR. HOWENSTINE:  -- WOW's ability essentially to

17   monitor what its subscribers are doing online.  So we

18   prepared a witness to talk about that.  And our point with

19   Topic 21 about the modem is that, to the extent that's

20   relevant to anything, it is redundant to Topic 13 because --

21         THE COURT:  Ability to monitor.

22         MR. HOWENSTINE:  It's the ability to monitor.  So

23   we put up a witness who was prepared to talk about WOW's

24   ability to monitor.  Plaintiffs' counsel asked him very few

25   questions on that subject, and instead was laser-focused on

65

1    this modem issue, which we told them we were not going to

2    produce a witness on, and -- and they accepted.

3            And you know, I -- I don't think we need to get

4    into this semantics debate about what redundant means

5    because --

6            THE COURT:  I will not.

7            MR. HOWENSTINE:  -- what we said in our response

8    was that we'll put up a witness on 13, we will not put up a

9    witness on 21, and that's exactly what we did.

10           THE COURT:  Okay.

11           MR. HOWENSTINE:  And again, as I understand it,

12   this is not a -- they have never asked in followup in

13   subsequent meet and confer for us to produce a witness to

14   talk about the modems.  They want to go straight to some

15   sort of sanction, some sort of adverse inference.  That's

16   the only thing they're asking for here.

17           MR. CULPEPPER:  Well, I just want to say, Your

18   Honor, the -- the issue was raised clear in deposition.  I

19   -- I think it's part of the transcript I repeated.  I asked

20   Mr. Swanson if -- is there someone else at WOW that I could

21   -- that I could, you know, ask about this topic, and he said

22   he didn't know.

23           These depositions happened the week of April 16th

24   or April 30th.  You know, it was -- WOW was on record about

25   this issue, and they didn't put a witness up.  Now, if WOW's

66

1    -- we're already going to do -- you know, the -- the topic

2    about the live sports and video on demand.  So if WOW's

3    willing to finally up on this topic, then I'm willing to do

4    it.

5              Now, I want to go -- speak briefly on the

6    relevance issue.  The safe harbor, the whole basis of it is

7    whether or not defendant took steps to terminate the

8    accounts of known infringers.  If WOW has the function to

9    see what's going -- the traffic that's going through these

10   modems, they will know that those customers were engaged in

11   infringement.  I believe that's directly tied to the

12   elements of the safe harbor.

13             THE COURT:  Well, he doesn't --

14             MR. CULPEPPER:  But just to --

15             THE COURT:  -- disagree.  He says they didn't

16   produce somebody on the ability to go into somebody's

17   monitor and cable boxes and -- and reset, and that's what

18   you put in your statement of the -- the dispute is --

19             MR. CULPEPPER:  Yeah.

20             THE COURT:  -- the ability to remotely reset or

21   otherwise monitor equipment.  So that's -- you didn't just

22   -- you did not give me the relevance of that, the ability to

23   reset a monitor.  What -- what relevance does that have?

24             MR. CULPEPPER:  It's -- it's the ability of them

25   to control the customer's equipment, whether or not they can

67

1   take certain --

2           THE COURT:  No, but what --

3           MR. CULPEPPER:  -- steps to stop it.

4           THE COURT:  -- what relevance does that have?  You

5   just said that what they're required to do is terminate, not

6   mess with their box, not stop the infringing --

7           MR. CULPEPPER:  Oh.

8           THE COURT:  -- contract in part, but to terminate

9   the customer.  Isn't that what the law requires?

10          MR. CULPEPPER:  Yeah.  Okay.  I follow, Your

11  Honor.  Sorry.  The -- the knowledge, how they even know

12  about the ongoing infringement.  If you can monitor the

13  traffic going into the modem, in this case, the piracy, you

14  should take steps to terminate the account of those accounts

15  that you know are repeat infringers.

