# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

AFTER II MOVIE, LLC, et al.,           )
                                       )
                    Plaintiffs,        )        Case No. 1:21-cv-01901-DDD-CYC
                                       )
vs.                                    )        **REDACTED**
                                       )
WIDEOPENWEST FINANCE, LLC,             )
                                       )
                    Defendant.         )

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## UNDER DMCA SAFE HARBOR, 17 U.S.C. § 512(a)

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PROCEDURAL BACKGROUND ..................................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................. 3

SUMMARY JUDGMENT STANDARD ......................................................................... 10

ARGUMENT ...................................................................................................................... 10

   I.   THE SECTION 512(a) SAFE HARBOR BARS PLAINTIFFS' CLAIMS
       FOR MONETARY AND INJUNCTIVE RELIEF FOR COPYRIGHT
       INFRINGEMENT .................................................................................................. 10

       A.  WOW Is a Section 512(a) "Service Provider." ...................................... 11

       B.  WOW's Accused Conduct Is Within the Scope of Section 512(a). ..... 11

       C.  WOW Had a Termination Policy as Required by Section 512(i)(1)(A). ........... 11

          i.   *WOW adopted a termination policy* ................................................... 12

          ii.  *WOW informed users of its policy* ...................................................... 13

          iii.  *WOW reasonably implemented its policy* .......................................... 13

       D.  WOW "Accommodate[d] and [Did] Not Interfere with Standard
           Technical Measures." ............................................................................. 17

       E.  The Safe Harbor Bars Plaintiffs' Requests for Injunctive Relief. ...... 18

       F.  Conclusion Regarding DMCA Safe Harbor. ........................................ 18

   II.  PLAINTIFFS' CLAIMS ALLEGING PRE-JULY 13, 2018
       INFRINGEMENT ARE TIME-BARRED ........................................................... 18

   III. SMV'S CLAIMS ALLEGING PRE-MAY 31, 2020 INFRINGEMENT OF
       THE NEW WORKS ARE TIME-BARRED ...................................................... 19

CONCLUSION ................................................................................................................... 20

Defendant WideOpenWest Finance, LLC ("WOW") moves for partial summary judgment that:

(I)     Plaintiffs' claims for monetary damages and injunctive relief for copyright infringement, Counts I–II of the Second Amended Complaint ("SAC"), are barred by the Digital Millennium Copyright Act ("DMCA") safe harbor, 17 U.S.C. § 512(a);

(II)    Plaintiffs' claims alleging copyright infringement prior to July 13, 2018 (three years prior to the filing of the original Complaint) are time-barred[1]; and

(III)   the claims of George L. Miller, trustee of the bankruptcy estate of Screen Media Ventures, LLC, alleging infringement prior to May 31, 2020 (three years before the filing of the SAC) of the 321 works added in the SAC, are time-barred.

## INTRODUCTION

In 1998, Congress passed the DMCA "to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age." S. Rep. No. 105-190, at 1–2 (1998) ("Senate Report"). Title II, 17 U.S.C. § 512, was designed to "provide certainty for copyright owners and Internet service providers ["ISPs"] with respect to copyright infringement liability online." *Id.* at 2.

To that end, section 512(a) "limits the liability of an ISP when it merely acts as a conduit for infringing material without storing, caching, or providing links to copyrighted material." *In re Charter Commc'ns, Inc. Subpoena Enf't Matter*, 393 F.3d 771, 776 (8th Cir. 2005). "[B]y limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and the variety and quality of services on the Internet will continue to expand." Senate Report at 8.

This is a textbook case for the safe harbor because "section 512(a) provides a broad grant of immunity to service providers whose connection with the [infringing] material is transient"—

---

[1] As detailed below, the statute of limitations issues raised in points (II) and (III) are intertwined with WOW's DMCA safe harbor defense.

1

like WOW. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1116 (9th Cir. 2007). Plaintiffs do not claim that WOW had any role in the alleged infringement apart from providing internet access to accused infringers. Nevertheless, WOW went far beyond the requirements of the safe harbor, with detailed policies and procedures for terminating the accounts of accused infringers. Indeed, WOW has terminated over ██ subscriber accounts pursuant to its safe harbor policy. And over the relevant time period, which roughly aligns with WOW's implementation of its policy, the number of copyright infringement complaints directed at WOW's subscribers dropped by nearly ██%.