16          Knowledge doesn't come just from DMC and notices.

17  Knowledge can come from a letter from an attorney.

18  Knowledge can come from your employees.

19          THE COURT:  I understand, but what does that have

20  to do with about to reset a -- reset a modem?

21          MR. CULPEPPER:  It shows that they have -- those

22  are specific functions that drew from the DOCSYS standard.

23  If Your Honor wants to -- is inclined to remove reset, and

24  only do remotely and monitor, that -- that's fair.  I would

25  -- it -- I -- I drew those exactly from the DOCSYS standard,

68

1    to be frank.

2         THE COURT:  Well, but he just -- Mr. Howenstine

3    just said they produced a witness who testified about the

4    ability to monitor, didn't you?

5         MR. HOWENSTINE:  We prepared and produced him on

6    that topic, and plaintiffs asked him very few questions on

7    it and were instead hung up on this modem issue.

8         THE COURT:  I don't find there's a live --

9         MR. CULPEPPER:  No.  No.  That's -- that's not

10   true.  I'm sorry.  That -- that was -- the modem -- the

11   modem questions were because the modem has funks that allow

12   WOW to monitor the customers' data traffic.  That's why I

13   was asking specific questions about the modem.

14        THE COURT:  Well, show me one -- wait.

15        MR. CULPEPPER:  If Your Honor's already ruled --

16        THE COURT:  Show me one question --

17        MR. CULPEPPER:  -- I'll leave it there.

18        THE COURT:  Mr. Culpepper, show me one question

19   you asked that was within the ability to monitor that you

20   didn't get an answer to, and maybe I can do something.

21        MR. CULPEPPER:  All right.  One -- one moment,

22   Your Honor.  I -- the -- the defendants had objected to

23   relevance of it, so I -- I -- I've printed out excerpts of

24   the -- oh, wait.  One moment.  Hold on.  All right.  I would

25   go to 42, the Page No. 42.  It's the last page of Exhibit 9.

69

1           THE COURT:  Okay.

2           MR. CULPEPPER:  And I ask him, "Are you prepared

3   to talk about WOW and remotely reset or otherwise monitor

4   any equipment that it provides to customers, including, but

5   not limited to routers and cable boxes?"  And the witness

6   says, "I am not."

7           And I asked him, "Would you be able to talk if you

8   had additional time to prepare," and he says, "No."  I asked

9   him if he knows anyone at WOW who -- some engineers (audio

10  interference), and he says, "Yes."  But that --

11          THE COURT:  I'm sorry.  Are you talking about Page

12  38 or 40?

13          MR. CULPEPPER:  The number is 42 in the

14  transcript.  It starts in the top, you see legal conclusion,

15  Kerry, two dashes, and then Mr. Culpepper.  This is Exhibit

16  9, the last page of Exhibit 9.  Are you there, Your Honor?

17          THE COURT:  Yeah.  But your question dealt with

18  remotely resetting or otherwise monitoring -- which are two

19  different topics, by the way, and I wouldn't be able to

20  answer that no matter how educated I was -- any equipment

21  that relates to customers, including routers and cable

22  boxes.  It -- you're talking about hardware rather than

23  their ability to monitor a customer's content.

24          MR. CULPEPPER:  That's the point.  The modem --

25  the functions -- the (indiscernible) functions of a DOCSYS

1   modem include a function to monitor traffic going in and out

2   of that modem.  That's the point of these questions, and you

3   know, it's a highly technical thing.

4          I'm trying to think of a -- of a way to make it --

5   to explain it in simpler terms, but I'll just say from what

6   I saw about the functions of modems that WOW publishes as

7   modems are used by its customers, it became pretty clear to

8   me that WOW had this ability.

9          And that's what this line of questioning was going

10  to, to see whether or not WOW had the ability to monitor the

11  customers' traffic that goes in and out of the modem.

12         THE COURT:  Okay.  I'll give you three

13  interrogatories about that, okay?

14         MR. CULPEPPER:  All right.  The next issue we have

15  --

16         THE COURT:  Is this the last issue?  I -- this is

17  -- I mean, this is not the general complaint department.