Because there is no genuine issue of material fact for trial regarding WOW's DMCA safe harbor defense, and because Plaintiffs' copyright claims pre-dating WOW's current DMCA policy are time-barred, the Court should grant WOW's Motion for Partial Summary Judgment.

## PROCEDURAL BACKGROUND

Plaintiffs, alleged owners of copyrights to films, seek to hold WOW secondarily liable for acts of copyright infringement—online file sharing—allegedly committed by users of WOW's internet service, as well as for alleged violations of section 1202 of the DMCA pertaining to the alteration of "copyright management information." *See generally* SAC, ECF No. 204.

Discovery was bifurcated, with the first stage focusing on WOW's DMCA safe harbor defense.[2] *See* ECF No. 142, at 5, 8–9. The first stage also addressed certain statute of limitations issues concerning Plaintiffs' claims. *See* Mar. 19, 2024 Hr'g Tr. 79–81. This is because evaluating WOW's defense requires consideration of the time period at issue. For example, if Plaintiffs'

---

[2] The Court has ruled that the DMCA safe harbor does not apply to Plaintiffs' claims alleging violations of section 1202 of the DMCA. *See* ECF No. 198, at 8.

copyright claims regarding alleged infringement in 2016 are time-barred, then there is no need for WOW to prove it qualified for the safe harbor in 2016.

Discovery on WOW's safe harbor defense closed on May 22, 2024. *See* ECF No. 220, at 1. The case was then stayed due to the bankruptcy of Plaintiff Screen Media Ventures, LLC ("SMV") and resumed once the trustee obtained leave to be substituted for SMV.[3] *See* ECF Nos. 262, 264. This motion followed.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### *WOW's Role as a Conduit ISP*

1.      WOW is an internet service provider, or ISP. Swanson Decl. ¶ 4.

2.      As an ISP, WOW facilitates digital online communications for users of its internet service without modifying the content of the material sent or received. *Id.* ¶ 5.

3.      Plaintiffs describe themselves as "producers of popular motion pictures" and claim to own the copyrights to the roughly 400 works in suit. SAC ¶¶ 7–8; Ex. 1 to SAC, ECF No. 204-1.

4.      Since at least 2017, WOW has been receiving emails from third parties, including representatives of Plaintiffs, accusing users of WOW's internet service of copyright infringement. Arnold Decl. ¶ 5.

5.      These emails ("copyright complaints" or "notices") typically concern the alleged use of peer-to-peer file-sharing platforms, such as BitTorrent, to download or share movies, TV shows, music, and other content. *Id.* ¶ 6.

6.      Apart from the content of the emails, there is no record evidence regarding the factual or evidentiary basis of any of these complaints.

---

[3] In this motion, WOW uses "SMV" to refer to SMV and/or the trustee.

7.     Copyright complaints typically identify a piece of digital content, an IP address, and the time of the alleged infringement. Ex. 1[4] (examples); Swanson Decl. ¶ 6.

8.     An IP address is a series of numbers separated by periods or colons (e.g., 100.37.203.5) that identifies an internet connection such as a modem in a subscriber's residence. Swanson Decl. ¶ 7.

9.     WOW does not and cannot monitor what content users of WOW's network upload or download over file-sharing platforms such as BitTorrent. *Id.* ¶¶ 8–9.

10.     WOW has no way to determine if the accusation in a copyright complaint is true. *Id.*

11.     When a user of WOW's internet service uploads or downloads digital content over a file-sharing platform such as BitTorrent, WOW does not control or initiate the transmission. *Id.* ¶ 10.

12.     Instead, the transmission or routing of the content is carried out through automatic technical processes, without any selection of the content by WOW. *Id.*

13.     When digital content is uploaded or downloaded over a file-sharing platform such as BitTorrent, WOW does not select who receives the content, except as an automatic response to the request of another person; does not maintain a copy of the content that is accessible to anyone other than the anticipated recipient(s); does not maintain any copy of the content that is accessible to the anticipated recipient(s) for longer than is reasonably necessary to facilitate the transmission; and does not modify the content transmitted. *Id.* ¶ 11.