18  This is concerning pinpoint discovery disputes.  So be

19  concise.

20         MR. CULPEPPER:  All right.  We had -- one of the

21  30(b) -- well, there were topics noticed for a 30(b)(6)

22  deposition, and defendant designated multiple individuals to

23  handle all of those topics, which -- which is fine.

24         One of those people, Ms. Tracy Hart, I -- we

25  conducted her deposition on one day, and the deposition was

71

 1    conducted first, her in her capacity as a 30(b)(6)

 2    representative, and then later with her as a capacity as an

 3    individual.

 4           This witness was, to be frankly, very

 5    uncooperative.  She -- she wouldn't even admit readily that

 6    a document she prepared was true.  I have -- every time a

 7    document was shown to her, I'd have to go through certain

 8    steps to get her to finally admit that the document is --

 9    what it says is true.

10           The -- we weren't able to complete within seven

11    hours a deposition of her as a 30(b)(6) representative and

12    her in her personal capacity.  I believe plaintiffs are

13    entitled to depose a witness in their individual capacity

14    for up to seven hours.

15           So our position was that we didn't complete all

16    the questions we had for Ms. Hart.  So she needed to come

17    back for a further three hours or so for another -- for a

18    further deposition so we could finish our questions.

19           Defendant has taken the position that because we

20    had seven hours, that's it.  We get both for her in her

21    capacity as an individual and for her capacity as a 30(b)(6)

22    witness.

23           Ms. Tracy Hart is a very important witness.  This

24    -- she was with WOW since, I believe, December of 2016.

25    She's the senior comply -- senior compliance manager or

72

1    something along that line.  She -- her and one other one

2    person -- well, her only, she's the only person who

3    consistently handling these DMC notices over the past eight

4    years or so.  I wasn't able to -- I wasn't able to depose

5    her on certain actions that were taken in 2017, early 2018.

6                THE COURT:  Okay.  No.  I get it.

7                MR. CULPEPPER:  I was --

8                THE COURT:  I get it.  I get it.  You want her

9    30(b)(6) and personal capacity.  You say you want seven

10   hours each.  What's your response?

11               MR. HOWENSTINE:  They had seven full hours, and

12   they didn't use it wisely.  They spent four hours talking to

13   her about how WOW responds to subpoenas in civil and

14   criminal cases.

15               THE COURT:  Was that a topic?

16               MR. HOWENSTINE:  Yes.  And about, you know, this

17   --

18               THE COURT:  What -- what -- okay.  So what

19   difference -- okay.  What difference does it make how a

20   company responds to a subpoena?  I'm not understanding.

21               MR. CULPEPPER:  It's -- I'll explain that, Your

22   Honor.  The lady, Tracy Hart, she handles subpoenas and DMCA

23   notices.  Now, when John Doe lawsuit is filed and Your Honor

24   issues an order allowing the plaintiff to serve a subpoena

25   on ISP based on allegations of copyright infringement, Ms.

73

1    Hart gets those subpoenas as well.  So she has knowledge

2    from two different sources that a customer is alleged of

3    engaging in a copyright infringement.

4           That's why I asked her about their policies with

5    respect to civil subpoenas in general.  With respect to

6    criminal -- criminal subpoenas, the terms the -- the

7    copyright infringement policy is wrapped up in their general

8    terms of service.  One of the terms is that you're not

9    allowed to engage in criminal conduct.

10           We had evidence that certain subpoenas were issued

11    for -- based on allegations of criminal conduct.  So I just

12    asked some simple questions such as, do you terminate

13    customers once you get, you know, proof that that customer

14    was using WOW's service for criminal conduct?

15           I'll -- I'll pass back to Mr. Howenstine.  I just

16    wanted to explain the relevance, Your Honor.