14.     WOW accommodates and does not interfere with any "standard technical measures," as that term is defined in 17 U.S.C. § 512(i)(2). *Id.* ¶ 12.

---

[4] Cited exhibits are attached to the supporting Howenstine Declaration.

4

*WOW's DMCA Safe Harbor Policy*

15.     Since 2017, WOW has had a policy ("DMCA policy") that provides for the termination of service to subscribers who may be repeat copyright infringers.  Arnold Decl. ¶ 9.

16.     Since 2017, WOW has terminated service to over ██ internet subscribers pursuant to its DMCA policy.  Exs. 2–4; Howenstine Decl. ¶¶ 3–6; Arnold Decl. ¶ 14.

17.     From July 13, 2018 (three years before the filing of this action) through April 30, 2023 (the date of WOW's final supplementation of DMCA data in discovery), WOW terminated service to ██ internet subscribers pursuant to its DMCA policy.  Exs. 2 & 4; Howenstine Decl. ¶ 6.

18.     Since 2017, WOW has had a public-facing "Terms of Service" and/or "DMCA Policy and Procedure" in which it informs users that their access may be terminated if they violate copyright laws.  Arnold Decl. ¶¶ 7–8; Exs. 5–6 (ToS); Exs. 7–9 (DMCA).

19.     WOW's "DMCA Policy and Procedure" also provides information about the procedure and format for submitting copyright complaints to WOW.  Exs. 7–9.

20.     In February 2018, WOW implemented a largely automated, software-based system ("DMCA system") to carry out its DMCA policy.  Arnold Decl. ¶ 10.

21.     WOW's DMCA system is designed to log all properly submitted complaints, associate them with customer accounts, and track subscribers' progress through WOW's graduated-response policy.  *Id.* ¶¶ 11–12; *see also* Howenstine Decl. ¶ 12 & Ex. 10 (DMCA data compilation).

22.     WOW maintains records of subscribers whose access has been terminated pursuant to its DMCA policy, and its policy prohibits them from reinstating service with WOW.  Arnold Decl. ¶ 13.

23.     Since 2018, the number of copyright complaints WOW received has decreased each year:

| Year | Complaints |
|------|------------|
| 2018 | ■ |
| 2019 | ■ |
| 2020 | ■ |
| 2021 | ■ |
| 2022 | ■ |
| 2023 (through April 30) | ■ |

*Id.* ¶ 19.

24.     From February 2018 through April 30, 2023, ■% of subscribers in WOW's DMCA system received ten or fewer total complaints.  *Id.* ¶ 21.

25.     Over that period, ■% of subscribers in the system received all their complaints on one calendar day.  *Id.* ¶ 22.

26.     Over that period, ■% of subscribers in the system received all their notices in one 7-day period.  *Id.*

27.     Details of WOW's DMCA policy are set forth in an internal document titled DMCA Violations Standard Operating Procedure ("SOP").  *Id.* ¶ 15; Ex. 11.  The SOP is an internal reference, and because WOW's DMCA policy is continually being refined, the SOP does not contain every aspect of the policy.  Arnold Decl. ¶ 15.

28.     WOW has a graduated-response policy ████████████████████████

████████████████████████████████████████████████████████████

Ex. 11, at WOW000017; *see also* Exs. 12–14 (flow charts).

29.     WOW has a team that handles inquiries related to copyright complaints and WOW's DMCA policy.  Ex. 15; Arnold Decl. ¶ 17.

30.     From February 2018 through April 30, 2023, WOW sent at least ▮▮▮ hard-copy letters and placed at least ▮▮▮ telephone calls to subscribers pursuant to its DMCA policy.  *Id.* ¶ 24; Ex. 16 (letter templates).

31.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████.  Arnold Decl. ¶ 16; Ex. 11, at WOW000017–18.

32.     WOW's DMCA policy for residential subscribers has ▮▮▮.  *Id.* at WOW000018–19.

33.     ████████████████████████████████████████
████████████████████████████████████████████
██████████████████.  *Id.* at WOW000018.

34.     ████████████████████████████████████████████.
Arnold Decl. ¶ 23.

35.     ████████████████████████████████████████
████████████████████████████████████████████
███████████████████████.  Ex. 11, at WOW000018.