17           MR. HOWENSTINE:  There -- there -- Your Honor,

18    there is not and there has never been any explanation of why

19    exactly they need more time.  They just continue saying, "We

20    need more time," and -- and that's not enough.

21           You know, this witness was deposed in -- into the

22    evening because we agreed to start late because Mr.

23    Culpepper is in Hawaii.

24           THE COURT:  Was it by video?

25           MR. HOWENSTINE:  It was by video.

74

1            THE COURT:  All right.

2            MR. HOWENSTINE:  It was a long day.  You know,

3    even in her individual capacity, you know, she still

4    testified for three-plus hours.

5            THE COURT:  Well --

6            MR. HOWENSTINE:  Was examined about 20-plus

7    documents.

8            THE COURT:  It's not in her individual capacity

9    per se.  It's her capacity as a client.

10            MR. HOWENSTINE:  Sure.  But I --

11            THE COURT:  And then one --

12            MR. HOWENSTINE:  I --

13            THE COURT:  -- is the 30(b)(6).

14            MR. HOWENSTINE:  I just mean --

15            THE COURT:  So yeah.

16            MR. HOWENSTINE:  -- we -- we divided the

17    transcript --

18            THE COURT:  Yeah, yeah.

19            MR. HOWENSTINE:  -- so there's a clear

20    delineation.

21            THE COURT:  Yeah.

22            MR. HOWENSTINE:  So you know, if -- if there had

23    been at any point some specific articulation of what they

24    needed to do with Ms. Hart that they didn't have a chance to

25    do, you know, we -- we might have considered that, but

1    they've never done that.  And then when you add the plus

2    factor of all this wasted time with these issues that don't

3    have any bearing on our safe harbor defense, you know, we

4    could not in good conscience subject Ms. Hart to even more

5    deposition.

6          THE COURT:  Yeah.  I don't mind that, and I'm --

7    I'm not going to disagree with the sentiment you just

8    expressed.  It's just that from a purely rules standpoint,

9    it's hard to argue that they don't get ten hours if there's

10   both 30(b)(6), is aspect and individual testimony involved.

11   He's asking for ten.  Just an additional three.  Cut it off

12   hard at three, okay?

13         MR. HOWENSTINE:  Understood.

14         THE COURT:  All right.  Use your three wisely.

15   He's going to cut it off hard at three, okay?

16         MR. CULPEPPER:  That's -- that's fine, Your Honor.

17   I -- I had question.  I don't have any more topics for

18   discovery.  I'll meet and confer with defendant on the other

19   issues.  As Your Honor made clear, this isn't the time for

20   --

21         THE COURT:  Okay.

22         MR. CULPEPPER:  -- sanctions whatsoever.  But

23   there's a question I have.  All right.  Regarding the first

24   issue, you -- you said that you would give defense counsel

25   his fees on the -- the motion -- the motion to extend the

1   discovery cutoff by one day?

2          THE COURT:  Just for -- just for the appearance

3   today.  Not in preparation, just for today's appearance,

4   okay?

5          MR. CULPEPPER:  All right.  That's what I want --

6   thank you.  I wanted to be clear on that.  Thank you.

7          THE COURT:  Thank you.  Because there were other

8   issues, and I -- I think that's a reasonable restriction.

9   Anything else, Mr. Culpepper or Mr. Moskin?

10          MR. CULPEPPER:  Just one other thing:  Does he --

11  he traveled in person there, you know, to Colorado for a

12  hearing that he the ability to do remotely.  Are -- he's not

13  going to get his travel costs too, is he, Your Honor?

14          THE COURT:  I would -- what's your rate?

15          MR. HOWENSTINE:  650.

16          THE COURT:  Okay.  And you travel --

17          MR. HOWENSTINE:  Something like that.

18          THE COURT:  I guess I don't mind people coming

19  into court.  I think it's what you're supposed to do

20  practicing law.  You could appear by -- you know you can

21  appear by video?

22          MR. HOWENSTINE:  I understand that, Your Honor,

23  but these are important issues.