36.     ████████████████████████████████████████
████████████████████████████████████████████

██████████. Ex. 11, at WOW000019; Ex. 17. ████████████████████████████

█████████████████████████████████████. Ex. 11, at WOW000019.

37. ███████████████████████████████████████████

████████████████████████████████. Ex. 11, at WOW000019, 22.

38. WOW has procedures in place that prevent terminated subscribers from reactivating service. *Id.* at WOW000022.

39. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████. Arnold

Decl. ¶ 27. ██████████████████████████████████████

█████████████████████████████████████████. *Id.*

40. By default, WOW's DMCA policy for residential subscribers applies to business subscribers. *Id.* ¶ 28.

41. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████. *Id.* ███████████████

███████████████████████████████████████████████████████

██████████████████████████. *Id.*

42. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████. *Id.* ¶ 29. ████████

████████████████████████████████████████████. *Id.*

*Plaintiffs' Time-Barred Claims*

43.     In interrogatory answers, Plaintiffs identified by date all acts of copyright infringement for which Plaintiffs contend they may timely assert claims, including infringement prior to July 13, 2018.  Ex. 18, at 7; Ex. 19, at 4–5.

44.     SMV identified alleged instances of copyright infringement of works first asserted in Plaintiffs' SAC prior to May 31, 2020.  Ex. 19, at 5.

45.     Plaintiffs' claims regarding pre-July 13, 2018 infringements are based on file sharing allegedly detected by a company called MaverickEye.  Ex. 18, at 7.

46.     ███████████████████████████████████████████████
████████████████████████████.  Ex. 20; Ex. 21, at 24:7–20, 35:3–36:4; Ex. 22, at 25:5–12, 81:4–84:23; Ex. 23, at 32:7–33:12; Ex. 24, at 29:15–32:2; Ex. 25, at 23:14–25:8; *see also* Ex. 26, at 2; Ex. 27, at 9; Ex. 28; Ex. 29, at ¶ 9; Ex. 30; Ex. 31, at ¶ 9.

47.     The alleged infringement of SMV's works-in-suit was detected by a company called Facterra, except for *A Street Cat Named Bob* (both Facterra and MaverickEye), *The Last Full Measure*, and *Hurricane Heist*.  Ex. 19, at 4–5.

48.     In an interrogatory answer, Plaintiffs identified all the actions they took to exercise reasonable diligence to discover the alleged facts underlying their claims.  Ex. 18, at 8; *see* Ex. 21, at 15:6–18:3, 93:20–95:8; Ex. 32, at 15:15–19, 65:1–66:7; Ex. 23, at 13:3–10, 64:11–65:10; Ex. 24, at 14:9–21, 97:19–99:15; Ex. 25, at 11:20–13:8, 67:20–68:25.

49.     In that interrogatory answer, Plaintiffs did not identify a single action they took to exercise "reasonable diligence" prior to 2020.  Ex. 18, at 8–9.

## SUMMARY JUDGMENT STANDARD

"A district court must grant summary judgment 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Darren Patterson Christian Acad. v. Roy*, _ F. Supp. 3d _, 2025 WL 700268, at *2–3 (D. Colo. 2025) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented." *Id.* "If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper and there is no need for a trial." *Am. Nat'l Prop. & Cas. Co. v. Banks*, 691 F. Supp. 3d 1297, 1302 (D. Colo. 2023).

## ARGUMENT

## I.  THE SECTION 512(a) SAFE HARBOR BARS PLAINTIFFS' CLAIMS FOR MONETARY AND INJUNCTIVE RELIEF FOR COPYRIGHT INFRINGEMENT

"Section 512(a) provides a broad grant of immunity to service providers whose connection with the [infringing] material is transient." *CCBill*, 488 F.3d at 1116. This is because an ISP acting as a mere conduit—unlike a website operator, for example—"has no ability to remove the infringing material from its system or disable access to the infringing material." *Charter*, 393 F.3d at 776.

The Court should grant summary judgment that WOW is protected by the section 512(a) safe harbor because WOW meets all the requirements of the statute, namely:

- WOW is a "service provider" (subsection A);

- WOW's accused conduct is protected (subsection B);

- WOW had a "repeat infringer" policy (subsection C); and

- WOW did not interfere with any "standard technical measures" (subsection D).