24          THE COURT:  These are very --

25          MR. HOWENSTINE:  This is a big case.

```
1              THE COURT:  -- important issues, very --
2              MR. HOWENSTINE:  That's why we're here.
3              THE COURT:  Very important.  Yeah.  So I mean,
4    gosh.  I'm drawing lines here, but yeah.  I'll give you --
5    I'll give you half of your travel time, okay?
6              MR. HOWENSTINE:  Understood.
7              THE COURT:  All right.  Anything else, Mr.
8    Culpepper?
9              MR. CULPEPPER:  Yeah.  I just -- since we're here,
10   can we get a clear scope of what -- what liability we're
11   looking at with, you know, his fees.  You said he gets half
12   of his travel time --
13             THE COURT:  Well, it's probably about --
14             MR. CULPEPPER:  -- and he gets --
15             THE COURT:  -- two, three, four -- where'd you
16   come from?
17             MR. HOWENSTINE:  New York.
18             THE COURT:  All right.  Six hours, okay?
19             MR. CULPEPPER:  So that would be three hours, or
20   -- or he gets six hours?
21             THE COURT:  Six hours.  That's -- we've been here,
22   what, two-plus, two?  Two.
23             MR. CULPEPPER:  All right.  So that's the total,
24   that he gets six -- six hours that we would pay for this?
25             THE COURT:  Yeah.
```

78

1          MR. CULPEPPER:  So six times -- I think he said

2    he's $650 an hour.  What did he said?

3          THE COURT:  That's what he said.

4          MR. HOWENSTINE:  I will have to look up at my

5    actual billed rate.  It may in fact be lower.  So I don't

6    want to, you know --

7          THE COURT:  You don't want to overcharge.

8          MR. HOWENSTINE:  -- sell -- sell you short.

9          THE COURT:  Okay.  Anything else, Mr. Culpepper?

10          MR. CULPEPPER:  Thank you.  I just thank you, Your

11    Honor, very much for your patience and allowing me to appear

12    remotely.

13          THE COURT:  Sure.  Yeah.  I mean, I get it.

14    Hawaii is a long ways away.  We do permit in person.  It is

15    a lot more effective in person, but we have to learn to do

16    things by video.  So it's permitted in the rules, permitted

17    by me specifically, and you're not prejudiced other than,

18    you know, it sometimes is a little less of an ability for a

19    back and forth because we stumble over each other.

20          Mr. Howenstine, anything more?

21          MR. HOWENSTINE:  Just -- just to get on the

22    record:  I think the parties are on the same page about

23    this, but we currently have a June 21 dispositive motion

24    deadline.

25          THE COURT:  I don't know how you're going to meet

1    that.

2              MR. HOWENSTINE:  In light of what has happened

3    here, we're going to have to adjust that.

4              THE COURT:  Of course.

5              MR. HOWENSTINE:  But we'll talk to each other and

6    --

7              THE COURT:  I'll bless any --

8              MR. HOWENSTINE:  -- propose something.

9              THE COURT:  -- stipulated amended schedule that

10   you submit.

11             MR. HOWENSTINE:  Understood.

12             THE COURT:  Okay?

13             MR. HOWENSTINE:  Thank you, Your Honor.

14             THE COURT:  All right.  Anything further?

15             MR. CULPEPPER:  No.  Thank you, Your Honor.

16             THE COURT:  Okay.  Thank you.  We're off the

17   record.

18             MR. MOSKIN:  Thank you, Your Honor.

19             THE COURT:  All right.  Bye-bye.

20             (Whereupon, the within proceedings concluded at

21   3:15 p.m.)

22

23

24

25

80

1                    TRANSCRIBER'S CERTIFICATE

2          I certify that the forgoing is a correct

3    transcript, to the best of my knowledge and belief(pursuant

4    to the quality of the recording) from the record of

5    proceeding in the above-entitled matter.

6

7    /s/Brittany Payne                    July 2, 2024

8    Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25