### A.    WOW Is a Section 512(a) "Service Provider."

"As used in [section 512(a)], the term 'service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification of the content of the material as sent or received."  17 U.S.C. § 512(k)(1)(A).

WOW satisfies this definition.  SUMF ¶ 2.

### B.    WOW's Accused Conduct Is Within the Scope of Section 512(a).

A section 512(a) "service provider" is not liable for damages or most forms of injunctive relief if the provider satisfies requirements demonstrating that it is a mere conduit.  *See* § 512(a)(1–5).

WOW satisfies each of these requirements with respect to the alleged file sharing at issue. First, when content is shared over file-sharing platforms, the transmission is initiated by the user— i.e., someone other than WOW.  § 512(a)(1); SUMF ¶ 11.   Second, that transmission is carried out through automatic technical processes, without WOW selecting the content to be transmitted. § 512(a)(2); SUMF ¶ 12.   Third, WOW does not select the recipient(s) of the material except as an automatic response to a user's request.  § 512(a)(3); SUMF ¶ 13.  Fourth, WOW does not make copies of the material that are ordinarily accessible to anyone other than the anticipated recipient(s) or otherwise store copies for longer than reasonably necessary to facilitate the transmission. § 512(a)(4); SUMF ¶ 13.   And fifth, WOW does not modify the content being transmitted. § 512(a)(5); SUMF ¶ 13.

### C.    WOW Had a Termination Policy as Required by Section 512(i)(1)(A).

Section 512 requires a service provider to have a policy under which service is terminated to repeat infringers "in appropriate circumstances."   *See* § 512(i)(1)(A).  This requirement has three prongs: (1) adopting a termination policy for repeat copyright infringers, (2) informing users

of the policy, and (3) implementing the policy in a reasonable manner.  *See, e.g.*, *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1100 (W.D. Wash. 2004).

> i.    *WOW adopted a termination policy*

A termination policy "need not be" extremely specific, considering that "[t]he key term, 'repeat infringer,' is not defined and the subsection never elaborates on what circumstances merit terminating a repeat infringer's access."  *Id.* at 1100–01.  "The fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined."  *Id.* at 1101; *see also CCBill*, 488 F.3d at 1109–10 ("The statute permits service providers to implement a variety of procedures" to satisfy § 512(i).).

As a result, a service provider satisfies this requirement "if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications."  *CCBill*, 488 F.3d at 1109 (collecting cases).  The policy does not need to be in writing.  *Ventura Content Ltd. v. Motherless, Inc.*, 885 F.3d 597, 615–16 (9th Cir. 2018).  The policy can be sufficient even if it relies on the "gut decisions" of the employees responsible for carrying it out.  *Id.* at 616 (affirming summary judgment for service provider); *see also Corbis*, 351 F. Supp. 2d at 1101 ("Given the complexities inherent in identifying and defining online copyright infringement, § 512(i) does not require a service provider to decide, *ex ante*, the specific types of conduct that will merit restricting access to its services.").

WOW certainly meets this low bar.  Since 2017, WOW has had a graduated-response policy in place under which it tracks properly-formatted copyright complaints, associates them with subscriber accounts, communicates with subscribers about complaints, and imposes a

meaningful risk of account termination.  SUMF ¶¶ 27–38, 40–41.  Under this policy, WOW has

terminated over ▮ subscriber accounts.  SUMF ¶¶ 16–17.  Nothing more is required.

### ii.    WOW informed users of its policy

To satisfy the second prong, a service provider "need only put users on notice that they

face exclusion from the service if they repeatedly violate copyright laws"; the provider does not

need to communicate its decision-making criteria.  *Corbis*, 351 F. Supp. 2d at 1102; *accord*

*Hempton v. Pond5, Inc.*, No. 3:15-cv-5696, 2016 WL 6217113, at *6–7 (W.D. Wash. Oct. 25,

2016); *Perfect 10, Inc. v. CCBill, LLC*, 340 F. Supp. 2d 1077, 1089 (C.D. Cal. 2004)*, rev'd on*

*other grounds*, 488 F.3d 110 (9th Cir. 2007); *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634,

658–59 (N.D. Ill. 2002).  WOW did this, through its Terms of Service, DMCA Policy and

Procedure, and the messages it sent to subscribers about copyright complaints.  SUMF ¶¶ 18–19,

30–31.

### iii.    WOW reasonably implemented its policy

"Although Section 512(i) does not clarify when it is 'appropriate' for service providers to

act, courts have consistently interpreted this phrase as requiring termination only when a service

provider has sufficient evidence of a user's blatant, repeat infringement of a willful and

commercial nature."  *Ventura Content, Ltd. v. Motherless, Inc.*, No. 2:11-cv-5912, 2013 WL

11237204, at *14 (C.D. Cal. July 3, 2013) (cleaned up), *aff'd*, 885 F.3d 597 (9th Cir. 2018); *accord*

*Corbis*, 351 F. Supp. 2d at 1104; *Capitol Recs., Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 638

(S.D.N.Y. 2011); *Rosen v. PCCW Global, Inc.*, No. 2:10-cv-2248, 2010 WL 11597955, at *4 (C.D.

Cal. Dec. 29, 2010); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1177 (C.D.

Cal. 2002), *abrogated in part on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388

(2006) & *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008); *see also* § 512(m)(1) (safe harbor

protection may not be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity").

Copyright complaints do "not, in themselves, provide evidence of blatant copyright infringement." *Corbis*, 351 F. Supp. 2d at 1105; *see also MP3tunes*, 821 F. Supp. 2d at 639 ("[T]akedown notices themselves are not evidence of blatant infringement . . . ."). Because copyright complaints may be inaccurate and do not account for potential defenses or "any of the myriad other factors that go into evaluating a copyright infringement claim," they "are not the *sine qua non* of copyright liability." *Corbis*, 351 F. Supp. 2d at 1105. The same is true of the mere fact that a third party's software identified certain content as infringing. *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1117–18 (C.D. Cal. 2009) ("Veoh has no way of verifying the accuracy of Audible Magic's database [of allegedly infringing files], and even if it did, it would be unreasonable to place that burden on Veoh.").

In this respect, *Rosen v. PCCW Global, Inc.* demonstrates that WOW went far beyond the requirements of section 512(i). In *Rosen*, the defendant PCCW was a global internet service provider and—unlike WOW—also hosted websites. 2010 WL 11597955, at *1. PCCW had a policy under which it terminated service only to "customers whose content hosted on PCCW's network generated many DMCA Notices"—i.e., customers for whom PCCW could readily verify the accuracy of the complaint. *Id.* at *4. "If PCCW [did] not host the material on its server, as in this case, PCCW relay[ed] the DMCA Notice to the pertinent customer." *Id.* On that evidence, the district court granted summary judgment for PCCW, holding that "no disputable issues of fact [were] raised as to the reasonableness of PCCW's implementation of its DMCA Policy." *Id.*

If PCCW was entitled to safe harbor protection, then WOW certainly is as well. In contrast to PCCW, WOW terminated over ▮ subscriber accounts—including ▮ accounts between July

2018 and April 2023—based **solely** on the receipt of unverifiable copyright complaints. SUMF ¶¶ 16–17. There is no evidence that WOW otherwise obtained any knowledge of subscribers' infringing activity. Because copyright complaints do not confer actual knowledge of infringement for safe harbor purposes, and because WOW's alleged knowledge is based solely on such notices, WOW's enforcement of its policy was more than reasonable.

Furthermore, factors that tend to show reasonable implementation of a policy include maintaining a log of complaints, maintaining records of terminated accounts, and preventing terminated users from reinstating service. *Ventura*, 885 F.3d at 617–18. WOW did all those things and more. WOW tracked complaints, communicated with subscribers extensively about complaints, terminated service to ▓▓▓▓ of accused subscribers, and prevented terminated subscribers from reinstating service. SUMF ¶¶ 15, 20–22, 28–38; *see also Steinmetz v. Shutterstock, Inc.*, 629 F. Supp. 3d 74, 83 (S.D.N.Y. 2022) (provider complied with section 512(i) because it "keeps records to identify repeat infringers and regularly terminates contributors' accounts due to infringing activity, including in this case").

The evidence also demonstrates beyond any doubt that WOW's policy is extremely effective. The dramatic reduction in copyright complaints since WOW implemented its policy speaks for itself:



SUMF ¶ 23. Indeed, over the relevant period, with WOW sending regular messages to subscribers accused of infringement, ██% of accused subscribers received all their complaints on one calendar day and were never accused of infringement again. SUMF ¶¶ 25, 31. ██████████ percent of subscribers received 10 or fewer complaints, and over ██% never even reached ████████████ ██████████. SUMF ¶¶ 24, 34.

Additionally, there is no evidence that any of WOW's accused subscribers actually shared infringing content with third parties, as opposed to having merely downloaded content for their own consumption. This further refutes any suggestion that WOW tolerated "blatant, repeat infringement of a willful and commercial nature." *See MP3tunes*, 821 F. Supp. 2d at 638 ("Blatant infringers typically are those who upload or post unauthorized content, allowing others to experience or copy the work. The record reveals that MP3tunes' users do not upload content to

the internet, but copy songs from third-party sites for their personal entertainment.") (granting summary judgment on safe harbor defense).

And again, while it is indisputable that WOW's policy has been exceptionally effective, section 512(i) requires far less. "Eligibility for the safe harbor is not lost just because some repeat infringers may have slipped through the provider's net for screening them out and terminating their access." *Ventura*, 885 F.3d at 618; *see also CCBill*, 488 F.3d at 1110 (affirming grant of summary judgment for defendant where defendant "mostly" recorded webmasters associated with infringing conduct). The provider does not even need to enforce its policy uniformly. *Ventura*, 885 F.3d at 618. In *Ventura*, the Ninth Circuit affirmed a grant of summary judgment on a safe harbor policy carried out through a single individual's "multifactor judgment based largely on his recollection of DMCA notices," which the court candidly described as having "unsystematic and casual implementation." *See id.* at 618–19. WOW did far more here, having implemented and enforced a systematic, graduated-response policy that has proved highly effective in decreasing the amount of infringement accusations directed at its internet users. *See, e.g.*, SUMF ¶¶ 23, 28–38.

In view of this evidence, there is no genuine issue of material fact as to whether WOW qualifies for section 512(a) safe harbor protection.

**D.    WOW "Accommodate[d] and [Did] Not Interfere with Standard Technical Measures."**

Section 512(i)(1)(B) provides that the safe harbors apply if the provider "accommodates and does not interfere with standard technical measures . . . that are used by copyright owners to identify or protect copyrighted works," and which "(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process; (B) are available to any person on reasonable and nondiscriminatory terms; and

17

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks."

WOW satisfies this requirement. SUMF ¶ 14. WOW is not aware of any "standard technical measure" implicated by Plaintiffs' allegations, *see* Swanson Decl. ¶ 12, and there is no evidence of any such measure WOW failed to accommodate.

### E.    The Safe Harbor Bars Plaintiffs' Requests for Injunctive Relief.

Because the section 512(a) safe harbor applies, only three forms of injunctive relief may be granted against WOW: (1) a prohibition on WOW "providing access to infringing material or activity residing at a particular online site on the provider's system or network," (2) a requirement that WOW terminate the accounts of specific copyright infringers, and (3) other injunctive relief necessary to prevent infringement "of copyrighted material specified in the order of the court at a particular online location." § 512(j)(1)(A). The forms of injunctive relief requested by Plaintiffs do not fall into any of these categories. *See* SAC, at 42 ((A)–(D)). The Court should enter judgment as a matter of law on Plaintiffs' requests for injunctive relief.

### F.    Conclusion Regarding DMCA Safe Harbor.

The evidence establishes that WOW qualifies for the protection of the section 512(a) safe harbor, so there is no genuine issue of material fact for trial. The Court should therefore enter partial summary judgment that Plaintiffs' claims for monetary and injunctive relief for copyright infringement are barred by the DMCA safe harbor.

## II.    PLAINTIFFS' CLAIMS ALLEGING PRE-JULY 13, 2018 INFRINGEMENT ARE TIME-BARRED

Plaintiffs intend to rely on the discovery rule to assert claims for infringement that occurred outside the limitations period—i.e., prior to July 13, 2018, three years before the date of the

original complaint.[5]  SUMF ¶ 43; ECF No. 163, at 4; 17 U.S.C. § 507(b).  Thus, Plaintiffs must prove that each late claim is nonetheless timely in view of the date each relevant Plaintiff knew or had reason to know "of the existence and cause of the injury which is the basis of [the] action," and that the Plaintiff "use[d] reasonable diligence in seeking to discover facts giving rise to a claim for relief."  *See Alexander v. Okla.*, 382 F.3d 1206, 1215–16 (10th Cir. 2004); *see also Herrera v. City of Espanola*, 32 F.4th 980, 992 (10th Cir. 2022).

Summary judgment is appropriate because Plaintiffs have no evidence with which they could meet this burden.  *Banks*, 691 F. Supp. 3d at 1302.  This is particularly true considering that (1) the alleged pre-July 2018 infringement was detected pursuant to agreements regarding the detection of unauthorized file sharing—i.e., Plaintiffs certainly "had reason to know" of it (SUMF ¶ 46); and (2) Plaintiffs admit they did absolutely nothing to exercise "reasonable diligence" to discover their claims before 2020, even though they had agents working on their behalf to uncover the very online file sharing at issue in this case.  SUMF ¶¶ 48–49.

## III.    SMV'S CLAIMS ALLEGING PRE-MAY 31, 2020 INFRINGEMENT OF THE NEW WORKS ARE TIME-BARRED

In the Second Amended Complaint, SMV added claims for infringement of 321 works (the "New Works"), based on new allegations regarding file sharing allegedly detected by a new and different detection company, Facterra.  *See* SAC, ¶ 101; Ex. 1 to SAC, at 4–11 ("Works owned and/or distributed by [SMV]"); Order Granting Leave to Amend at 3, ECF No. 200.

Thus, for SMV to pursue claims for infringement of the New Works prior to May 31, 2020—three years before Plaintiffs moved for leave to file the SAC—SMV must prove that these

---

[5] There is reason to doubt the continued vitality of the discovery rule in copyright cases, but for now it remains the law in the Tenth Circuit.  *See Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 375–76 (2024) (Gorsuch, J., dissenting) (in "traditional equitable practice," the discovery rule applies "only in cases of fraud or concealment," but none of the parties raised that issue below (quotations omitted)).

claims relate back to the filing date of the original complaint under Rule 15(c)(1). *See, e.g.*, *Walker v. JTM Equip., Inc.*, No. 2:15-cv-60, 2018 WL 11414570, at *4 (D. Wyo. Jan. 25, 2018) (plaintiff bears burden to prove relation back). SMV cannot meet this burden, considering that these claims (1) involve copyrighted works not at issue in the original complaint, and (2) are based on facts and evidence—alleged detections by Facterra—likewise not set out in the original complaint. *See* SUMF ¶ 47. As a matter of law, these claims are time-barred because they do not "ar[ise] out of the conduct, transaction, or occurrence set out . . . in the original pleading." *See* Fed. R. Civ. P. 15(c)(1)(B).

## CONCLUSION

For the foregoing reasons, the Court should grant WOW's Motion for Partial Summary Judgment, in whole or in part.

Dated:  March 21, 2025                    Respectfully submitted,


                                          By: */s/ Zachary C. Howenstine*_____
                                          Richard L. Brophy
                                          Zachary C. Howenstine
                                          Angela B. Kennedy
                                          Margaret R. Szewczyk
                                          Melanie E. King
                                          ARMSTRONG TEASDALE LLP
                                          7700 Forsyth Blvd., Suite 1800
                                          St. Louis, Missouri 63105
                                          (314) 621–5070
                                          rbrophy@atllp.com
                                          zhowenstine@atllp.com
                                          akennedy@atllp.com
                                          mszewczyk@atllp.com
                                          meking@atllp.com

                                          *Attorneys for Defendant WideOpenWest
                                          Finance, LLC*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS**

I hereby certify that the foregoing pleading complies with the type-volume limitation set

forth in Judge Domenico's Practice Standard III(A)(1) and the Court's March 12, 2025 Text

Order (ECF No. 276).

By:     */s/ Zachary C. Howenstine*
Zachary C. Howenstine

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2025, a copy of the foregoing was contemporaneously

served on all counsel of record via the CM/ECF system.

By:     */s/ Zachary C. Howenstine*
Zachary C. Howenstine